Exhibit "H"



**BILL OF SALE**

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Happy Hollow Ranch, LP, a Texas limited partnership ("**Seller**"), does hereby grant, bargain, transfer, sell, assign, convey, and deliver to Lowenjager, LLC, a Texas limited liability company ("**Buyer**"), all of its right, title, and interest in and to any cattle, horses, and other livestock (the "**Acquired Assets**") owned by Seller, as specified in that certain Ranch Management and Ownership Agreement, dated of even date herewith (the "**Ranch Management and Ownership Agreement**"), by and among Seller, Buyer, and certain other parties, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Seller makes no representation or warranty with respect to the Acquired Assets being conveyed hereby except as specifically set forth in the Ranch Management and Ownership Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the Acquired Assets sold, conveyed and transferred by this Bill of Sale.

This Bill of Sale may be executed and delivered via facsimile, portable document format (PDF) or electronic mail and, upon such delivery, the facsimile, PDF or electronic transmission shall be deemed to have the same effect as if the original signature had been delivered to Buyer.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered by its duly authorized representative as of January 1, 2020.

**SELLER:**

Happy Hollow Ranch, LP,
a Texas limited partnership

By:    Happy Hollow Management, LLC,
a Texas limited liability company
its General Partner

By: *Nancy T. Howley*
Nancy T. Howley, President
by Scott Howley, as agent *SGH*

**EXHIBIT**

**32**

BH002586

Exhibit "I"



## BILL OF SALE

For $303,500.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Happy Hollow Ranch, LP, a Texas limited partnership ("Seller"), does hereby grant, bargain, transfer, sell, assign, convey, and deliver to Lowenjager, LLC, a Texas limited liability company ("Buyer"), all of its right, title, and interest in and to any cow herds, yearlings, bulls, and other cattle, as identified more particularly on Exhibit A, attached hereto (the "Acquired Assets") owned by Seller, to have and to hold the same unto Buyer, its successors and assigns, forever.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the Acquired Assets sold, conveyed and transferred by this Bill of Sale.

This Bill of Sale may be executed and delivered via facsimile, portable document format (PDF) or electronic mail and, upon such delivery, the facsimile, PDF or electronic transmission shall be deemed to have the same effect as if the original signature had been delivered to Buyer.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be duly executed and delivered by its duly authorized representative as of the 4 day of JUNE , 2020.

**SELLER:**

Happy Hollow Ranch, LP,
a Texas limited partnership

By:    Happy Hollow Management, LLC,
        a Texas limited liability company
        its General Partner



By: _____
        Nancy T. Howley, President
        by Scott Howley, as agent

State: Texas
County: Dallas
Date: 06/04/2020
Notary: _____



KENYOTA S. WILLIAMS
Notary Public, State of Texas
Comm. Expires 11-27-2022
Notary ID 131806713

EXHIBIT

12

HHR 00286    App'x 094

Exhibit "J"



EXHIBIT J

## TRACT 1:

All that certain lot, tract or parcel of land situated in one or more of the following surveys: S.M. HARRISON SURVEY, A-373, A Y. BARBO SURVEY, A-979 and M. GOODWIN SURVEY, A-319, same being all of a called 97.808 acre tract as found in Deed dated March 28, 1961, from OSWALD NORMAN et ux, SARAH LEE et al to C. G. ADAMS as found recorded in Volume 515, Page 527, of the Deed Records of Van Zandt County, Texas, and being all of a called 34.5 acre tract as found in Deed dated September 26, 1962, from OSWALD NORMAN et ux, SARAH LEE, to C. G. ADAMS as found recorded in Vol. 540, Page 261 of said Deed Records, and being all of a called 34.5 acre tract less and except a 1 acre tract as found in Deed dated January 24, 1968, from JAMES J. PARNELL et ux EVA B. To C. G. ADAMS as found recorded in Volume 671, Page 171, of said Deed Records, and being all of a called 2.3 acre tract as found in Deed filed December 3, 1962 from A. T. BURNLEY et al to C. G. ADAMS as found recorded in Vol. 545, Page 5 of said Deed Records, and being all of a called 75.21 acre tract as found in Deed dated May 8, 1961, from WILLIAM H. HATCHER et ux, PAULINE, to C. G. ADAMS as found recorded in Volume 522, Page 98, of said Deed Records, and being more fully described as follows:

BEGINNING at a 60$^{\underline{d}}$ nail set in the center of a community oil road and in the North ROW line of State Hwy. No. 243 from the Southeast corner of said 2.3 acre tract, same being the Southeast corner of this;

THENCE North 83 deg. 29 min. 37 sec. West approaching an occupied fence line at about 50 feet and continuing on along said fence line and the North ROW line of said Hwy No. 243 for a total distance of 3665.71 feet to a ½" iron rod set for a corner of this;

THENCE North 6 deg. 05 min. 44 sec. East 245.24 feet to a 3" concrete monument found for an inter-all corner of this;

THENCE North 88 deg. 55 min. 53 sec. West 252.34 feet to a 3" concrete monument found in the East ROW line of F.M. Road No. 47 for a corner of this;

THENCE North 2 deg. 33 min. 15 sec. East along an occupied fence line and along the East ROW line of said FM Road No. 47, 551.58 feet to a ½" iron rod set for a corner of this and an angle point in same;

THENCE North 7 deg. 44 min. 43 sec. East along said fence line and ROW line 177.73 feet to a concrete ROW monument found for a corner of this and an angle point in the same;

EXHIBIT J                        -1-                HAPPY HOLLOW RANCH, LP

THENCE North 1 deg. 00 min. 58 sec. East along said fence line and ROW line 116.80 feet to a concrete ROW monument found for a corner of this and an angle point in the same;

THENCE North 0 deg. 34 min. 16 sec. East along said fence line and ROW line 388.90 feet to a ½" iron rod set for the P.C. of a curve to the right;

THENCE along the arc of said curve, which has a chord bearing of North 12 deg. 14 min. 54.4 sec. East, a chord distance of 441.12 feet, a central angle of 23 deg. 21 min. 17 sec., a radius length of 1089.719 feet, and an arc length of 444.19 feet to a 60$^{\underline{d}}$ nail set in the ROW line of said FM Road No. 47 and in the center of a community oil road for the P.T. of said curve;

THENCE North 74 deg. 55 min. 58 sec. East along the center of said oil road 1235.02 feet to a 6$^{\underline{d}}$ nail set at the P.I. of two (2) community oil roads for corner of this;

THENCE North 5 deg. 43 min. East along the center of a community oil road 992.47 feet to a ½" iron rod set in the East ROW line of said FM Road No. 47 for the P.C. of a curve to the left;

THENCE along the arc of said curve which has a chord bearing of North 18 deg. 30 min. 42.4 sec. East, a chord distance of 161.63 feet, a central angle of 7 deg. 45 min. 27 sec., a radius length of 1194.71 feet, and an arc length of 161.76 feet to a ½" iron rod set in the East ROW line of said FM Road No. 47 for a corner of this;

THENCE South 87 deg. 40 min. 46 sec. East along an occupied fence line 173.62 feet to a ½" iron rod set for a corner of this;

THENCE North 5 deg. 09 min. 34 sec. East along an occupied fence line 206.98 feet to a ½" iron rod set for a corner of this;

THENCE South 87 deg. 41 min. 33 sec. East along an occupied fence line 664.24 feet to a ½" iron rod set for a corner of this, and an angle point in the same;

THENCE South 85 deg. 38 min. 50 sec. East along said fence line 696.34 feet to a ½" iron rod set for a corner of this;

THENCE South 1 deg. 35 min. 51 sec. West along an occupied fence line passing a ½" iron rod set in the Northwest ROW line of a community oil road at 672.99 feet, and continuing of for a total distance of 710.99 feet to a 60$^{\underline{d}}$ set in the center of a community oil road, for an inter-ell corner of this;

THENCE North 69 deg. 06 sec. East along the center of said oil road 479.80 feet to a 60$^{\underline{d}}$ nail set at the P.I. of two (2) community oil roads for a corner of this;

THENCE in a Southerly direction along the center of a community oil road as follows:

EXHIBIT J                          -2-                    HAPPY HOLLOW RANCH, LP

South 2 deg. 55 min. West 674.19 feet to a 60$\underline{d}$ nail;
South 16 deg. 33 min. East 459.67 feet to a 60$\underline{d}$ nail;
South 3 deg. 17 min. East 1076.53 feet to a 60$\underline{d}$ nail;
South 11 deg. 31 min. 13 sec. East 1205.21 feet to the place of beginning and containing 247.88 acres of land.

## TRACT 2:

All that certain lot, tract or parcel of land situated in Van Zandt County, Texas, part of the Samuel Harrison Survey, Abstract No. 373, being a part of the same land described in Deed of Trust from Oswald Norman to A. H. Boyd, Trustee, dated December 17, 1963, recorded under Clerk's File No. 160, filed January 10, 1964, recorded in Volume 97, page 314, Deed of Trust Records of said county; and being more particularly located as the tract of land lying Southeast of and adjacent to State Farm Road No. 47 South;

BEGINNING at a point in the North edge of a hard-surfaced Farm Road the old Canton to Kaufman Road, on the South line of said tract, said point being South 1758.33 feet and North 73 1/4 East 165.5 feet from the Northwest corner of said Harrison Survey;

THENCE North 30 1/3 East, at 58 feet a cross-tie corner post set in the Southeast right of way line of State Farm Road No. 47 South, and at 226 feet a cross-tie post for corner in said Southeast right of way line;

THENCE with the Southeast right of way line of said Farm Road and with fence to points of turns, as follows: North 36 East 98 feet; North 43 East 128.5 feet; North 48½ East 88 feet; North 53 3/4 East 643.5 feet; North 50¼ East 115 feet; North 44¼ East 148.5 feet; North 38½ East 94 feet; North 33 3/4 East 83 feet; and North 30¼ East 97.5 feet to cross-tie corner post for corner;

THENCE North 23 3/4 East 149 feet to stake set for corner in abandoned roadway at the intersection of the Southeast right of way line of said Farm Road with the extension of the centerline of a hard surfaced Farm Road;

THENCE South 3 3/4 West with center of said hard-surfaced Farm Road 995 feet to corner at the intersection of said road with the center of said old Canton to Kaufman Road being the Southeast corner of original tract;

THENCE South 73¼ West with said old Canton to Kaufman Road 1239 feet to the place of beginning, containing 12.6 acres of land.

LESS AND EXCEPT: All that certain tract or parcel of land situated in the County of Van Zandt, State of Texas, part of the Samuel Harrison Survey, Abstract No. 373, being part of the same land described in deed of trust from Oswald Norman to A. H. Boyd, Trustee, dated December 17, 1963, recorded under Clerk's File No. 160, filed January 10, 1964, recorded in Volume 97, page 314, Deed of Trust Records of said County; being more particularly located as a two acre tract of land cut out

EXHIBIT J                              -3-                    HAPPY HOLLOW RANCH, LP

CERTIFIED COPY

of the Southwest corner of a certain 12.6 acre tract of land lying Southeast of the adjacent to State Farm Road No. 47 South in said survey;

BEGINNING at a point in the North edge of a hard-surfaced Farm Road (the old Canton-Kaufman Road), said point being the intersection of the South line of the said 12.6 acre tract with the Southeast right of way line of said Farm Road No. 47; also, being a point South 1758.33 feet and North 73¼ East 165.5 feet from the Northwest corner of said Harrison Survey;

THENCE North 30½ East with said right of way line, at 58 feet a stake set on fence-line, and at 226 feet corner at slight turn in same;

THENCE North 36 East, following said right of way line, 98 feet to cross-tie fence corner at slight turn in same;

THENCE North 43 East, following said right of way line, 128.5 feet to cross-tie fence corner at slight turn in same;

THENCE North 48½ East, following said right of way line, 88 feet to cross-tie fence corner at slight turn in same;

THENCE North 53 3/4 East, following said right of way line, 32 feet to a 3/8 inch steel rod set for corner in same;

THENCE South 16¼ East, at 283 feet a 3/8 inch steel rod set in fence line, and at 325 feet corner in North edge of said Farm Road on the South line of said tract;

THENCE South 73¼ West 463 feet to the place of beginning, containing two (2) acres of land.

And being the same land described in Partial Release from Oswald Norman and wife, Sarah Lee Norman, to Gary L. Muzingo and wife, Mary L. Muzingo, dated December 31, 1974, recorded in Volume 827, page 500, Deed Records of Van Zandt County, Texas.

There is reserved and excepted from this conveyance by the grantors herein, their heirs and assigns forever, an undivided one-half (1/2) of all the oil, gas and other minerals in and under the above described land, it being specifically agreed and understood that this reservation includes such part of the oil, gas and other mineral estate heretofore severed from said land, and the general warranty hereinafter made shall cover and include an undivided one-half (1/2) of all the oil, gas and other minerals in and under the above described land.

TRACT 3:

All that certain lot, tract or parcel of land situated in the County of Van Zandt, State of Texas, part of the Samuel Harrison Survey, Abstract No. 373, being part of the same land described in Deed of Trust from Oswald Norman to A.H. Boyd, Trustee, dated December 17, 1963, recorded under

EXHIBIT J                                        -4-                        HAPPY HOLLOW RANCH, LP



Clerk's File No. 160, filed January 10, 1964, recorded in Volume 97, page 314 of the Deed of Trust Records of Van Zandt County, Texas; being more particularly located as a two acre tract of land cut out of the Southwest corner of a certain 12.6 acre tract of land lying Southeast of and adjacent to State Farm Road No. 47, South in said survey;

BEGINNING at a point in the North edge of a hard-surfaced Farm Road (the old Canton-Kaufman road), said point being the intersection of the South line of the said 12.6 acre tract with the Southeast right of way line of said Farm Road No. 47; also being a point South 1758.33 feet and North 73 1/4 East 165.5 feet from the Northwest of the said Harrison survey;

THENCE North 30 1/2 East with said Right of way line at 58 feet a stake set on fence line, and at 226 feet corner at slight turn in same;

THENCE North 36 East following said right of way line 98 feet to cross-tie fence corner at slight turn in same;

THENCE North 43 East following said right of way line 128.5 feet to cross-tie fence corner at slight turn in same;

THENCE North 48 1/2 East, following said right of way line 88 feet to cross-tie fence, corner at slight turn in same;

THENCE North 53 3/4 East following said right of way line 32 feet to a 3/8 inch steel rod set for corner in same;

THENCE South 15 1/4 East, at 283 feet a 3/8 inch steel rod set in fence line, and at 325 feet corner in North edge of said Farm Road on the South line of said tract;

THENCE South 73 1/4 West, 463 feet to the place of beginning, containing two (2) acres of land.

TRACT 4:

All that certain lot, tract, or parcel of land situated in the N. KILLOUGH SURVEY A-451, same being part of a called 100 acre tract of land as found conveyed in Deed dated Jan. 5, 1900 from J.T. Morris et al to Lawrence Gray as found recorded in Vol. 82, Page 123, of the Deed Records of Van Zandt County, Texas, and being more fully described as follows:

BEGINNING at a 15" post oak tree found for the Northeast corner of said Killough Survey, same being the Northeast corner of said 100 acre tract of land, and the Northeast corner of this;

THENCE: South 4 deg 59 min 51 sec West 1638.20 feet along the East Survey line of said Killough Survey, being the East occupied fence line of said 100 acre tract of land to a ½" I.R. set for the Southeast corner of said 100 acre tract of land, and the Southeast corner of this;

EXHIBIT J                    -5-                    HAPPY HOLLOW RANCH, LP

THENCE: West 2318.54 feet along the South occupied fence line of said 100 acre tract of land to a 40d nail found in the center of F.M. road 47 for the Southwest corner of this, from which a ½" I.R. was set East 42.90 feet;

THENCE: North 3 deg 42 min 42 sec East 1371.12 feet along the center of said F.M. road 47 to a 60d nail set for an angle point of this;

THENCE: North 7 deg 36 min 24 sec East 251.54 feet along the center of said F.M. road 47 to a 60d nail set in the North Survey line of said Killough Survey, and in the North line of said 100 acre tract of land for the Northwest corner of this, from which a ½" I.R. was set North 89 deg 38 min 50 sec East 42.30 feet;

THENCE: North 89 deg 38 min 50 sec East 2339.24 feet along the North Survey line of said Killough Survey, and along the North occupied fence line of said 100 acre tract of land to the place of beginning, containing 87.11 acres of land, with 1.49 of an acre lying within the R.O.W. of said F.M. road 47.

TRACT 5:

All those certain lots, tracts or parcels land lying and being situated in the N. KILLOUGH SURVEY, described in two tracts as follows:

First Parcel: Being 49 acres of land out of the N. KILLOUGH SURVEY Patent No. 563, Volume 1, A-451:

BEGINNING at a stake the Southeast corner of the N one-half (N½) of said Killough Survey a PO 14" in dia brs S 3 W 10 vrs;

THENCE N 356.1 vrs to post the SE corner of a 200 acre block set apart as Tibiatha Haley's homestead an ash 12" in dai brs S 84 W 18 vrs PO 13 in in dia brs S 6 E 10 vrs;

THENCE West 845 vrs to the East side of Wills Point and Goshen public road;

THENCE S with said road 318.3 vrs to the Northwest corner of a one acre tract heretofore sold to J. M. Robets by A. M. Roberts et ux;

THENCE East 150 vrs to the Northeast corner of said 1 acre tract;

THENCE South 38 vrs to the Southeast corner of said 1 acre tract;

THENCE East 695 vrs to the place of beginning.

EXHIBIT J                          -6-                    HAPPY HOLLOW RANCH, LP

<u>Second Parcel</u>: Being a part of the N. KILLOUGH SURVEY:

BEGINNING 707 vrs West of the Southeast corner of 80 acres of said survey conveyed by W. H. Gray et ux to A. M. Roberts on January 20, 1920, and in the South line of said 80 acre tract the Southeast corner of said 80 acres being 950.3 vrs South of the Northeast corner of said Killough Survey;

THENCE W 140 yards with said South line to Wills Point and Goshen Public Road;

THENCE N 35 yards to corner;

THENCE E 140 yards to corner;

THENCE S 35 yards to the place of beginning, containing one (1) acres of land, more or less.

<u>TRACT 6</u>:

All that certain lot, tract or parcel of land situated in Van Zandt County, Texas, being a part of the SAMUEL HARRISON SURVEY, Abst. No. 373 and more fully described as follows, to-wit: Being a part of certain lands out of said Harrison survey conveyed by Weldon Norman to Oswald Norman by deed of December 16, 1963 and now of record in Vol. 574 page 52 Deed Records, Van Zandt County, Texas,

BEGINNING at an iron bar set for corner at the occupied Northwest corner of said Harrison survey;

THENCE South first following old fence row along occupied West line of said Harrison survey intersecting fence and following same and said survey line to a total distance of 1701 feet to fence corner in North line of a community road;

THENCE East with fence along said NOrth line of community road 55 feet to fence corner in Northwest right of way line of State Farm Road No. 47 as same is marked and occupied as of this date;

THENCE North 29 deg. East with said right of way line 227.5 feet to corner insame;

THENCE North 37 deg. East with said right of way line 136 feet to corner in same;

THENCE North 42 deg. 30 min East with said right of way line 230 feet to corner in same;

THENCE North 55 deg. East with said right of way line 490 feet to iron bar set for corner in center of a new channel of creek;

THENCE North 38 deg. 15 min West 1200.5 feet to iron bar set for corner in occupied North line of said Harrison survey;

EXHIBIT J                                    -7-                    HAPPY HOLLOW RANCH, LP



THENCE West with said occupied North line of Harrison survey 60 feet to the place of beginning, containing 15.502 acres of land more or less.

Being the same land described in deed from Alpha Johnson to Chuck Howley dated Feb. 26, 1982 recorded under Clerk's File No. 1622 Deed Records, Van zandt county, Texas.

TRACT 7:

All that certain lot, tract or parcel of land, lying and being situated in the County of Van Zandt, State of Texas, a part of the SAMUEL HARRISON SURVEY, Abstract No. 373, and more fully described as follows, to-wit:

BEING a part of the certain lands out of said Harrison Survey conveyed by Weldon Norman to Oswald Norman, by deed of December 16, 1963, and now of record in Vol. 574, at page 52, Deed Records of Van Zandt County, Texas,

BEGINNING at an iron bar set for corner in the occupied North line of said Harrison survey and 60 feet East from the occupied Northwest corner of said survey;

THENCE South 38 deg 15 min East 1200.5 feet to iron bar set for corner in center of new channel of creek and at point of its intersection with the Northwest right of way line of State Farm Road No. 47, as same is marked and occupied as of this date;

THENCE North 55 deg East with right of way line 289 feet to corner in same;

THENCE North 42 deg East with said right of way line, 220 feet to corner in same;

THENCE North 34 deg East with said right of way line 122 feet to corner in same;

THENCE North 12 deg East with said right of way line 300 feet to corner in same;

THENCE North 8 deg 30 min East with said right of way line 219 feet to fence corner in same and at point of its intersection with said occupied North line of Harrison Survey;

THENCE West, with fence along said occupied Survey line, 1289 feet to the place of beginning, containing 16.562 acres of land, more or less. And being the same land described in deed dated December 3, 1969, from David Chambliss, and wife, Calvery Chambliss, to Tom K. Randall and wife, Bertha Randall, recorded among the Deed Records of Van Zandt County, Texas.

TRACT 8:

All that certain lot, tract or parcel of land situated in Van Zandt County, Texas, a part of the K.K. Brewer Survey, A-119, containing 110 acres, more or less, and being more particularly described by metes and bounds as follows, to-wit:

EXHIBIT J

-8-                    HAPPY HOLLOW RANCH, LP



BEGINNING at the Southwest corner of said survey;

THENCE East 48 vrs. to corner;

THENCE North 342 vrs. to corner;

THENCE West 49 vrs. to corner;

THENCE North 419 vrs. to corner;

THENCE West 699 vrs. to corner;

THENCE South 741 vrs. to the Place of Beginning, and being the same property conveyed by Dan J. Tanner et ux, to E.R. Hollon and Murry Patterson, dated April 25, 1960, recorded in vol. 505, Page 531, Deed Records of Van Zandt County, Texas.

TRACT 9:

BEING a 479.8 acre tract of land situated in the W.C. BUTLER SURVEY A-41, and in the W. DRODDY SURVEY A-200, and in the T. HOOPER SURVEY A-372, and in the S.M. HARRISON SURVEY A-373, and in the J. H. IRBY SURVEY A-419, and in the C.W. SWANK SURVEY A-835, of Van Zandt County, Texas and being the same land as described in separate instruments to KENNETH Z. BOND as recorded in Volume 609 page 130, and in volume 767 page 678, and in volume 776 page 434, and in volume 609 page 127, and in volume 626 page 332 of the Van Zandt County Deed Records, said 479.8 acre tract being further described as follows:

BEGINNING at a 5/8" iron rod found at the Southwest corner of the J.H. Irby Survey A-419, same being the Northwest corner of the C.W.Swank Survey A-835;

THENCE S 88° 56' 06" E along the fenced South line of the Irby Survey 1263.66 feet to a 5/8" iron rod found at a fence corner;

THENCE N 08° 40' 05" E along a fence 1477.24 feet to a 5/8" iron rod found at a fence corner;

THENCE S 89° 53' 18" E along a fence 1568.19 feet to a ½" iron rod found at a fence corner;

THENCE N 00° 44' 10" E along fence 1445.75 feet to a ½" iron rod found at a fence corner;

THENCE S 89° 38' 57" E along a fence passing the East line of the Irby Survey and entering the W. Droddy Survey continuing 1744.39 feet to a ½" iron rod set for a corner, from which a double 40" post oak bears N 77½° W 15.8 feet and from which a double 30" elm bears S 59½° E 36.9 feet;

THENCE S 05° 25' 51" W along a fence 4979.17 feet to a nail set in a public road, from which ½" iron rod found at a fence corner bears N 05° 25 51" E 36.2 feet;

EXHIBIT J                          -9-                          HAPPY HOLLOW RANCH, LP

THENCE Southwesterly along a public roadway the following courses:

S 83° 14' 45" W 225.56 feet;

S 77° 38' 37" W 1210.00 feet;

S 77° 08' 37" W 723.11 feet;

S 77° 14' 00" W 765.58 feet;

S 77° 10' 29" W 660.50 feet;

S 76° 57' 49" W 900.46 feet to a nail set for the Southeast corner of a called 1 acre tract described in deed to Sharon M. Morris as recorded in Volume 936 Page 319 of the Van Zandt County, Deed Records;

THENCE N 04° 53' 50" E 185.11 feet to a fence corner found at the Northeast corner of said 1 acre tract;

THENCE S 77° 18' 56" W 247.97 feet to a fence corner found at the Northwest corner of said 1 acre tract;

THENCE S 07° 12' 42" W 187.97 feet to a nail set in a public road at the Southwest corner of said 1 acre tract;

THENCE S 76° 51' 45" W along said public road 597.76 feet to a nail set for a corner;

THENCE N 01° 04' 15" W 84.45 feet to a fence corner found at the Northeast corner of a called 0.145 acre tract described in deed to MacBee Water Supply Co., as recorded in Volume 637 Page 194 of the Van Zandt County, Deed Records;

THENCE S 89° 08' 27" W 125.87 feet to a nail set in a public road;

THENCE N 00° 41' 35" W along said road 1755.31 feet to a bend;

THENCE N 00° 00' 02" W along said road 837.44 feet to a nail set for a corner;

THENCE N 89° 52' 12" E along a fence 1006.00 feet to a fence corner found on the East line of the W.C. Butler Survey;

THENCE N 00° 44' 58" E along the fenced East line of the Butler Survey 568.27 feet to the point of beginning and containing 479.8 acres of land, more or less, of which about 5.5 acres lies in public roadways.

TRACT 10:

All that certain lot, tract, or parcel of land situated in the W. F. C. BUTLER SURVEY A-41, J. H. IRVY SURVEY A-419, and the WM. DRODDY SURVEY A-200 and being all of a called 47.00 acre tract of land known as "TRACT #1", all of a called 96.77 acre tract of land known as "Tract #2", all of a called 8.30 acre tract of land known as "TRACT #3", all of a called 180.00 acre tract of land

EXHIBIT J                          -10-                          HAPPY HOLLOW RANCH, LP

known as "TRACT #4", all of a called 90.00 acre tract of land known as "TRACT #5", and all of a called 32.80 acre tract of land known as "TRACT #6", in Warranty Deed dated March 31, 1980 from Marsco Corporation to Ralph E. Martin and wife Cynthia Gwyn Martin as found recorded in Vol. 1799, Page 542, of the Deed Records of Smith County, Texas, same being all the land conveyed from W. R. Dobbs et ux, Dorothy Grace to Marso Engineering Corp. as found in Warranty Deed dated July 17, 1978 and found recorded in Vol. 896, Page 591, of the Deed Records of Van Zandt County, Texas, and being more fully described as follows:

BEGINNING at a point for the occupied Northwest corner of said IRBY SURVEY, the occupied Northwest corner of said 180.00 acre tract of land, and being the most Northerly Northwest corner of this, a forked Post Oak tree bears South 04 deg 59 min 21 sec East 4.00 feet;

THENCE:  North 87 deg 20 min 52 sec East 1783.52 feet with the occupied North line of said IRBY SURVEY to a 1/2" I.R. set for an angle in same;

THENCE: South 85 deg 40 min 09 sec East 1959.81 feet with the occupied North line of said IRBY SURVEY to a 1/2" I.R. set for the occupied Northeast corner of said 180.00 acre tract of land, and being the most Northerly Northeast corner of this;

THENCE: South 06 deg 56 min 59 sec West 1955.62 feet with the occupied East line of said 180.00 acre tract of land to a point on the South bank of Caney Creek for a corner of this, a 1/2" I.R. bears North 06 deg 56 min 59 sec East 245.00 feet;

THENCE: Along the South bank of Caney Creek as follows:

> North 79 deg 17 min 26 sec East 158.57 feet;
> North 15 deg 08 min 31 sec East  81.59 feet;
> North 48 deg 37 min 23 sec East  60.21 feet;
> South 27 deg 36 min 15 sec East  93.01 feet;
> North 85 deg 08 min 44 sec East 192.48 feet;
> North 36 deg 58 min 38 sec East  96.72 feet;
> South 45 deg 36 min 22 sec East 123.38 feet;
> North 82 deg 25 min 22 sec East  54.38 feet;
> South 07 deg 17 min 48 sec East 122.04 feet;
> South 59 deg 15 min 04 sec East 133.47 feet;
> South 52 deg 14 min 27 sec East 131.60 feet;
> South 05 deg 41 min 50 sec East  43.82 feet;
> South 80 deg 11 min 28 sec East  80.68 feet;
> South 66 deg 55 min 36 sec East 132.84 feet;
> South 81 deg 53 min 32 sec East  99.50 feet;
> North 84 deg 58 min 00 sec East 131.46 feet;
> South 50 deg 06 min 15 sec East  63.26 feet;
> South 06 deg 18 min 56 sec East  80.85 feet;
> South 79 deg 00 min 12 sec East  63.01 feet;

EXHIBIT J

-11-

HAPPY HOLLOW RANCH, LP

North 00 deg 29 min 30 sec East   52.34 feet;
South 41 deg 57 min 08 sec East   69.54 feet;
South 17 deg 52 min 13 sec East   75.87 feet;
South 65 deg 22 min 02 sec East 110.16 feet;
North 45 deg 17 min 45 sec East 158.21 feet;
South 73 deg 44 min 49 sec East 214.20 feet;
North 48 deg 03 min 06 sec East 107.21 feet;
South 31 deg 45 min 35 sec East 172.82 feet;
North 77 deg 26 min 02 sec East   33.99 feet;
North 08 deg 30 min 32 sec East 156.67 feet;
North 31 deg 33 min 32 sec East 120.00 feet;
South 20 deg 30 min 54 sec East   48.38 feet;
South 00 deg 56 min 08 sec East 215.93 feet, and South 28 deg 27 min 10 sec East
98.17 feet to a 1/2" I.R. set for the Northeast corner of said 90.00 acre tract of land, and being the
most Easterly Northeast corner of this;

THENCE: South 04 deg 59 min 26 sec West 4191.98 feet to a 1/2" I.R. set for the Southeast corner
of said 90.00 acre tract of land, and being a Southeast corner of this;

THENCE: South 89 deg 23 min 23 sec West 195.08 feet to a 1/2" I.R. set for the Northeast corner
of said 8.30 acre tract of land and being an inner-ell corner of this;

THENCE: South 00 deg 18 min 26 sec West 604.44 feet to a point in the Old Kaufman to Canton
road for the Southeast corner of said 8.30 acre tract of land, and being the most Southerly Southeast
corner of this, a 1/2" I.R. bears North 00 deg 18 min 26 sec East 26.80 feet;

THENCE: South 81 deg 06 min 37 sec West 604.02 feet with road to a 40d nail for the Southwest
corner of said 8.30 acre tract of land, and being a Southwest corner of this, a 1/2" I.R. bears North
05 deg 27 min 49 sec East 36.20 feet'

THENCE: North 05 deg 27 min 49 sec East 4979.13 feet to a 1/2" I.R. set for an inner-ell corner of
said 90.00 acre tract of land, and being an inner-ell corner of this;

THENCE: North 89 deg 38 min 57 sec West 1744.39 feet to a 1/2" I.R. set for a Southwest corner
of said 90.00 acre tract of land, and being an inner-ell corner of this;

THENCE: South 00 deg 44 min 10 sec West 1446.52 feet to a 1/2" I.R. set for the Southeast corner
of said 96.77 acre tract of land, and being Southeast corner of this;

THENCE:  North 89 deg 54 min 26 sec West 1567.61 feet to a 1/2" I.R. found for an angle of this;

THENCE:  North 89 deg 30 min 21 sec West 811.70 feet to a point in a branch for the Southwest
corner of said 96.77 acre tract of land, and being a Southwest corner of this, a 5/8" I.R. bears South
89 deg 30 min 21 sec East 10.00 feet;

EXHIBIT J                              -12-                   HAPPY HOLLOW RANCH, LP

CERTIFIED COPY

THENCE: North 40 deg 27 min 32 sec East 310.22 feet with said branch for a turn in same;

THENCE: North 04 deg 41 min 34 sec East 370.07 feet with said branch to a point for the Southeast corner of said 47.00 acre tract of land, and being an inner-ell corner of this, a 1/2" I.R. bears North 86 deg 41 min 09 sec West 7.00 feet;

THENCE: North 86 deg 41 min 09 sec West 1235.10 feet to a 1/2" I.R. found for the Southwest corner of said 47.00 acre tract of land, and being a Southwest corner of this;

THENCE: North 00 deg 18 min 43 sec East 1203.84 feet to a 1/2" I.R. found for the Southeast corner of said 32.80 acre tract of land, and being an inner-ell corner of this;

THENCE: South 88 deg 47 min 04 sec West 638.66 feet to a 1/2" I.R. found for the Southwest corner of said 32.80 acre tract of land and being the most Westerly Southwest corner of this;

THENCE: North 01 deg 03 min 03 sec East 1594.52 feet to a 1/2" I.R. set for the Northwest corner of said 32.80 acre tract of land, and being a Northwest corner of this;

THENCE: South 85 deg 14 min 58 sec East 1096.39 feet to a 1/2" I.R. found for the Northeast corner of said 32.80 acre tract of land, and being an inner-ell corner of this;

THENCE: North 04 deg 59 min 21 sec West 788.79 feet to the place of beginning, containing 456.93 acres of land.

_____

END OF EXHIBIT J

EXHIBIT J                              -13-                    HAPPY HOLLOW RANCH, LP

CERTIFIED COPY

Exhibit "K"



## BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT is made and entered into effective as of ____MAR 1 2 2019____, 2019, between CHARLES L. HOWLEY, acting through Nancy T. Howley pursuant to a power of attorney dated August 11, 2015 and NANCY T. HOOWLEY (collectively, the "Transferor") and the BRANDON S. HOWLEY TRUST, Brandon S. Howley, Trustee ("Transferee").

### RECITALS

A.    Transferor owns a 100% membership interest in HAPPY HOLLOW MANAGEMENT, LLC, a Texas limited liability company (the "Company").

B.    As a gift, Transferor desires to transfer to Transferee a 0.2% membership interest in the Company (the "Interest").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the receipt and adequacy of which are hereby acknowledged, it is agreed as follows:

1.    Transferor hereby assigns, transfers, and conveys to Transferee all right, title, and interest in and to the Interest.

2.    Transferee hereby assumes Transferor's rights, liabilities and obligations, if any, as a member with respect to the Interest being transferred.

3.    Transferee hereby assumes Transferor's liability and obligations with respect to the Interest being transferred.

4.    The Transferee by execution of this assignment agrees to be bound by the terms of the Company Agreement evidencing the Interest.

5.    This agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

DATED effective ____MAR 1 2 2019____, 2019.

TRANSFEROR:                                    TRANSFEREE:

*Charles L. Howley by Nancy Howley*           BRANDON S. HOWLEY TRUST
CHARLES L. HOWLEY, acting through
NANCY T. HOWLEY pursuant to a statutory
durable power of attorney dated August 11,    By: _____
2015                                          Brandon S. Howley, Trustee

*Nancy Howley*
NANCY T. HOWLEY

BILL OF SALE AND ASSIGNMENT          -1-          BRANDON S. HOWLEY TRUST





BH002349
CERTIFIED COPY

App'x 110

## ACKNOWLEDGMENT OF ASSIGNMENT OF
## MEMBERSHIP INTEREST IN LIMITED LIABILITY COMPANY

The undersigned President of HAPPY HOLLOW MANAGEMENT, LLC, a Texas limited liability company (the "Company"), hereby acknowledges receipt of the Bill of Sale and Assignment transferring a 0.2% membership interest to the BRANDON S. HOWLEY TRUST and admits the BRANDON S. HOWLEY TRUST as a Substituted Member.

DATED effective _____MAR 1 2 2019_____, 2019.

HAPPY HOLLOW MANAGEMENT, LLC

By: _Nancy Howley_,
Nancy T. Howley, President

347831.1

BILL OF SALE AND ASSIGNMENT        -2-        BRANDON S. HOWLEY TRUST



BH002350
CERTIFIED COPY

# Exhibit "L"



I, Charles "Chuck" Howley, consent to the use and registration of my name, Chuck Howley, as a trademark with the USPTO.

_____
Charles "Chuck" Howley



## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Cindy Lamb on behalf of Dorothea Vidal
Bar No. 20578100
clamb@gpd.com
Envelope ID: 72495261
Status as of 2/27/2023 9:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Janet Bryan | | jbryan@gpd.com | 2/6/2023 8:18:01 PM | SENT |
| Peter King | | pking@gpd.com | 2/6/2023 8:18:01 PM | SENT |
| Jason McCoy | | jason@mccoylawpllc.com | 2/6/2023 8:18:01 PM | SENT |
| D Jason JasonMcCoy | | jason@mccoylawpllc.com | 2/6/2023 8:18:01 PM | SENT |
| Kimberley Griffin | | kim@elliottlawfirmpc.com | 2/6/2023 8:18:01 PM | SENT |
| Joel CElliott | | info@elliottlawfirmpc.com | 2/6/2023 8:18:01 PM | SENT |
| Joel Elliott | | info@elliottlawfirmpc.com | 2/6/2023 8:18:01 PM | SENT |
| Justin Beckham | | justin@wynneandwynne.com | 2/6/2023 8:18:01 PM | SENT |
| Justin Beckham | | justin@wynneandwynne.com | 2/6/2023 8:18:01 PM | SENT |
| Craig Brinker | | craig.brinker@wilsonelser.com | 2/6/2023 8:18:01 PM | SENT |
| Shelly Wells | | shelly.wells@wilsonelser.com | 2/6/2023 8:18:01 PM | SENT |
| Sam Myers | | sam.myers@wilsonelser.com | 2/6/2023 8:18:01 PM | SENT |
| Ana Moran | | ana.moran@wilsonelser.com | 2/6/2023 8:18:01 PM | SENT |
| Dorothea Vidal | | dvidal@gpd.com | 2/6/2023 8:18:01 PM | SENT |
| Charlotte Colclough | | ccolclough@gpd.com | 2/6/2023 8:18:01 PM | SENT |



I certify this to be a true and
exact copy of the original on file
in the District Clerk's Office
Van Zandt County, Texas
By _____
DEPUTY CLERK

App'x 114

FILED 3-31-2023 7:51 A.M.
Karen L. Wilson
District Clerk
Van Zandt County, Texas

Stormy Canady

Cause No. 22-00060

| | | |
|---|---|---|
| HAPPY HOLLOW RANCH, LP, a Texas Limited Partnership; ROBIN HOWLEY FABIK as a Trustee of the HOWLEY FAMILY TRUST, and ROBIN HOWLEY FABIK as next friend for CHARLES L. and NANCY HOWLEY, | § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | |
| v. | § § | |
| BRANDON HOWLEY, and LÖWENJÄGER, LLC, BRANDON HOWLEY as trustee of the BRANDON HOWLEY TRUST, HAPPY HOLLOW MANAGEMENT, LLC, a Texas limited liability company in Derivative Capacity for HAPPY HOLLOW RANCH, LP, | § § § § § § § § § | VAN ZANDT COUNTY, TEXAS |
| *Defendants/Third-Party Plaintiffs,* | § § § | |
| v. | § § | |
| ROBIN HOWLEY FABIK, as trustee of the CLH LOYAL TRUST, ROBIN HOWLEY FABIK, as trustee of the NTH SECURE TRUST, | § § § § § | |
| *Third-Party Defendants.* | § | 294th   JUDICIAL DISTRICT |

## FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Having considered the pleadings, the admissible evidence, and the applicable authorities, at

the request of Defendants, the Court makes the following findings of fact and conclusions of law:

FINDINGS OF FACT AND CONCLUSIONS OF LAW

I certify this to be a true and
exact copy of the original on file
in the District Clerk's Office
Van Zandt County, Texas
By_____
DEPUTY CLERK

# I.
## FINDINGS OF FACT

**A.      The Parties**

1.      This case was initiated by plaintiff, Happy Hollow Ranch, LP ("HH"), a Texas

Limited Partnership with its principal place of business in Dallas, Texas, and by plaintiffs, Chuck

and  Nancy  Howley  ("Chuck"  and  "Nancy").  Chuck and Nancy are married.  Both Chuck and

Nancy are citizens of Texas.  They reside in both Dallas and Van Zandt counties.  Chuck and Nancy

are elderly (eighty-five years old).  They suffer from significant cognitive impairment.  Chuck and

Nancy are both cognitively impaired to the point that they were incapable of participating in trial.

They appeared through their next friend, their only daughter, Robin Howley Fabik ("Robin"), and

through the Court-appointed *ad litem,* Joel Elliott.

2.      The Howley Family Trust is a revocable living trust created under the laws of the

State of Texas.  It appeared through Robin, one of its co-trustees.

3.      Defendant Brandon  Howley  ("Brandon")  is  a  citizen  of Texas who resides in

Rockwall County, Texas.  Brandon appeared and testified at trial.

4.      Defendant Löwenjäger, LLC ("Löwenjäger") is a Texas limited liability company

with its principal place of business in Dallas, Texas.  Löwenjäger appeared and testified through

Brandon who owns and controls Löwenjäger.

5.      Defendant the Brandon Howley Trust ("BHT") is an irrevocable trust created under

the laws of the State of Texas.  BHT was never funded or finalized and never filed a tax return.

BHT appeared by stipulation through Brandon.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                     PAGE 2

CERTIFIED COPY

6.      Happy Hollow Management, LLC ("Management LLC") is a Texas limited liability company with its principal place of business in Dallas, Texas.  It appeared by stipulation through Brandon.

7.      The CLH Loyal Trust ("CLH Trust") is an irrevocable trust created under the laws of the State of Texas.  It appeared by stipulation through one of its two co-trustees, Robin.

8.      The NTH Secure Trust ("NTH Trust") is an irrevocable trust created under the laws of the State of Texas.  It appeared by stipulation through one of its two co-trustees, Robin.

9.      Scott Howley ("Scott") is a citizen of Texas and a resident of Dallas County.  He appeared through his attorney and filed a Motion to Dismiss pursuant to the Texas Citizens Participation Act ("TCPA").

10.     Robin is a citizen of Texas and a resident of Dallas County.  She appeared through her attorney and filed a Motion to Dismiss pursuant to the TCPA.

11.     Chuck is a well-known, well recognized, and highly regarded former NFL linebacker for the Dallas Cowboys.  Chuck was the Most Valuable Player in Super Bowl V.

12.     Chuck and Nancy have only two children, Robin and Scott.

13.     In addition, Chuck and Nancy have six grandchildren.  Brandon is Scott's son and one of Chuck and Nancy's six grandchildren.

14.     At its formation in 2008, Chuck and Nancy were the only two limited partners in HH with each owning a 49.99% limited partnership interest in HH.  The general partner of HH was Management LLC.  Management LLC owned a .02% general partnership interest in HH.

15.     HH is the owner of approximately 1,476.384 acres of real property located in Van Zandt County which is specifically described as Exhibit "J" to the Court's Final Judgment.  The

1,476.384 acres of real property located in Van Zandt County will be referred to herein as "Happy Hollow Ranch."

16.    On February 7, 2011, HH acquired Happy Hollow Ranch from Chuck who established Happy Hollow Ranch in 1977 and grew it by aggregating approximately twenty-four (24) separate, non-contiguous parcels over the years from 1977 to 1993. On February 7, 2011, Chuck transferred the entirety of Happy Hollow Ranch to HH in a single deed. The transfer was a part of Chuck's and Nancy's estate plan.

17.    In 2011, Chuck and Nancy were the only two members in Management LLC with each owning a 50% membership interest. Management LLC was a member-managed limited liability company. Management LLC and all business and financial transactions were controlled entirely by Chuck. Nancy never worked and was not knowledgeable about Chuck's business affairs.

**B.    Chuck's and Nancy's Estate Plan.**

18.    To ensure that Chuck's and Nancy's assets would be protected, properly managed, and would provide for Chuck and Nancy in their old age, Chuck and Nancy engaged the services of a lawyer, Jim Mincey, for estate planning purposes. In 2012, to protect Chuck and Nancy, each of their limited partnership interests in HH were transferred into two separate irrevocable trusts, the CLH Trust, and the NTH Trust (collectively "the Trusts"). Chuck and Nancy are the beneficiaries of the Trusts.

19.    The Trusts became the only limited partners of HH owning 99.98% of HH, with Management LLC owning a .02% general partnership interest.

20.    To further protect Chuck and Nancy, in August 2015, Chuck's and Nancy's remaining assets, including all cattle and livestock, all of the intellectual property and trade marks,



CERTIFIED COPY

and Chuck's and Nancy's membership interests in Management LLC were placed into the separate Howley Family Trust ("HFT"). By the end of August 2015, Chuck and Nancy did not own any assets. All their former assets were held by the Trusts, HFT, or by HH.

21.     From the end of August 2015 to the present, the Trademarks (as hereinafter defined in paragraph 106) have been owned by HFT.

22.     From the end of August 2015 to the present, neither Chuck and Nancy, HH nor the Trusts owned any cattle or livestock. HFT is the only entity that owned any cattle or livestock.

23.     From the end of August 2015 to the present, 100% of the membership interests in Management LLC have been owned by HFT.

**C.     Chuck's and Nancy's Cognitive Impairment and Mental Incapacity.**

24.     By sometime in 2016, Chuck was unable to manage his own affairs and was diagnosed with Lewy Body Dementia. He required 24-hour care which Nancy tried to provide for a short time.

25.     At least by sometime in 2016, Chuck did not have the mind or memory needed to understand the nature or effect of any business transaction. Chuck's mental incapacity did not improve.

26.     Nancy's cognitive ability declined too. Sometime before January 1, 2017, Nancy's cognitive ability was impaired to the extent that she could not be relied upon to properly administer Chuck's medications. Full-time, live-in nursing care was hired to care for Chuck.

27.     By at least 2018, Nancy's cognitive abilities were impaired to the extent that although she had played cards with her friends for decades, she was no longer able to play the game. She lost her patience with Chuck when by all accounts they had always been a kind and loving couple. By



at least January 1, 2019, full-time live-in care takers were caring for Nancy as well.  In 2019, Nancy

was diagnosed with vascular dementia, aphasia, and Alzheimer's disease.

28.    At least by January 1, 2019, Nancy did not have the mind or memory needed to

understand the nature or effect of any business transaction.  Nancy's mental incapacity did not

improve.

**D.    The 2020 Documents.**

**(1)    Brandon's and Scott's efforts to benefit themselves
at the expense of Chuck and Nancy.**

29.    In 2018, Brandon did not have employment with which he was satisfied and had

recently been discharged from military service.  Brandon was hired to work for HH in the position

of manager.  Soon, Brandon sought more than employment at HH.  Brandon wanted control of HH.

He wanted all or most of HH's income; and he wanted to own all or some of HH's land.

30.    Scott and Robin were both required to act in the best interests of the Trusts, HFT, and

Chuck and Nancy.  However, Scott improperly put Brandon's interests and Scott's own interests

above the interests of the Trusts, HFT, and Chuck and Nancy.  Robin was not involved in, did not

know about, and would have disapproved of Scott's improper actions designed to benefit Brandon

and Scott to the detriment of Chuck and Nancy.

31.    HH, the Trusts, HFT, and Chuck and Nancy had three trusted advisors who had

served them for decades.  Those advisors were their accountant, Alan Ross; their financial advisor,

Rob Bertino; and Jim Mincey, their lawyer.  After Nancy lost her cognitive ability, Brandon and

Scott jointly undertook to eliminate all three of the trusted advisors and replace them with advisors

who would be loyal to Brandon and Scott.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

CERTIFIED COPY

32.    Brandon and Scott were successful at firing Rob Bertino and Alan Ross. By mid-2019, HH, the Trusts, HFT, and Chuck and Nancy were wholly deprived of the expertise and protection that had been provided by those two trusted advisors. In addition, Brandon was imploring Scott to fire Jim Mincey.

33.    To benefit himself and his son, Scott signed documents as "agent" for Nancy, or on behalf of Nancy. Scott had no approval or authority from anyone, including his co-trustee and sister, to do so.

### (2)    Brandon and Scott take control of Management LLC.

34.    Without having been given control of Management LLC, Brandon proceeded to control it anyway. Without authority to do so, on December 20, 2019, Brandon caused a Certificate of Amendment to the Certificate of Formation of Management LLC to be filed with the Texas Secretary of State. In the Certificate of Amendment, Brandon changed Management LLC from a member-managed limited liability company to a manager-managed limited liability company. The managers were Brandon, Scott, and Robin. The Amendment to the Certificate of Formation was signed under penalty of perjury solely by Brandon who falsely asserted that he had authority to make the change, when he did not.

35.    The effect of the Amendment to the Certificate of Formation was to alter the nature of Management LLC so that it was no longer the entity contemplated to be the general partner of HH. Among other things, HFT (which owned 100% of the membership interests in Management LLC) was not a manager at all. HFT was deprived and any voice, or vote, and no longer had the ability to control Management LLC. The managers who were in control, Scott, Brandon, and Robin,

FINDINGS OF FACT AND CONCLUSIONS OF LAW

were not members. Moreover, Scott and Brandon could outvote Robin on everything. For all practical purposes, both the HFT and Robin were deprived of a meaningful voice or vote.

### (3)    The Ranch Management and Ownership Agreement.

36.    Immediately after altering the fundamental nature of Management LLC, and unbeknownst to Jim Mincey or to Robin, on January 7, 2020, Brandon and Scott had Nancy sign a Ranch Management and Ownership Agreement which is attached to the Court's Final Judgment as Exhibit "C." The Ranch Management and Ownership Agreement sought to hire Löwenjäger to manage some real property located in Dallas, Texas referred to as "The Ranch" and to sell certain livestock located on the Ranch to Löwenjäger.

37.    The Ranch Management and Ownership Agreement says that the property to be managed, "The Ranch," is described in the attached Exhibit "A," but there never was any Exhibit "A." In addition, the Ranch Management and Ownership Agreement includes an option to purchase 36 unidentified acres of property. The Ranch Management and Ownership Agreement is for a term of ten (10) years with automatic renewals thereafter. Brandon signed the Ranch Management and Ownership Agreement on behalf of Löwenjäger, Brandon's wholly-owned company.

38.    A person reasonably familiar with land in Van Zandt and Dallas counties could not locate the property that is the subject of the Ranch Management and Ownership Agreement based on any property description contained in (or more accurately not contained in), or referenced in, the Ranch Management and Ownership Agreement.

39.    The mailing address mentioned in the Ranch Management and Ownership Agreement does not identify the property at issue with sufficient precision to enable the Court to determine the



App'x 122

obligations of the parties.  Nothing in the Ranch Management and Ownership Agreement provides information regarding the size, shape, and boundaries of the subject real property.

40.    Neither Löwenjäger nor Brandon performed the Ranch Management and Ownership Agreement in any way that is unequivocally referable to the Ranch Management and Ownership Agreement.  Neither Löwenjäger nor Brandon performed the Ranch Management and Ownership Agreement in any way that is corroborative of the fact that a contract actually was made.  Neither Löwenjäger nor Brandon made any valuable improvements to the unidentified property that is the subject of the Ranch Management and Ownership Agreement.

41.    Both Löwenjäger and Brandon failed to report to HH all material developments and to provide semi-annual reports as they were required to do by the Ranch Management and Ownership Agreement.  This breach of the Ranch Management and Ownership Agreement predates any alleged breach by Plaintiffs which the Court finds did not occur.

42.    Both Brandon and Löwenjäger starved the cattle, harmed the value of the herd, falsified cattle certifications harming HH's good name and reputation, and alienated personnel who had worked for HH for decades.  This breach of the Ranch Management and Ownership Agreement predates any alleged breach by Plaintiffs which the Court finds did not occur.

43.    There was no meeting of the minds or agreement about the essential terms of the Ranch Management and Ownership Agreement.  Management LLC did not agree to the Ranch Management and Ownership Agreement, and neither did Robin.  Robin refused to sign the Ranch Management and Ownership Agreement.

CERTIFIED COPY

### (4)    The January Bill of Sale.

44.    Brandon and Scott also had Nancy sign a Bill of Sale dated January 1, 2020 that is attached to this Court's Final Judgment as Exhibit "H" (the "January Bill of Sale"). The January Bill of Sale purported to sell cattle owned by HH as specified in the Ranch Management and Ownership Agreement. HH did not own any cattle. Only the HFT owned any cattle. The cattle referenced in the January Bill of Sale are those located on the "The Ranch" in Dallas, Texas which is not described or otherwise identified except by a mailing address which is insufficient. No quantity of cattle or livestock is identified in the January Bill of Sale. The cattle are not described in any way in the January Bill of Sale other than by a location which cannot be ascertained from the document.

45.    There was no meeting of the minds or agreement about the essential terms of the January Bill of Sale.

46.    Neither Löwenjäger nor Brandon performed the January Bill of Sale in any way that is unequivocally referable to the January Bill of Sale. Neither Löwenjäger nor Brandon performed the January Bill of Sale in any way that is corroborative of the fact that a contract actually was made.

47.    Neither Brandon nor Löwenjäger paid the consideration required by the Bill of Sale. This breach predates any alleged breach by Plaintiffs which the Court finds did not occur.

### (5)    The January Lease Agreement.

48.    Also executed was a Lease Agreement which states on page 1 that it first took effect January 1, 2020. However, on page 7, the Lease Agreement says that it first took effect on January 1, 2019 (the "January Lease"). The January Lease is attached to the Court's Final Judgment as



Exhibit "F." Nancy did not sign the January Lease. On its face, the January Lease says it was signed by Scott as Nancy's "agent." However, neither Scott nor Nancy signed it.

49.     The January Lease says that HH leases to Löwenjäger the property described on the attached Exhibit "A," but there never was any Exhibit "A." The January Lease does not identify the county in which the property is located or even whether the property is located in Texas. Paragraph 2 of the January Lease contains a merger clause which states that the January Lease contains the entire agreement of the parties.

50.     A person reasonably familiar with land in Van Zandt and Dallas counties could not locate the property that is the subject of the January Lease based on any property description contained in, or referenced in, the January Lease. Nothing in the January Lease provides information regarding the size, shape, and boundaries of the subject property.

51.     There was no meeting of the minds or agreement about the essential terms of the January Lease.

52.     Neither Löwenjäger nor Brandon performed the January Lease in any way that is unequivocally referable to the January Lease. Neither Löwenjäger nor Brandon performed the January Lease in any way that is corroborative of the fact that a contract actually was made. Neither Löwenjäger nor Brandon made any valuable improvements to the unidentified property that is the subject of the January Lease.

53.     Brandon never disclosed either the January Bill of Sale or the January Lease to Robin or to Nancy's attorney, Jim Mincey. Brandon also did not inform HH's accountant about the documents for months. This made it difficult for the accountant to keep track of any funds owed to Chuck and Nancy or to HH and delayed financial reporting.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PAGE 11

54.     Brandon deliberately deprived Nancy of the advice of her lawyer before having her sign the January 2020 Ranch Management and Ownership Agreement. Nancy did not understand that she signed the January 2020 Ranch Management and Ownership Agreement, the January Bill of Sale, or the January Lease. Nancy did not understand the nature or the consequences of any of those transactions.

55.     Although no one admits to signing the January Lease, based on the totality of the evidence including the circumstances, Brandon's demeanor, and his mendacity both to his family, to his own lawyer and in trial, the Court finds that Brandon either signed Nancy's name to the January Lease, or he directed and authorized someone (other than Nancy or Scott) to do it.

56.     Neither Brandon nor Löwenjäger performed under the January Lease. This breach predates any alleged breach by Plaintiffs which the Court finds did not occur.

### (6)    Brandon circumvented Robin and Jim Mincey when they tried to protect Chuck and Nancy.

57.     Upon learning of the executed January 2020 Ranch Management and Ownership Agreement (after it was signed), Robin objected to it and refused to sign. When Chuck and Nancy's lawyer, Jim Mincey, learned about the Ranch Management and Ownership Agreement (after it was signed), he told both Scott and Brandon that the terms of the proposed Ranch Management and Ownership Agreement were very one-sided in favor of Brandon and very harmful to Chuck and Nancy.

58.     Negotiations resumed with Brandon and Scott leading Robin and Jim Mincey to believe that further documents would not be executed without their approval.

59.     Thereafter, Brandon falsely told his lawyer that the entire family was in agreement about the transaction. Brandon had the proposed agreement redrafted on terms that were even more favorable to Brandon and more harmful to Chuck and Nancy.

60.     When the revised documents were provided to Jim Mincey, Jim Mincey told Brandon that there was no point in further negotiations because the transaction was not in the best interest of Chuck and Nancy. By at least early May 2020, all negotiations ceased.

### (7)     The Purchase Option Agreement

61.     Shortly after all negotiations ceased, Brandon caused a Purchase Option Agreement to be drafted. The Purchase Option Agreement allowed Brandon to purchase some unidentified three hundred sixty (360) acres of land located in Wills Point, Texas at a fixed price for thirty (30) years without any appreciation in the price in 30 years. The Purchase Option Agreement was signed by Scott "as agent" for Nancy on June 20, 2020. The Purchase Option Agreement is attached to the Court's Final Judgment as Exhibit "A."

62.     Scott had no authority to act as Nancy's "agent" in 2020.

63.     Persons reasonably familiar with land in Van Zandt County could not locate the 360 acres of land that are the subject of the Purchase Option Agreement based on any description contained in, or referenced in, the Purchase Option Agreement. The mailing address mentioned in the Purchase Option Agreement does not identify the property at issue with sufficient precision to enable the Court to determine the obligations of the parties. Nothing in the Purchase Option Agreement provides information about the shape or the boundaries of the subject property.

64.     There is an Exhibit "B" to the Purchase Option Agreement which is supposed to identify the 360 acres out of the larger parcel that was supposed to be identified (but never was) in

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 13

Exhibit "A."   The absence of any Exhibit "A" to the Purchase Option renders Exhibit "B"
incomprehensible.

65.    There was no meeting of the minds or agreement about the essential terms of the
Purchase Option Agreement.

66.    No consideration was paid to HH for keeping the land that comprises Happy Hollow
Ranch tied up for thirty(30) years under the Purchase Option.

67.    Neither Löwenjäger, nor Brandon, performed the Purchase Option Agreement in any
way that is unequivocally referable to the Purchase Option Agreement.   Neither Löwenjäger nor
Brandon performed the Purchase Option Agreement in any way that is corroborative of the fact that
a contract actually was made.   Neither Löwenjäger, nor Brandon, made any valuable improvements
to the unidentified property that is the subject of the Purchase Option Agreement.

### (8)    The Commission Agreement.

68.    Brandon also caused a Commission Agreement to be drafted.   The Commission
Agreement required HH to pay Brandon's company, Löwenjäger, a commission in the amount of
30% of all of the revenue received from an unidentified "solar field agreement" on some
unidentified property.

69.    The Commission Agreement says it was signed by Scott "as agent" for Nancy on
June 20, 2020 (although it also says it took effect on June 1, 2020).   Scott denies signing the
Commission Agreement, and denies knowing about the existence of the Commission Agreement
until February 2022.   The Commission Agreement bears the signature of a notary, but the notary
signature block does not say that the document was signed before the notary.   Nor does it say that
the notary identified the person who signed the Commission Agreement.   The Commission

Agreement is attached as Exhibit "B" to this Court's Final Judgment. Based on the totality of the evidence including the circumstances, Brandon's demeanor, and his mendacity, the Court finds that Brandon signed Nancy's name to the Commission Agreement.

70.    Brandon had no authority to sign on behalf of Scott, and had no authority to act as Nancy's "agent" in 2020. Scott had no authority to act as Nancy's "agent" in 2020.

71.    Persons reasonably familiar with land in Van Zandt County could not locate the land that is the subject of the Commission Agreement based on any description contained in, or referenced in, the Commission Agreement. Nothing in the Commission Agreement provides information regarding the size, shape, and boundaries of the subject property.

72.    There was no meeting of the minds or agreement about the essential terms of the Commission Agreement.

73.    Neither Löwenjäger nor Brandon performed the Commission Agreement in any way that is unequivocally referable to the Commission Agreement. Neither Löwenjäger nor Brandon performed the Commission Agreement in any way that is corroborative of the fact that a contract actually was made. Neither Löwenjäger nor Brandon made any valuable improvements to unidentified property that is the subject of the Commission Agreement.

74.    Neither Jim Mincey nor Robin were told about, or provided a copy of, either the Purchase Option Agreement or the Commission Agreement.

75.    Neither Löwenjäger nor Brandon performed as required by the Commission Agreement, and this breach predates any alleged breach by Plaintiffs which the Court finds did not occur.

76.    Neither Brandon nor Löwenjäger are a licensed real estate broker or lawyer.

(9)    **The Management Agreement.**

77.    Brandon also caused to be drafted the Management Agreement attached as Exhibit "D" to this Court's Final Judgment (the "Management Agreement"). The Management Agreement was signed by Scott "as agent" for Nancy on June 20, 2020. Scott had no authority to sign the Management Agreement as Nancy's "agent."

78.    The Management Agreement required HH to pay BH's company, Löwenjäger, $450 per week to manage property located in Wills Point, Texas which the agreement says is identified on the attached Exhibit "A," but there never was any Exhibit "A." The Management Agreement also required HH to pay BH's company, Löwenjäger, a 15% commission of "alternative revenue" from "real property" that also is not identified. This might be in addition to the 30% commission in the Commission Agreement, but because neither document is sufficiently specific about the property at issue, it is impossible to tell.

79.    The Management Agreement was for a term of ten (10) years with automatic renewals thereafter.

80.    Persons reasonably familiar with land in Van Zandt County could not locate the land that is the subject of the Management Agreement based on any description contained in, or referenced in, the Management Agreement. The mailing address mentioned in the Management Agreement does not identify the property at issue with sufficient precision to enable the Court to determine the obligations of the parties.

81.    There was no meeting of the minds or agreement about the essential terms of the Management Agreement.

82.     Neither Löwenjäger, nor Brandon, performed the Management Agreement in any way that is unequivocally referable to the Management Agreement. Neither Löwenjäger nor Brandon performed the Management Agreement in any way that is corroborative of the fact that a contract actually was made. Neither Löwenjäger, nor Brandon, made any valuable improvements to the unidentified property that is the subject of the Management Agreement.

83.     Both Löwenjäger breached the Management Agreement. Among other things, both Brandon and Löwenjäger starved the cattle, harmed the value of the herd, falsified cattle certifications harming HH's good name and reputation, and alienated personnel who had worked for HH for decades. This breach of the Management Agreement predates any alleged breach by Plaintiffs which the Court finds did not occur.

### (10)    The Ranch Management Agreement.

84.     Brandon also caused to be drafted the Ranch Management Agreement attached as Exhibit "E" to this Court's Final Judgment (the "Ranch Management Agreement"). The Ranch Management Agreement was signed by Scott "as agent" for Nancy on June 20, 2020. Scott had no authority to sign the Management Agreement as Nancy's "agent."

85.     The Ranch Management Agreement required HH to sell to BH's company, Löwenjäger, cattle located on some undescribed property in Wills Point, Texas which the agreement says is identified on the attached Exhibit "A," but there never was any Exhibit "A." The Ranch Management Agreement required the execution of a lease of some undescribed real property. The Ranch Management Agreement also required Löwenjäger to perform customary ranch management services.



86.     The Ranch Management Agreement was for a term of ten (10) years with automatic renewals thereafter.

87.     Persons reasonably familiar with land in Van Zandt County could not locate the land on which the cattle to be sold were located based on any description contained in, or referenced in, the Ranch Management Agreement.  Persons reasonably familiar with land in Van Zandt County could not locate the real property to be leased pursuant to the Ranch Management Agreement based on any description contained in, or referenced in, the Ranch Management Agreement.  The mailing address mentioned in the Ranch Management Agreement does not identify the property at issue with sufficient precision to enable the Court to determine the obligations of the parties.

88.     There was no meeting of the minds or agreement about the essential terms of the Ranch Management Agreement.

89.     Neither Löwenjäger, nor Brandon, performed the Ranch Management Agreement in any way that is unequivocally referable to the Ranch Management Agreement.  Neither Löwenjäger nor Brandon performed the Ranch Management Agreement in any way that is corroborative of the fact that a contract actually was made.  Neither Löwenjäger, nor Brandon, made any valuable improvements to the unidentified property that is the subject of the Ranch Management Agreement.

90.     Both Löwenjäger and Brandon breached the Ranch Management Agreement.  Among other things, Both Brandon and Löwenjäger starved the cattle, harmed the value of the herd, falsified cattle certifications harming HH's good name and reputation, and alienated personnel who had worked for HH for decades.    This breach of the Ranch Management Agreement predates any alleged breach by Plaintiffs which the Court finds did not occur.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 18

CERTIFIED COPY

91.     Neither Brandon nor Löwenjäger paid the consideration required by the Ranch Management Agreement.  This breach predates any alleged breach by Plaintiffs which the Court finds did not occur.

(11)    **The June/July Lease.**

92.     Also executed was a Lease Agreement that states on page 1 that it first took effect on July 1, 2020.  However, the Lease Agreement also states on page 8 that it first took effect on June 4, 2020 (the "June/July Lease").  The June/July Lease is attached to the Court's Final Judgment as Exhibit "G."  On its face, the June/July Lease says it was signed by Scott as Nancy's "agent."

93.     The June/July Lease says that HH leases to Löwenjäger the property described on the attached Exhibit "A," but there never was any Exhibit "A."

94.     The June/July Lease does not identify the size or shape of the parcel to be leased. The June/July Lease does not identify the county in which the property is located, or even whether the property is located in Texas.  Persons reasonably familiar with land in Van Zandt County could not locate the property that is the subject of the June/July Lease based on any property description contained in, or referenced in, the June/July Lease.

95.     Paragraph 2 of the June/July Lease contains a merger clause which states that it contains the entire agreement of the parties.

96.     There was no meeting of the minds or agreement about the essential terms of the June/July Lease.

97.     Neither Löwenjäger, nor Brandon, performed the June/July Lease in any way that is unequivocally referable to the June/July Lease.  Neither Löwenjäger nor Brandon performed the June/July Lease in any way that is corroborative of the fact that a contract actually was made.

Neither Löwenjäger, nor Brandon, made any valuable improvements to the unidentified property that is the subject of the June/July Lease.

98.    Neither Brandon nor Löwenjäger performed under the June/July Lease. This breach predates any alleged breach by Plaintiffs which the Court finds did not occur.

    **(12)    The June Bill of Sale**.

99.    Also executed was a Bill of Sale dated June 4, 2020 (the "June Bill of Sale"). The June Bill of Sale is attached to the Court's Final Judgment as Exhibit "I." On its face, the June Bill of Sale says it was signed by Scott as Nancy's "agent." Scott was not Nancy's agent and was not authorized to act as Nancy's agent at the time of the June Bill of Sale.

100.    In the June Bill of Sale, HH purports to sell to Löwenjäger "any cow herds, yearlings, bulls, and other cattle as identified on Exhibit A, attached hereto  . . . owned by [HH]." HH did not own any cow herds, yearlings, bulls, and other cattle at the time of the June Bill of Sale. There never was any Exhibit A attached to the June Bill of Sale.

101.    There was no meeting of the minds or agreement about the essential terms of the June Bill of Sale.

102.    Neither Löwenjäger, nor Brandon, performed the June Bill of Sale in any way that is unequivocally referable to the June Bill of Sale. Neither Löwenjäger nor Brandon performed the June Bill of Sale in any way that is corroborative of the fact that a contract actually was made. Neither Löwenjäger, nor Brandon, made any valuable improvements to the unidentified property that is the subject of the June Bill of Sale.

103.    Neither Brandon nor Löwenjäger paid the consideration required by the June Bill of Sale. This breach predates any alleged breach by Plaintiffs which the Court finds did not occur.

104.    Brandon and Löwenjäger made claims on Happy Hollow Ranch relying on the 2020 Documents. Among other things, Brandon and Löwenjäger: (1) demanded that HH sell acreage from Happy Hollow Ranch to them; (2) demanded exclusive rights to Happy Hollow Ranch based on the January Lease and the June/July Lease; and (3) represented to others that they are the exclusive parties with whom to deal concerning Happy Hollow Ranch.

**E.    The Trademarks**

105.    In 1977, after retiring as a Dallas Cowboys linebacker, Chuck adopted the CHUCK HOWLEY'S HAPPY HOLLOW RANCH trademark and began a business of raising and breeding cattle and Quarter Horses.

106.    For the last forty-four years, HH and Chuck Howley used the CHUCK HOWLEY'S HAPPY HOLLOW RANCH trademark and various formative trademarks thereof including but not limited to CHUCK HOWLEY, CH, CHUCK HOWLEY RANCH, CH HAPPY HOLLOW, HAPPY HOLLOW RANCH, and HAPPY HOLLOW (collectively, "the Trademarks").

107.    For forty-four years, Chuck (and later HH) used the Trademarks on goods bearing the mark; in and on prominent signage including street-frontage signage; a website; business transactions and accounts; marketing and informational materials; cattle and other livestock, and in other ways customary in the ranching and livestock industries. The Trademarks are inherently distinctive and served to identify and distinguish Chuck's and HH's goods from those sold by others. In addition, over time, the Trademarks acquired secondary meaning identifying the source of the goods as being from Chuck or HH.

108.    In August of 2020, Chuck had been severely cognitively impaired and without the mind or memory needed to enter into a contract for more than four (4) years. In August of 2020,

Nancy had been cognitively impaired and without the mind or memory needed to enter into a contract for over a year.

109.    Nevertheless, in August of 2020, Brandon had Chuck sign a consent to allow him the use and registration of Chuck's name as a trademark.

110.    Thereafter, and without the authority or knowledge of the trustees of HFT, the NTH Trust, or the CLH Trust, Brandon used that consent to file applications for USPTO Registration Nos. 6706943, 6707339, and 6215259 which were issued reflecting the following word marks to be owned solely by Löwenjäger:

      A.     Chuck Howley's Happy Hollow Ranch;

      B.     CH (with the mark consisting of "a stylized 'C' & 'H', with the 'C' elevated above the 'H' and a lower extremity of the 'C' joined to an upper extremity of the 'H'"); and,

      C.     Happy Hollow.

111.    To register the Trademarks, Brandon and Löwenjäger falsely represented that Chuck Howley's Happy Hollow Ranch was first put into use on September 1, 2019, and that the remaining marks were first put into use in 2018. The truth, which Brandon knew, was that the marks had been used by Chuck and HH since 1977.

112.    Brandon and Löwenjäger have used the names and marks: Chuck Howley, Chuck Howley's Happy Hollow Ranch, "CH," Chuck Howley Ranch, "CH Happy Hollow," "Happy Hollow Ranch," "Happy Hollow," "HHR" as if Brandon and Löwenjäger are Chuck or HH.

113.    Brandon and Löwenjäger misappropriated the identity of "Chuck Howley" to themselves. Brandon and Löwenjäger created and maintain an Instagram account, internet domains

(for websites and email accounts) and social media accounts linked to the foregoing names in a confusingly similar way such as "@chuckhowley," happyhollowbeef.com, chuckhowley.com, happyhollowranching.com, @happyhollow.beef, @chuckhowley, @chuckhowleylegacy, @happyhollowbeef, @txhappyhollow). Through the misappropriated identity, Brandon and Löwenjäger each falsely communicate to the public as if they are Chuck.

114. Brandon's and Löwenjäger's registration of the Trademarks and use of Chuck's identity was without authorization and wrongful. Brandon's and Löwenjäger's wrongful registration of the Trademarks and use of Chuck's identity caused and continues to cause confusion, harm, and damages to Plaintiffs.

**F.  The Need for Permanent Injunctive Relief.**

115. Brandon, Löwenjäger, BHT, and Management LLC engaged in numerous wrongful acts causing irreparable harm to Plaintiffs.

116. Brandon, Löwenjäger, BHT, and Management LLC took advantage of the cognitive impairment of both Chuck and Nancy in an effort to enrich themselves at the expense of Chuck and Nancy.

117. Brandon, Löwenjäger, and Management LLC starved and neglected HFT's cattle causing a high death rate in the herd, a low reproduction rate, and a low growth rate among the calves and yearlings that were born.

118. Brandon, Löwenjäger, and Management LLC sold large numbers of HFT's cattle and kept all of the sales proceeds for themselves (while HH paid all expenses). Brandon, Löwenjäger, and Management, LLC did not report the sales to HH or keep an accurate inventory of the cattle.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 23

CERTIFIED COPY

119.    Brandon, Löwenjäger, and Happy Hollow Management LLC falsified certifications about the age of cattle being sold.

120.    Brandon and Löwenjäger registered the Trademarks that belong to HFT making Löwenjäger the sole registered owner of the marks.

121.    Brandon, Löwenjäger, and Management LLC caused to be filed unauthorized documents with the Texas Secretary of State that negatively impacted HH the Trusts, and Chuck and Nancy. Then Brandon denied authorizing the filing, and but did not withdraw the documents.

122.    Brandon, Löwenjäger, and Management LLC abused and alienated HH's and Chuck's and Nancy's long-time employees both at Happy Hollow Ranch, and employees who provided trusted guidance to Chuck and Nancy for decades. In some instances, Brandon, Löwenjäger, and Management LLC demanded that employees falsify documents and made other completely unreasonable demands.

123.    Brandon, Löwenjäger, BHT, and Management LLC falsely represented to others that they alone have the right to control HH. Brandon, Löwenjäger, BHT, and Management, LLC falsely represented to others that they alone have the right and power to act on behalf of, and make decisions for, Chuck and Nancy and for HH. Brandon, Löwenjäger, BHT, and Management, LLC excluded Scott and Robin from information or decisions about HH and Happy Hollow Ranch and purported to act on their behalf.

124.    Brandon's testimony, demeanor, and conduct at trial demonstrated a lack of remorse and a failure to recognize that he has done anything wrong. Brandon's testimony, demeanor, and conduct at trial demonstrated his belief that he is entitled to engage in such wrongful acts and control

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 24

CERTIFIED COPY

Happy Hollow Ranch and HH to the detriment of Chuck and Nancy. If Brandon and Löwenjäger are not enjoined they will continue to engage in the same or similar acts.

125. Unless they are enjoined, Brandon, Löwenjäger, BHT, and Management LLC will continue to try to obtain Chuck's and Nancy's signatures on documents to the detriment of Chuck and Nancy. Unless they are enjoined, Brandon, Löwenjäger, BHT, and Management LLC will try to control Happy Hollow Ranch, HH and Chuck and Nancy.

126. Unless they are enjoined, Brandon, Löwenjäger, BHT, and Management LLC will use, sell, lease, or encumber Plaintiffs' assets (including Happy Hollow Ranch and the Trademarks and confusingly similar names) and direct the proceeds to themselves. Unless they are enjoined, Brandon, Löwenjäger, BHT, and Happy Hollow Management LLC will commit HH and Chuck and Nancy to legal obligations to the detriment of Chuck and Nancy and HH.

127. Unless they are enjoined, Brandon, Löwenjäger, BHT, and Management LLC will harm HFT's cattle, harm HH's employee relations, and at a minimum create so much confusion about who has a right to control, or act on behalf of, Happy Hollow Ranch, HH, and Chuck and Nancy as to deprive them of their assets. Unless they are enjoined, Brandon, Löwenjäger, BHT, and Management LLC will file, or cause to be filed, liens or other encumbrances in the deed records that will prevent Plaintiffs from the use and enjoyment of the property.

128. Unless they are enjoined, Brandon, Löwenjäger, and Management LLC, will continue to file false and unauthorized documents with the Texas Secretary of State and with the USPTO concerning property and rights that belong to Plaintiffs and in which Brandon, Löwenjäger, and Management LLC have no interest.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 25

129.     Plaintiffs have no adequate remedy at law.   Plaintiffs have already suffered

significant damage from all of the foregoing.  Lost employees cannot be replaced.  Damage to the

reputations of HH, Chuck and Nancy, and to the Trademarks from the falsified documents that

Brandon, Löwenjäger, and Management LLC published may never be properly quantified or

repaired.  Brandon, Löwenjäger, and Management LLC will sell cattle, but because Brandon and

Löwenjäger do not keep an adequate inventory of the cattle, it will be difficult or impossible

quantify damages.  In addition, Brandon, Löwenjäger, and Management LLC do not have the

financial means to pay the significant monetary damages that are likely to be incurred.

**G.      The March 12, 2019 Bill of Sale.**

130.     On March 12, 2019, Nancy signed a Bill of Sale and Assignment (the "2019 Bill of

Sale") which is attached to this Court's Final Judgment as Exhibit"K."  The 2019 Bill of Sale

purports to transfer a .2% interest in Management LLC as a gift to the BHT.  Nancy signed the 2019

Bill of Sale on behalf of Chuck and herself.

131.     On March 12, 2019, Chuck and Nancy did not own any interest in Management LLC

that they could gift to the BHT.  Due to Chuck's and Nancy's cognitive impairment and incapacity,

they did not understand the nature of the transaction.  They certainly would not recall or understand

that in August 2015 they transferred 100% of the interests in Management LLC to HFT and they

owned no interest that they could gift to BHT.

132.     When Brandon learned how small the attempted conveyance of an interest in

Management LLC would be, he was unhappy with it and sought a different type of transaction.  As

a result, the transfer was never finalized, and BHT was not funded.  If there was an error in the 2019

Bill of Sale, it was not corrected because Brandon was not interested in it.  Brandon never filed, or

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                                PAGE 26

caused to be filed, a tax return for BHT. Although he was in a position to do so, Brandon never

caused to be filed a gift tax return for Chuck and Nancy, or for HFT. Also, although he was in a

position to do so, Brandon never issued an IRS Form K-1 to BHT reflecting that it owned any

interest in Management LLC. Brandon also allowed HFT to pay 100% of the significant losses

incurred by Management LLC and did not contribute any capital to cover the losses as he should

have done if he were an owner.

**H.      Judicial Expulsion of Management LLC**

133.    Management LLC put its own, and Brandon's and Löwenjäger's interests ahead of

the limited partners' interest. Management LLC willfully and persistently acted in contravention

of the Agreement of Limited Partnership of HH, and breached its fiduciary duties to both HH and

its limited partners.

134.    Management LLC fraudulently amended its Certificate of Formation in a way to

eliminate the members' right to vote. Management LLC directed most of HH's revenue to Brandon

and Löwenjäger, and abused and alienated employees. Management LLC breached HH's

Agreement of Limited Partnership. Management LLC went to one of the beneficiaries of the limited

partners of HH, Nancy, an 85-year-old woman with dementia, and had her sign documents she could

not understand and that were harmful to the limited partners of HH.

135.    It is not reasonably practicable for the business of HH to be carried on in partnership

with Management LLC.

**I.      The Undue Influence and Fraud.**

136.    Brandon and Löwenjäger engaged in a fraudulent scheme to exert influence over HH,

Chuck, and Nancy. The influence and fraud was so extreme that it overcame any mental capacity

FINDINGS OF FACT AND CONCLUSIONS OF LAW

still possessed by Chuck and Nancy, and overcame HH's ability to function as required by the

Agreement of Limited Partnership.  At Brandon's request, Scott wrongfully assisted Brandon in

most, but not all, of his scheme.  By means of example, and without meaning or attempting to

comprehensively summarize all of Brandon's and Löwenjäger's wrongful acts, their undue influence

included, without limitation:

A.  Firing two of HH's and Chuck's and Nancy's trusted advisors (an accountant and a financial advisor) each of whom had decades of experience with and knowledge about HH, the Trusts, the HFT, and Chuck and Nancy;

B.  Hiring a financial advisor who controlled Chuck's and Nancy's and the Trusts' money and who was loyal to Brandon and Scott, not to Chuck and Nancy;

C.  Attempting to fire a third trusted advisor, a lawyer, Jim Mincey, because he was trying to protect HH, the Trusts, HFT, and Chuck and Nancy from Brandon;

D.  When Brandon did not succeed in firing Jim Mincey, he and Scott actively deprived Mincey of access to his clients and pursued transactions with the intent of depriving HH, the Trusts, HFT, and Chuck and Nancy of legal counsel;

E.  Although Brandon had been told there was no agreement to the transactions he sought, to block both Robin and Jim Mincey from any further input, Brandon made false representations to his own lawyer that the entire family (including the trustees of the Trusts) agreed with his proposed transactions;[1]

---

[1]    Based on the testimony of Brandon's lawyer, including the circumstances, Brandon's testimony and demeanor and the totality of the evidence, it is more likely than not that Brandon repeated the same falsehood to others, including Chuck and Nancy.

CERTIFIED COPY

F.   Brandon made the foregoing false representation to his own lawyer to encourage him to draft documents for a transaction when Brandon knew there was no agreement to the transaction;

G.   Brandon then removed the signature block for Robin (a trustee of Trusts and HFT) and had the 2020 Documents executed without her, and without her knowledge;

H.   Robin's signature block was on the draft 2020 Documents and Brandon had to remove it because the only way Brandon was able to get the documents drafted was through dishonesty directed to his own lawyer about the agreement of the entire family;

I.   The absence of Robin's signature block was an implied false representation that Robin's signature was not required on the document when it was;

J.   Brandon did not inform Robin or Jim Mincey of his intent to have Nancy sign documents without their approval;

K.   For almost a year after the fact, Brandon did not inform Robin or Jim Mincey that the documents had been signed;

L.   In many cases, Brandon had his father Scott sign documents (purportedly on behalf of Nancy) even though Brandon was well informed that Scott did not have the authority to act alone on behalf of Nancy;

M.   Brandon falsely represented that the transactions reflected in the 2020 Documents would add to HH's income, and improve the annual income available for Chuck and Nancy when the truth was that the transactions were designed to, and most certainly would, divert almost all of HH's revenue (which was from cattle sales) to Brandon and Löwenjäger while increasing HH's expenses and depriving Chuck and Nancy of funds they need for their care; and

FINDINGS OF FACT AND CONCLUSIONS OF LAW

App'x 143

N.   The transactions that Brandon sought from HH, Chuck, and Nancy were overreaching, one-sided, and unconscionable up to and including having Chuck sign away the trademark rights to his own name in exchange for nothing of value.

137.   The foregoing scheme was designed to and did exert influence over HH, and Chuck and Nancy.

138.   The foregoing scheme was designed to and did operate in such a way as to subvert or overpower HH, and Chuck and Nancy at the time the 2020 Documents were signed.

139.   The foregoing representations were material and were false. The foregoing false representations involved a real estate transaction. Brandon and Löwenjäger knew the foregoing representations were false, or they made the representations recklessly or with disregard for the truth.

140.   The foregoing false representations were made with the intent to induce reliance. To the extent that Chuck and Nancy had any remaining mental capacity, they actually and justifiably relied upon Brandon's and Löwenjäger's false representations.

141.   The 2020 Documents would not have been drafted, much less signed without Brandon's and Löwenjäger's false representations and scheme of undue influence.

142.   After all due credits and offsets, Brandon's and Löwenjäger's false representations proximately caused damages to Plaintiffs in the amount of $444,324.00.

**J.   Money Had and Received.**

143.   Brandon and Löwenjäger, jointly and severally, received and hold money that rightfully and in good conscious belongs to Plaintiffs. Brandon and Löwenjäger refused to account for or return the wrongfully received funds.

144.    Brandon and Löwenjäger, jointly and severally, wrongfully secured and hold benefits from Plaintiffs or passively received benefits which would be unconscionable to retain.  Brandon and Löwenjäger refused to account for or return the wrongfully received benefits.

145.    Brandon and Löwenjäger did not detrimentally rely on any representation or promise by Plaintiffs.

146.    After all due credits and offsets, the amount of the money and benefits that rightfully and in good conscience belong to Plaintiffs but was received by Brandon and Löwenjäger is $444,324.00.

## K.    Attorneys' Fees.

147.    Robin Howley Fabik, individually, and Scott Howley, individually, incurred reasonable, necessary, usual, and customary attorneys' fees in defending the claims brought against them in the amount of Twelve Thousand Two Hundred Fifty Dollars and no cents ($12,250).

148.    Plaintiffs incurred reasonable and necessary, usual, and customary attorneys' fees in pursuing their declaratory judgment claims in the sum of Five Hundred Thirty-Six Thousand Four Hundred Sixty-Three Dollars and Forty Six Cents ($536,463.46) through the conclusion of the trial.

149.    Plaintiffs' and Third Party-Defendants' reasonable, necessary, usual, and customary attorneys' fees in the event of an appeal to the Court of Appeals would be One Hundred Thousand Dollars and no cents ($100,000.00) .

150.    In the event a petition of review is filed with the Texas Supreme Court, Plaintiffs' reasonable, necessary, usual, and customary attorneys' fees would be Ten Thousand Dollars and no cents ($10,000.00).

CERTIFIED COPY

151.    In the event a petition of review is granted with the Texas Supreme Court, Plaintiffs and Third-Party Defendants' reasonable, necessary, usual, and customary attorneys' fees would be Fifty Thousand Dollars and no cents ($50,000.00).

152.    Any conclusion of law that constitutes a finding of fact is hereby deemed a finding of fact and should be treated as such.

## II.
### CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue.**

1.    This Court has jurisdiction pursuant to the Texas Constitution, TEXAS GOV'T CODE §§ 24.007 and 24.471, and the Texas Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE § 37.001, *et seq.*  The relief requested is within the Court's jurisdictional limits and authority.

2.    Venue is mandatory in Van Zandt County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.011 because the lawsuit seeks to recover an interest in real property and to remove a cloud on property located in Van Zandt County.  In addition, venue is proper in Van Zandt County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) and §15.011 because all, or a substantial part of, the events or omissions giving rise to the claims occurred in Van Zandt County, Texas.

**B.    Chuck's and Nancy's Mental Incapacity.**

3.    By 2016, Chuck lacked the mental capacity to enter into any contract.

4.    By January 1, 2019, Nancy lacked the mental capacity to enter into any contract.

**C.    The Trademarks and the Constructive Trust.**

5.    Chuck and Nancy developed, established, and owned common law trademark rights in the Trademarks. In August of 2015, Chuck and Nancy transferred their rights and interests in the Trademarks to the HFT. HFT is the current lawful owner of the Trademarks.

6.    Brandon secured Chuck's signature to the consent to use Chuck's name only because he took advantage of the fact that at the time, neither Chuck nor Nancy had the mind or memory needed to understand the nature or effect of what they were being asked to do.

7.    Brandon's and Löwenjäger's registration of the Trademarks was wrongful, fraudulent, and in breach of a special trust and duty imposed on Brandon and Löwenjäger. Brandon's and Löwenjäger's conduct in registering the Trademarks was unfair and results in unjust enrichment to Brandon and Löwenjäger and damage to Plaintiffs.

8.    Because Chuck is a living person, the USPTO would not have issued a trademark to Löwenjäger without Chuck's consent.

9.    A constructive trust is proper to impose in favor of HFT on USPTO Registration Nos. 6706943, 6707339, and 6215259 and any trademark registration, brand registration, name, likeness of, any publicity rights, and any other indicia of ownership owned or controlled by either Brandon and Löwenjäger or Third-Party Plaintiffs that incorporate "Chuck Howley," "Happy Hollow," "Happy Hollow Ranch," "HHR," or "CH" (when "CH" refers to or is intended to refer to "Chuck Howley"), and any confusingly similar names or marks thereto.

FINDINGS OF FACT AND CONCLUSIONS OF LAW



PAGE 33

CERTIFIED COPY

**D.      The 2020 Documents.**

**(1)      The Purchase Option.**

10.      No contract was created by the Purchase Option Agreement attached as Exhibit "A" to this Court's Final Judgment because there was no acceptance of an offer, and there was no mutual assent or meeting of the minds on the essential terms of the Purchase Option Agreement. There was no acceptance or meeting of the minds about the property over which a purchase option was being granted.

11.      The Purchase Option Agreement attached as Exhibit "A" to this Court's Final Judgment was not supported by mutual consideration.

12.      The Purchase Option Agreement attached as Exhibit "A" to this Court's Final Judgment falls within the Statute of Frauds because (1) it is for a term of more than one (1) year and (2) it involves the sale of an interest in real estate. The Purchase Option fails to satisfy the requirements of the Statute of Frauds and is voidable and unenforceable.

13.      The Purchase Option Agreement attached as Exhibit "A" to this Court's Final Judgment is void and unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

14.      The Purchase Option Agreement is an unenforceable agreement to agree.

**(2)      The Commission Agreement**

15.      No contract was formed by the Commission Agreement attached as Exhibit "B" to this Court's Final Judgment because there was no offer and acceptance, and no mutual assent or meeting of the minds on the essential terms of the Commission Agreement. Without authority, Brandon signed Nancy's name as if it had been signed by Scott. Scott did not give Brandon

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 34

CERTIFIED COPY

authority to sign on his behalf; and, Scott did not have authority to sign on behalf of Nancy. In

addition, there was no acceptance or meeting of the minds either on the commission amount or on

the property over which a commission was to be paid.

16.    The Commission Agreement attached as Exhibit "B" to this Court's Final Judgment

is voidable and unenforceable under TEX. OCC. CODE § 1101.806.

17.    The Commission Agreement attached as Exhibit "B" to this Court's Final Judgment

is void and unenforceable because Nancy lacked the requisite mental capacity to enter into a

contract.

18.    The Commission Agreement is an unenforceable agreement to agree.

**(3)    The Ranch Management and Ownership Agreement.**

19.    No contract was formed by the Ranch Management and Ownership Agreement,

which is attached to the Court's Final Judgment as Exhibit "C," because there was no acceptance

of an offer; and no mutual assent or meeting of the minds on the essential terms of the Ranch

Management and Ownership Agreement. There was no acceptance or meeting of the minds either

on the property to be managed or the cattle, if any, at issue.

20.    The Ranch Management and Ownership Agreement which is attached to the Court's

Final Judgment as Exhibit "C" falls within the Statute of Frauds because: (A) it is for a term of more

than one (1) year; and (B) it involves the sale of an interest in real estate. The Ranch Management

and Ownership Agreement fails to satisfy the requirements of the Statute of Frauds and is voidable

and unenforceable.



FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                      PAGE 35

21.     The Ranch Management and Ownership Agreement which is attached to the Court's
Final Judgment as Exhibit "C" is void and unenforceable because Nancy lacked the requisite mental
capacity to enter into a contract.

22.     The Ranch Management and Ownership Agreement is an unenforceable agreement
to agree.

### (4)     The Management Agreement.

23.     No contract was formed by the Management Agreement attached as Exhibit "D" to
this Court's Final Judgment  because there was no offer and acceptance, and there was no mutual
assent or meeting of the minds on the essential terms of the Management Agreement.  There was
no acceptance of an offer or meeting of the minds by a person authorized to act on behalf of HH.
In addition, there was no acceptance or meeting of the minds either on the property to be managed
or the property on which a commission was to be paid.

24.     The Management Agreement which is attached to the Court's Final Judgment as
Exhibit "D" falls within the Statute of Frauds because it is for a term of more than one (1) year.  The
Management Agreement which is attached to the Court's Final Judgment as Exhibit "D" fails to
satisfy the requirements of the Statute of Frauds and is voidable and unenforceable.

25.     The Management Agreement, which is attached to the Court's Final Judgment as
Exhibit "D," falls within TEX. OCC. CODE § 1101.806 and is voidable and unenforceable because
it fails to satisfy the requirements of the statute of frauds contained in TEX. OCC. CODE § 1101.806.

26.     The Management Agreement which is attached to the Court's Final Judgment as
Exhibit "D" is void and unenforceable because Nancy lacked the requisite mental capacity to enter
into a contract.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                PAGE 36

27.    The Management Agreement is an unenforceable agreement to agree.

**(5)    The Ranch Management Agreement**.

28.    No contract was formed by the Ranch Management Agreement attached as Exhibit "E" to this Court's Final Judgment because there was no acceptance of an offer, and there was no mutual assent or meeting of the minds on the essential terms of the Ranch Management Agreement. There was no acceptance or meeting of the minds by a person authorized to act on behalf of HH. In addition, there was no acceptance or meeting of the minds either about the cattle to be sold or the ranch to be managed.

29.    The Ranch Management Agreement attached as Exhibit "E" to this Court's Final Judgment falls within the Statute of Frauds because: (A) it is for a term of more than one (1) year; and (B) it involves the lease of real property.  The Ranch Management Agreement fails to satisfy the requirements of the Statute of Frauds and is voidable and unenforceable.

30.    The Ranch Management Agreement which is attached to the Court's Final Judgment as Exhibit "E" is void and unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

31.    The Ranch Management Agreement is an unenforceable agreement to agree.

**(6)    The January Lease.**

32.    No contract was formed by the January Lease attached to the Court's Final Judgment as Exhibit "F" because there was no acceptance of an offer, and there was no mutual assent or meeting of the minds on the essential terms of the January Lease.  There was no acceptance or meeting of the minds by a person authorized to act on behalf of HH.  In addition, there was no

CERTIFIED COPY

acceptance or meeting of the minds about the property to be leased or even the year when the

January Lease would become effective.

33.     The January Lease attached to the Court's Final Judgment as Exhibit "F" falls within

the Statute of Frauds because it involves the lease of real estate for a term longer than one year.  The

January Lease fails to satisfy the requirements of the Statute of Frauds and is voidable and

unenforceable.

34.     The January Lease attached to the Court's Final Judgment as Exhibit "F" is void and

unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

35.     The January Lease is an unenforceable agreement to agree.

(7)     **The June/July Lease.**

36.     No contract was formed by the June/July Lease attached to the Court's Final

Judgment as Exhibit "G" because there was no acceptance of an offer, and there was no mutual

assent or meeting of the minds on the essential terms of the June/July Lease.  There was no

acceptance or meeting of the minds by a person authorized to act on behalf of HH.  In addition, there

was no acceptance or meeting of the minds about the property to be leased, or about the month in

which the June/July Lease was to first become effective.

37.     The June/July Lease attached to the Court's Final Judgment as Exhibit "G" falls

within the Statute of Frauds because it involves the lease of real estate for a term longer than one

year.  The June/July Lease fails to satisfy the requirements of the Statute of Frauds and is voidable

and unenforceable.

38.     The June/July Lease attached to the Court's Final Judgment as Exhibit "G" is void

and unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAGE 38

39.    The June/July Lease is an unenforceable agreement to agree.

**(8)    The January Bill of Sale.**

40.    No contract was formed by the January Bill of Sale attached to the Court's Final Judgment as Exhibit "H" because there was no acceptance of an offer, and there was no mutual assent or meeting of the minds on the essential terms of the January Bill of Sale. There was no acceptance or meeting of the minds by a person authorized to act on behalf of HH. In addition, there was no acceptance or meeting of the minds about the quantity or the identity of the cattle to be sold.

41.    Because HH did not own any cattle or livestock at the time of the January Bill of Sale, the January Bill of Sale does not transfer any cattle or livestock.

42.    The January Bill of Sale attached to the Court's Final Judgment as Exhibit "H" falls within the Statute of Frauds of TEX. BUS. & COMM. CODE ANN. § 2.201(a) because it involved the sale of goods valued at over $500.00. The January Bill of Sale fails to satisfy the requirements of the Statute of Frauds and is voidable and unenforceable. No gap filler is available to supply the quantity of cattle to be sold.

43.    The January Bill of Sale attached to the Court's Final Judgment as Exhibit "H" is void and unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

44.    The January Bill of Sale is an unenforceable agreement to agree.

**(9)    The June Bill of Sale.**

45.    No contract was formed by the June Bill of Sale attached to the Court's Final Judgment as Exhibit "I" because there was no acceptance of an offer, and there was no mutual assent or meeting of the minds on the essential terms of the June Bill of Sale. There was no acceptance or meeting of the minds about the quantity or the identity of the cattle to be sold.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PAGE 39

46.    Because HH did not own any cattle or livestock at the time of the June Bill of Sale, the June Bill of Sale does not transfer any cattle or livestock.

47.    The June Bill of Sale attached to the Court's Final Judgment as Exhibit "I" falls within the Statute of Frauds of TEX. BUS. & COMM. CODE ANN. § 2.201(a) because it was for the sale of goods valued at over $500.00. The June Bill of Sale fails to satisfy the requirements of the Statute of Frauds and is voidable and unenforceable. No gap filler is available to supply the quantity of cattle to be sold.

48.    The June Bill of Sale attached to the Court's Final Judgment as Exhibit "I" is void and unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

49.    The June Bill of Sale is an unenforceable agreement to agree.

**(10)    Conclusions applicable to all the 2020 Documents.**

50.    To act on behalf of the Trusts or on behalf of HFT, both co-trustees must act together. No single trustee had the authority to take actions on behalf of the Trusts or HFT. In particular, Scott did not have the authority to bind the Trusts or HFT without Robin.

51.    Scott did not have the authority to act alone on behalf of Nancy. Even if he did, he breached his fiduciary duty to Nancy by acting in Brandon's and his own best interest, instead of in Chuck's and Nancy's best interest.

52.    None of the 2020 Documents are enforceable by specific performance because Brandon and Löwenjäger did not establish that they were or are ready, willing, and able to perform.

53.    Specific performance also could not be ordered because neither the land nor the cattle at issue were ever identified.

54.     No fraud is perpetrated on Löwenjäger or Brandon by the enforcement of the Statute of Frauds.

55.     The partial performance exception does not apply to:

- The Purchase Option Agreement (Exhibit "A" to the Final Judgment);

- The Commission Agreement (Exhibit "B" to the Final Judgment);

- The Ranch Management and Ownership Agreement (Exhibit "C" to the Final Judgment);

- The Management Agreement (Exhibit "D" to the Final Judgment);

- The Ranch Management Agreement (Exhibit "E" to the Final Judgment);

- The January Lease (Exhibit "F" to the Final Judgment);

- The June/July Lease (Exhibit "G" to the Final Judgment);

- The January Bill of Sale (Exhibit "H" to the Final Judgment); or

- The June Bill of Sale (Exhibit "I" to the Final Judgment).

56.     If the Commission Agreement, the Ranch Management and Ownership Agreement; the Management Agreement, the Ranch Management Agreement, the January Lease, the June/July Lease, the January Bill of Sale, or the June Bill of Sale were enforceable, neither Brandon nor Löwenjäger could recover for any alleged breach of any of those alleged agreements because Löwenjäger and Brandon committed the first material breach.

**E.      The Need to Quiet Title Concerning Happy Hollow Ranch.**

57.     HH is the rightful owner of all of Happy Hollow Ranch as more specifically described in Exhibit "J" to this Court's Final Judgment.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                                    PAGE 41

58.    Brandon and Löwenjäger made claims to all or part of Happy Hollow Ranch. Brandon's and Löwenjäger's claims negatively affected HH's title and rights to Happy Hollow Ranch.

59.    Brandon's and Löwenjäger's claims, although facially valid are legally invalid and unenforceable.

**F.    The 2019 Bill of Sale.**

60.    The 2019 Bill of Sale attached as Exhibit "K" to this Court's Final Judgment did not transfer any membership interest in Management LLC to BHT because the transferors did not own any interest in Management LLC that they could transfer.

61.    The 2019 Bill of Sale attached as Exhibit "K" to this Court's Final Judgment is void and unenforceable because Nancy lacked the requisite mental capacity to enter into a contract.

**G.    Judicial Expulsion of Management LLC**

62.    Management LLC breached its fiduciary duties to HH and breached its duties under the Agreement of Limited Partnership.

63.    Management LLC was removed as the general partner of HH by the limited partners.

64.    Management LLC was properly removed as the general partner of HH by the limited partners.

65.    The removal of Management LLC was effective even if it had been accomplished without authority.

66.    It is not reasonably practicable for the business of HH to be carried on in partnership with Management LLC.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    PAGE 42



**H.    Permanent Injunctive Relief.**

67.    Brandon and Löwenjäger engaged in multiple wrongful acts including but not limited to using and registering trademarks that do not belong to them, misappropriating Chuck's identity, exercising undue influence over HH and Chuck and Nancy, fraudulently filing false documents with the Texas Secretary of State and with the USPTO harming HH and Chuck and Nancy, and making numerous false representations and failures to disclose to HH and Chuck and Nancy.

68.    Brandon's and Löwenjäger's actions present an imminent threat of irreparable harm to HH, and most of all, to Chuck and Nancy.

69.    If Brandon continues to engage in such wrongful acts HH, the Trusts, the HFT, and Chuck and Nancy will not have any adequate remedy at law.

**I.    Fraud and Undue Influence.**

70.    The 2020 Documents are voidable and unenforceable due to Brandon's and Löwenjäger's undue influence.

71.    The 2020 Documents are voidable and unenforceable due to Brandon's and Löwenjäger's fraud.

**J.    Unaddressed Defenses and Claims.**

72.    Brandon's and Löwenjäger's unclean hands bar all of their equitable remedies and defenses.

73.    Brandon cannot recover in *quantum meruit* because the evidence showed an at-will employment contract between HH and Brandon.

74.    Any finding of fact that constitutes a conclusion of law is hereby deemed a conclusion of law and should be treated as such.

SIGNED this _____ day of _____ 2023.
3/30/2023 2:07:55 pm

_____
JUDGE PRESIDING

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Cindy Lamb on behalf of Dorothea Vidal
Bar No. 20578100
clamb@gpd.com
Envelope ID: 74151738
Filing Code Description: No Fee Documents
Filing Description: FINDINGS OF FACT AND CONCLUSIONS OF LAW
Status as of 3/31/2023 7:52 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dorothea Vidal | | dvidal@gpd.com | 3/29/2023 11:47:07 PM | SENT |
| Janet Bryan | | jbryan@gpd.com | 3/29/2023 11:47:07 PM | SENT |
| Peter King | | pking@gpd.com | 3/29/2023 11:47:07 PM | SENT |
| Charlotte Colclough | | ccolclough@gpd.com | 3/29/2023 11:47:07 PM | SENT |
| elizabeth spivey | | elizabeth.spivey@huschblackwell.com | 3/29/2023 11:47:07 PM | SENT |
| Jason McCoy | | jason@mccoylawpllc.com | 3/29/2023 11:47:07 PM | SENT |
| Craig Brinker | | craig.brinker@wilsonelser.com | 3/29/2023 11:47:07 PM | SENT |
| Shelly Wells | | shelly.wells@wilsonelser.com | 3/29/2023 11:47:07 PM | SENT |
| Sam Myers | | sam.myers@wilsonelser.com | 3/29/2023 11:47:07 PM | SENT |
| Ana Moran | | ana.moran@wilsonelser.com | 3/29/2023 11:47:07 PM | SENT |
| D Jason JasonMcCoy | | jason@mccoylawpllc.com | 3/29/2023 11:47:07 PM | SENT |
| Kimberley Griffin | | kim@elliottlawfirmpc.com | 3/29/2023 11:47:07 PM | SENT |
| Joel CElliott | | info@elliottlawfirmpc.com | 3/29/2023 11:47:07 PM | SENT |
| Joel Elliott | | info@elliottlawfirmpc.com | 3/29/2023 11:47:07 PM | SENT |
| Justin Beckham | | justin@wynneandwynne.com | 3/29/2023 11:47:07 PM | SENT |
| Justin Beckham | | justin@wynneandwynne.com | 3/29/2023 11:47:07 PM | SENT |



I certify this to be a true and
exact copy of the original on file
in the District Clerk's Office
Van Zandt County, Texas
By
DEPUTY CLERK

App'x 159

Filed 6/1/2022 12:04 PM
Karen L. Wilson
District Clerk
Van Zandt County, Texas

Tara Monroe

Cause No. 22-00060

| | | |
|---|---|---|
| HAPPY HOLLOW RANCH, LP, a Texas Limited Partnership; and SCOTT HOWLEY, and ROBIN HOWLEY FABIK as next friends for CHARLES L. and NANCY HOWLEY, | § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § § | VAN ZANDT COUNTY, TEXAS |
| v. | § § § | |
| B R A N D O N   H O W L E Y ,   a n d LÖWENJÄGER, LLC, | § § § | |
| *Defendants.* | § | 294th   JUDICIAL DISTRICT |

---

### PLAINTIFFS' ORIGINAL PETITION
### AND EMERGENCY APPLICATION FOR TRO

---

TO THE HONORABLE JUDGE:

Plaintiffs, HAPPY HOLLOW RANCH, LP, a Texas Limited Partnership ("HH"), and SCOTT HOWLEY and ROBIN HOWLEY FABIK, as next friends for CHARLES L. ("Chuck") and NANCY HOWLEY ("Nancy") file this Original Petition and Emergency Application for Temporary Restraining Order against defendants, BRANDON HOWLEY ("BH"), and LÖWENJÄGER, LLC ("Löwenjäger"). In support thereof, Plaintiffs respectfully show the following:

PLAINTIFFS' ORIGINAL PETITION AND EMERGENCY APPLICATION FOR TRO                    PAGE 1

# I.

## SUMMARY OF THE CLAIMS

HH owns almost 1,500 acres in Van Zandt County that comprise the Happy Hollow Ranch

("The Ranch").   HH acquired The Ranch from Chuck and Nancy Howley who are elderly, and who

are both physically and cognitively impaired.  Chuck and Nancy require 24-hour care.  Chuck and

Nancy's next friends are their only two children who are responsible for caring for Chuck and Nancy.

Through fraud, fraudulent non-disclosure, and by taking unfair advantage of Nancy's inability

to fully understand the transactions presented to her, in June 2020, defendant, BH (one of Chuck and

Nancy's six grandchildren) induced Nancy to sign certain documents on behalf of herself and Chuck.

Relying on void and wrongfully secured documents, BH and his company, Löwenjäger, wrongfully

diverted over 75% of the revenue from The Ranch to themselves.  Worse, BH drained a significant

portion of the funds saved by Chuck and Nancy to provide for their old age.

Prior to 2020, through The Ranch, HH was able to break even and provide a peaceful country

retreat for Chuck and Nancy and their family.  After 2020, because of BH's fraud and unfair over

reaching, HH now operates at an annual loss of over $250,000.00.  A loss that has drained Chuck's

and Nancy's resources so severely that they no longer have the resources necessary to provide for

their care for the rest of their lives.  As a result, The Ranch must be sold to provide the resources that

Chuck and Nancy need.  Unfortunately, the documents wrongfully and fraudulently induced by BH

are clouding HH's title to The Ranch so that The Ranch cannot be sold, and an offer that has been

received for The Ranch may be lost.

Plaintiffs seek a TRO to restrain BH and Löwenjäger (a company BH owns and controls)

from presenting Chuck or Nancy with any more documents;  from purporting to have the authority

to act on behalf of any of Plaintiffs; from encumbering, collateralizing, selling, or leasing all, or any part of HH's property; and from filing any documents that will affect Chuck, Nancy, HH's title to The Ranch, or that will affect HH itself.

In addition, Plaintiffs seek a declaratory judgment declaring the wrongfully secured documents void and unenforceable. Plaintiffs also seek to remove the cloud from HH's title to The Ranch. Plaintiffs seek to recover all of the funds wrongfully diverted from HH, and Chuck and Nancy by Defendants and seek an accounting of all revenues and benefits Defendants received or derived from HH, The Ranch, or Chuck and Nancy.

## II.
### CLAIM FOR RELIEF & DISCOVERY CONTROL PLAN – LEVEL 3

1.      Plaintiffs intend to conduct discovery under Level 3 of the Texas Rules of Civil Procedure. This suit is not governed by TEX. R. CIV. P. 169 because Plaintiffs seek injunctive relief and monetary relief in excess of $250,000.00.

2.      Plaintiffs seek both non-monetary and monetary relief of more than $1,000,000.00 exclusive of attorneys' fees, punitive damages, and interest.

## III.
### PARTIES & SERVICE

3.      Plaintiff HH is a Texas Limited Partnership with its principal place of business in Dallas, Texas.

4.      Plaintiffs Chuck and Nancy are both citizens of Texas. Both of them reside in both Van Zandt and Dallas Counties. Chuck and Nancy are physically and cognitively impaired. They appear through their next friends and their only children Scott Howley ("Scott") and Robin Howley Fabik ("Robin").

5.    Defendant Brandon Howley is a citizen of Texas who resides in Rockwall County, Texas.  Brandon Howley may be served at 26875 FM Highway 47, Wills Point, Texas 75169, or at 2505 Pampas Ct., Heath, TX 75126-1837.

6.    Defendant Löwenjäger, LLC is a Texas limited liability company with its principal place of business in Dallas Texas.  Löwenjäger, LLC may be served through its Manager and Registered Agent, Brandon S. Howley, at 1489 Prudential Dr., Dallas, Texas 75235 or at t 26875 FM Highway 47, Wills Point, Texas 75169 or at 2505 Pampas Ct., Heath, TX 75126-1837.

## IV.
### JURISDICTION & VENUE

7.    This Court has jurisdiction pursuant to the Texas Constitution, TEXAS GOV'T CODE §§ 24.007 and 24.471, and the Texas Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE § 37.001, *et seq.*  The relief requested is within the Court's jurisdictional limits and authority.

8.    Venue is mandatory in Van Zandt County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 15.011 because this suit seeks to recover an interest in real property and to remove a cloud on property located in Van Zandt County.  In addition, venue is proper in Van Zandt County pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) and §15.011 because all, or a substantial part of, the events or omissions giving rise to the claims occurred in Van Zandt County, Texas.

## V.
### FACTS

**A.    The Parties**

9.    Chuck Howley founded Happy Hollow Ranch in 1977 and is married to Nancy. Chuck is a well known former NFL linebacker for the Dallas Cowboys.

10.    Chuck and Nancy have two children, a son, Scott, and a daughter, Robin.

11.     In addition, Chuck and Nancy have six grandchildren.  BH is one of the six grandchildren, and he is Scott's son.

12.     HH is the owner of approximately 1,476.384 acres of real property located in Van Zandt County comprising The Ranch.  HH acquired The Ranch from Chuck who created The Ranch by aggregating approximately twenty-four (24) parcels of property over the years from 1977 to 1993.  HH is one of the largest property owners in Van Zandt County.  The Ranch has a mailing address of 26875 FM 47, Wills Point, Texas 75169.

**B.     Chuck and Nancy's cognitive decline**

13.     Chuck and Nancy are both elderly (eighty-five years old) and suffer from both physical and cognitive disabilities.  As they were facing both mental and physical decline, and to be sure that their assets would be properly managed so as to provide the funds they would need for the remainder of their lives, on August 11, 2015 Chuck and Nancy each executed durable powers of attorney appointing Scott and Robin their attorneys-in-fact and immediately vesting them with the power and ability to act on their behalf.  The powers of attorney were not affected by their subsequent disability or incapacity.

14.     To further protect Chuck and Nancy, their ownership interests in HH were transferred into two separate irrevocable trusts, one for Chuck and one for Nancy.  The trusts are named the CHL Loyal Trust and the NTH Secure Trust (collectively "the Trusts").  Chuck and Nancy are the sole beneficiaries of the Trusts.  Scott and Robin are co-trustees of the Trusts.  To further protect Chuck and Nancy, in 2015, Chuck's and Nancy's remaining assets were placed into a separate Family Trust.

15.      By 2019, Chuck was unable to manage his own affairs.  He looked to Nancy, Scott and Robin to act for him.  On June 22, 2019, Nancy was also diagnosed to be suffering with vascular dementia with aphasia (a communication impairment of both comprehension and speech).  Then, on November 6, 2019, Nancy was diagnosed with late onset Alzheimer's Disease.  During her doctor's visit in November 2019, Nancy could not remember her caregiver, Phillip's, name.  Phillip had to give the doctor Nancy's medical history because Nancy was too impaired to do it.  Nancy's medical records reveal a severe and continuing decline in cognition.

16.      Due to Nancy's declining cognition, on October 15, 2019 Scott and Robin were made co-trustees of the Family Trust.

**C.      BH's wrongful actions.**

17.      In 2019, BH sought to enter into agreements with HH that would permit him to earn some income from management of some of the cattle.  He negotiated with Scott and Robin to whom he knew Chuck and Nancy looked for major decisions.  Scott and Robin were willing to agree to some limited terms as long as those terms *improved* the income available to care for Chuck and Nancy.

18.      However, BH demanded terms that were very one sided in his favor and very harmful to Chuck and Nancy.  Scott and Robin rejected those terms and required a much more limited transaction.  BH continued to make unreasonable demands.  He was so unreasonable that he was advised there was no point to further negotiations because what BH wanted was not in the best interests of Chuck and Nancy.  At that point all negotiations ceased.

19.      After negotiations ended, BH secretly had documents drafted that were even more harmful to Chuck and Nancy and more favorable to BH.  Without the required authority, and without

the knowledge of Scott and Robin, or counsel for Chuck and Nancy, BH went to Nancy and asked

her to sign the documents.  Nancy did not understand what she was being asked to sign.  It would

have been easy for Nancy's grandson to mislead her into believing that Scott and Robin and her

counsel approved the documents.  Unless BH disclosed the fact that Scott and Robin disapproved,

Nancy would have believed that the presentation of the documents to her meant that Scott and Robin

had approved of them.

**D.    The documents and activity at issue**

20.    By taking unfair advantage of Nancy's inability to understand what she was signing,

in June 2020, BH induced Nancy to sign the documents on behalf of herself and Chuck.  Among

others, the documents BH had Nancy sign were:

> A.    An Option to Purchase some unidentified three hundred sixty
> (360) acres of The Ranch at a fixed, below-market price for
> thirty (30) years ("the Option to Purchase");
>
> B.    A Bill of Sale that sold the cattle owned by HH (not properly
> identified) to BH's company, Löwenjäger, for a below market
> price of $303,500.00 ("the Bill of Sale");
>
> C.    A Promissory Note that loaned $300,000.00 in principal to
> Löwenjäger to pay for the cattle at the below market interest
> rate of 3.25% *per annum* ("Promissory Note");
>
> D.    A Loan Agreement through which HH loaned $300,000.00 in
> operating capital to BH's company, Löwenjäger, at a below
> market interest rate of 3.25% ("the Loan Agreement");
>
> E.    A Commission Agreement that required HH to pay BH's
> company, Löwenjäger, a commission in the extraordinary
> amount of 30% of all of the revenue received from an
> unidentified "solar field agreement" on an unidentified portion
> of The Ranch ("the Commission Agreement"); and

F.      A Management Agreement that required HH to pay BH's company, Löwenjäger, $450 per week plus 15% of some unidentified "alternative revenue" from "real property" that also is not identified ("the Management Agreement").

These agreements will be referred to collectively as the "June 2020 Agreements."

21.    Also unknown to Scott and Robin, in April 2020, BH filed a trademark application seeking to acquire a trademark in the name "Chuck Howley's Happy Hollow Ranch" to be owned solely by Löwenjäger and depriving Chuck and Nancy of the benefits of the name of The Ranch. However, because Chuck Howley is a living person, the trademark office would not issue a trademark to BH without Chuck's written consent.  BH, then, went to Chuck, who was not capable of making such a decision at the time, and had him sign a written consent for Löwenjäger, BH's company, to own the trademark of Chuck's name and The Ranch.  Now, Löwenjäger is listed as the trademark owner of the following word marks:

A.      Chuck Howley's Happy Hollow Ranch;

B.      CH (with the mark consisting of "a stylized 'C' & 'H', with the 'C' elevated above the 'H' and a lower extremity of the 'C' joined to an upper extremity of the 'H'"); and,

C.      Happy Hollow.

22.    BH also misappropriated the identity of "Chuck Howley" to himself.  BH created and maintains an Instagram identity as "@chuckhowley."  Through the misappropriated identity, BH communicates as if he is Chuck Howley, thereby harming Chuck Howely while endorsing or adding to the credibility of sites, comments, or events chosen by BH.

23.    Also unknown to Scott and Robin, in December of 2019, BH filed a Certificate of Amendment to HH's general partner's Certificate of Formation, Happy Hollow Management LLC,

claiming that the company would be managed by managers.  This was not approved in accordance with statute and is in violation of the Company Agreement of Happy Hollow Management LLC.  It was signed under penalty of perjury solely by BH who falsely asserted that he had authority to make the change.

**E.    The devastating impact on Chuck and Nancy.**

24.    Through its ownership of The Ranch, prior to 2020, HH generated modest revenue that it reinvested in The Ranch.  In 2019, the Ranch had approximately $129,000.00 in revenue. However, as a direct result of the unfair, over reaching, self-dealing, and fraudulent transactions BH extracted from Chuck and Nancy in 2020, The Ranch's revenue dropped to approximately $50,000.00, and dropped even lower to $45,000.00 in 2021.

25.    To make matters worse, although BH purports to have purchased HH's cattle (he even sold cattle and kept the proceeds for himself), BH continued to require HH to pay for cattle medications and cattle feed.  In fact, HH paid more than four times as much for cattle medications in 2021 than it did in 2019, before the June 2020 Agreements.  Further, although BH argues that he is entitled to a commission based on the Management Agreement, he still received a salary for doing the very same work for HH.  Instead of reducing expenses, and increasing the funds available to HH and Chuck and Nancy, BH increased HH's expenses while diverting over 75% of its revenue to himself and his company.  As a result, HH has been operating at a significant loss (more than $250,000 in losses in 2021).  Instead of improving Chuck's and Nancy's financial situation, the June 2020 Agreements made it worse.  To cover the losses, Chuck and Nancy had to use the savings they need to provide for their care for the rest of their lives.  The care that Chuck and Nancy need is significant because they require at least three (3) full time caretakers.

26.     Because of the drain on Chuck and Nancy's funds caused by BH through the June 2020 Agreements, Scott and Robin determined that they would have to sell The Ranch to provide for Chuck and Nancy's needs.  On May 1, 2022, HH received an offer to purchase The Ranch.

27.     Knowing that a potential offer to purchase (or some type of transaction) was in the works, on April 28, 2022, BH purported to exercise his Purchase Option Agreement.  According to BH, this allegedly converts the Purchase Option Agreement into an agreement to sell.

**F.     The imminent and irreparable harm**

28.     There is an imminent danger that the third-party purchase offer to HH will be lost and that no sale can be consummated as long as the June 2020 Agreements remain in place.  As a result, a declaration about whether the June 2020 Agreements are enforceable is needed without delay.

29.     BH admits that there is "absolute urgency" in having the matter resolved because of the conflict and uncertainty that has been created.

**VI.**
**CLAIMS & RELIEF REQUESTED**

**A.     Application for a Temporary Restraining Order and Temporary Injunction**

30.     As set forth in Section VI.B. through VI.C. below, the June 2020 Agreements and the trademark registrations are unenforceable and void for multiple reasons.  Among other things, the June 2020 Agreements:

     a.     Were fraudulently induced with misrepresentations and by taking advantage of a cognitively impaired person's disabilities and going around those who were charged with protecting her to such an extent and in such a way that it would be inequitable to enforce the agreements;

     b.     Violate the Statute of Frauds;

    c.      Violate the Real Estate License Act;

    d.      Fail for want of consideration;

    e.      Fail for lack of mutuality; and,

    f.      Fail to describe the parties' rights and obligations so that it is impossible to determine what the parties' rights and obligations might be.

31.    The threat of harm to HH and to Chuck and Nancy is imminent. Defendants claim that they have rights under the unenforceable June 2020 Agreements and the trademark registrations. Under the guise of the bogus June 2020 Agreements and the trademark registrations, Defendants are draining Chuck's and Nancy's resources, and are interfering with HH's contracts and potential contracts concerning The Ranch.

32.    Among other things, BH represents himself to be the person in charge with respect to all negotiations concerning The Ranch when, he is not. Further, BH demands information and action from HH and Chuck and Nancy to which he is not entitled.

33.    BH is selling HH's cattle, keeping the proceeds for himself, and failing to account to HH or Scott and Robin for the proceeds. Further, BH is causing invoices to be submitted to HH for payment that have been approved only by BH.

34.    Worst of all, BH is attempting to enforce the void June 2020 Agreements. Unless Defendants are enjoined, Defendants will proceed to interfere with the sale or lease of The Ranch. A transaction that is essential to provide for the care of Chuck and Nancy may be lost. As interest rates are rising rapidly, the ability to sell or lease The Ranch in an economically feasible way may be lost for the foreseeable future and for the remainder of Chuck's and Nancy's lives. There is no way to remedy this harm at law or through money damages.

PLAINTIFFS' ORIGINAL PETITION AND EMERGENCY APPLICATION FOR TRO        PAGE 11

35.     Plaintiffs seek a temporary restraining order, a temporary injunction, and a permanent injunction, enjoining Defendants from, directly or indirectly, through any other person or entity:

    a.    Obtaining Chuck's or Nancy's signature on any document;

    b.    Requesting the agreement of Chuck or Nancy to anything;

    c.    Purporting to have the authority to act on behalf of HH or Chuck or Nancy;

    d.    Representing or purporting to have the authority to act on behalf of Scott or Robin;

    e.    Encumbering, collateralizing, selling, or leasing all of any part of HH's property including, but not limited to, The Ranch, the cattle, the equipment, the trademark rights, and any other intellectual property;

    f.    Allowing any lien or encumbrance to attach to HH's property by failing or causing a failure to pay taxes, for work performed, or through any other manner;

    g.    Filing any document in the deed records with respect to property owned by HH, Chuck, or Nancy;

    h.    Committing either HH or The Ranch to any obligation; and

    i.    Filing any document with the Texas Secretary of State or any other State or federal governmental entity concerning HH.

**B.     Declaratory Judgment Action**

**1.     The June 2020 Agreements should be declared unenforceable under the Statute of Frauds.**

36.     With respect to any contract for the sale of real estate, or any lease of real estate for a term longer than one year, the Statute of Frauds provides that no such agreement is enforceable "unless the promise or agreement, or a memorandum of it, is:

    (1)    in writing;  and

(2)     signed by the person to be charged with the promise or agreement or
         by someone lawfully authorized to sign for him."

TEX. BUS. & COM. CODE § 26.01.

37.     To satisfy the requirements of the Statute of Frauds, the written agreement or
memorandum required by the statute must contain the essential terms of a contract, expressed with
such certainty and clarity that it may be understood without recourse to parol evidence to show the
intention of the parties.  A property description is an essential term.

38.     The property description must not only furnish enough information to locate the
general area, as in identifying the property by survey and county, but also it must contain information
regarding the size, shape, and boundaries of the property.

         a.     **The Purchase Option does not satisfy the Statute of Frauds.**

39.     The Purchase Option contract states that "Happy Hollow owns that certain real
property and improvements thereupon located at 26875 FM 47, Wills Point, Texas 75169 and more
particularly described on Exhibit A attached hereto and made a part hereof for all purposes (the
"Land")."  But there is no Exhibit A, and, thus, no property description at all – only a mailing address
that does nothing to identify the shape or boundaries of The Ranch.

40.     Without any property description, the Purchase Option is insufficient as a matter of
law to identify the property at issue with reasonable certainty. The Purchase Option does not provide
within itself a means of identifying the land with reasonable certainty.  As such, Plaintiffs seek a
declaratory judgment that the Purchase Option is unenforceable under the Statute of Frauds.

**b.      The Commission Agreement is unenforceable under TEX. OCC. CODE § 1101.806.**

41.      TEX. OCC. CODE § 1101.806 also contains a Statute of Frauds that applies to commission agreements.  The Commission Agreement concerns a 30% commission to be paid with respect to "property owned by HH," but no effort was made to identify which property, or even the County in which it might be located.

42.      TEX. OCC. CODE § 1101.806 also renders any commission agreement unenforceable unless the party to be paid a commission is a licensed real estate broker.  Neither BH nor Löwenjäger possess a real estate broker's license.  As such, Plaintiffs seek a declaratory judgment that the Commission Agreement is unenforceable as a matter of law.

**c.      The Management Agreement is void under the Statute of Frauds.**

43.      The Management Agreement provides Defendants with a 15% commission on any revenue generated from real property in Wills Point, but the specific property for which the commission is to be paid is not described or mentioned.   As previously noted, neither BH, nor Löwenjäger possess a real estate broker's license.  As such, Plaintiffs seek a declaratory judgment that the Management Agreement is unenforceable as a matter of law under both the Statute of Frauds and under TEX. OCC. CODE § 1101.806.

**2.      The June 2020 Agreements should be declared unenforceable due to Nancy's incapacity and for want of consideration and lack of mutuality.**

44.      An essential element for a contract to be valid is that there be a meeting of the minds.

45.    In order to have the required meeting of the minds to form a contract, there must be mental capacity so that the parties appreciated the effect of what they were doing and understood the nature and consequences of their acts and the business being transacted.

46.    Further, the Purchase Option, the Commission Agreement, and the Management Agreement all fail for want of consideration and for lack of mutuality.  Defendants committed to do nothing, and paid no consideration for the commitments from HH in any of those agreements.  In the alternative, if Defendants agreed to anything at all, they failed to perform and substantially breached relieving HH of any further performance.

47.    Nancy lacked the mental capacity needed to understand what she was signing, to appreciate the effect of the June 2020 Agreements she was signing, and/or to understand the nature and consequences of her acts and the business being transacted.  As such, Plaintiffs seek a declaratory judgment that the June 2020 Agreements are unenforceable as a matter of law.

**C.    Fraud, statutory fraud, fraud by non-disclosure, negligent misrepresentation, and undue influence**

48.    Alternatively, and without waiving any of the foregoing claims, if Nancy did have mental capacity to sign the June 2020 Agreements, then she signed the June 2020 Agreements due to the fraud, statutory fraud, fraud by non-disclosure, negligent misrepresentation and/or under the undue influence of Defendants.

49.    The only circumstance under which Nancy would have knowingly signed the June 2020 Agreements is if she thought she was signing something of minimal consequence, or that the June 2020 Agreements had been approved by Robin, Scott and her legal counsel.

50.    The June 2020 Agreements involved real estate.

51.     Defendants misrepresented the nature and consequences of the June 2020 Agreements and led Nancy to believe that they were either of minimal consequence, or Robin and Scott and her legal counsel had approved of the documents or both.  The misrepresentations were material and false.  Defendants knew their misrepresentations were false and made the misrepresentations with the intent that Nancy act on them.

52.      In addition, Defendants did not inform Nancy that Robin and Scott and her legal counsel did not approve of the documents, objected to the documents, and had concluded that the documents are not in Chuck's and Nancy's best interests.  Defendants had a duty to disclose these material facts to Nancy.  Defendants knew Nancy was ignorant of the facts and did not have the cognitive ability to appreciate or discover the facts.  Yet, Defendants were deliberately silent about these material facts.  By failing to disclose these important facts, Defendants intended to induce Nancy to sign the documents.

53.     Nancy reasonably and justifiably relied on her grandson's misrepresentations in signing the documents which proximately caused significant harm to Plaintiffs.  Further, Nancy reasonably and justifiably relied on her grandson's failures to disclose that those charged with advising her had concluded that the documents were not in her best interests and opposed her signing.  Defendants' failures to disclose misled Nancy into signing the June 2020 Agreements and proximately caused significant damage to Plaintiffs.

54.     Further, BH exercised such dominion and control over Nancy as to overcome her free will and prevent her from exercising her own discretion and caused her to perform actions she would not have done but for such dominion and control.

55.     All of the foregoing proximately caused damage to Plaintiffs.  For which, Plaintiffs seek to rescind all of the June 2020 Agreements, seek to recover the monetary damages proximately caused thereby, seek to impose a constructive trust over any assets wrongfully taken and over any assets traced from those assets wrongfully taken, and seek punitive damages.  Plaintiffs agree to return any consideration paid by Defendants.

**D.      Suit to remove cloud from title or quiet title**

56.     The June 2020 Agreements create a cloud on HH's title to the Ranch which should be removed.

57.     HH owns title to The Ranch.

58.     HH's title in The Ranch is affected by the claims of Defendants.  Among other things, Defendants claim to have a right of first refusal for three hundred sixty (360) acres under the Purchase Option and claim to have a right to a commission under both the Commission Agreement and the Management Agreement.  All three instruments are unenforceable and if enforced would interfere with HH's enjoyment of The Ranch.

59.     The claims by Defendants, even if facially valid, are invalid and unenforceable.

**E.      Suit for an accounting**

60.     Pursuant to the Management Agreement, and pursuant to the fact that the cattle and any other property taken by Defendants, is being held in constructive trust for Plaintiffs, Defendants have a duty to account to Plaintiffs for all of the revenue, from any source, Defendants' obtained from The Ranch, HH, Chuck, or Nancy.

61.     Plaintiffs seek an accounting of all revenues or other benefits that inured to Defendants from any source related to The Ranch, HH, or Chuck and Nancy including any revenue derived from the improper use of Chuck's name and improper trademark registration.

## VII.
### PRAYER

WHEREFORE, Plaintiffs pray:

a.     The Emergency Application for TRO be set for expedited hearing;

b.     That Defendants be cited to appear and answer herein;

d.     The Emergency TRO be entered;

e.     That a hearing on a temporary injunction be set for

        hearing within two (2) weeks;

f.      A Temporary Injunction be entered;

g.     Upon trial, a Permanent Injunction be entered;

h.     Upon trial, a declaratory judgment be entered that:

        (1)     The June 2020 Agreements are unenforceable; or

        (2)     In the alternative, the June 2020 Agreements are rescinded;

i.      That the cloud on HH's title to The Ranch created by the June 2020 Agreements be removed and title be quieted;

j.      An accounting of all revenues or other benefits Defendants have received from The Ranch;

k.     For judgment for their actual damages;

l.      For an award of their reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009;

m.    For prejudgment and post judgment interest; and

n.    For such other and further relief to which Plaintiffs may show
themselves to be justly entitled.

Respectfully submitted,

GEARY, PORTER & DONOVAN, P.C.

By:    \s\ Dorothea L. Vidal
Dorothea L. Vidal
State Bar No. 20578100
Dvidal@gpd.com
One Bent Tree Tower
16475 Dallas Parkway, Suite 400
Addison, Texas 75001-6837
(972) 931-9901, phone
(972) 931-9208, facsimile

**ATTORNEYS FOR PLAINTIFFS
HAPPY HOLLOW RANCH, LP.,
and CHUCK AND NANCY HOWLEY.**

**VERIFICATION**

"My name is Robin Howley Fabik, my date of birth is _05-17-1966_, and my address is

_2605 Sir Gawain Lane_ and United States.  I declare under penalty of
_Lewisville, Tx 75056_
perjury that the facts stated in paragraphs 9 through 29 are true and correct.

Executed in Dallas County, State of Texas, on the _31_ day of May, 2022.

ROBIN HOWLEY FABIK, Declarant"

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cindy Lamb on behalf of Dorothea Vidal
Bar No. 20578100
clamb@gpd.com
Envelope ID: 65019404
Status as of 6/1/2022 1:05 PM CST

Associated Case Party: HAPPY HOLLOW RANCH, LP, a Texas Limited Partnership; and SCOTT HOWLEY, and ROBIN HOWLEY FABIK as next friends for CHARLES L. and NANCY HOWLEY

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Dorothea Vidal | | dvidal@gpd.com | 6/1/2022 12:04:11 PM | SENT |