

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 2, 2024**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-31029-sgj7 |
| **BRANDON HOWLEY,** | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| | § | |
| **HAPPY HOLLOW RANCH, LP,** | § | |
| **ROBIN HOWLEY FABIK,** as trustee of | § | |
| the Howley Family Trust, and **ROBIN** | § | |
| **HOWLEY FABIK** as next friend for | § | |
| Charles and Nancy Howley, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 23-03068-sgj |
| | § | |
| **BRANDON HOWLEY,** | § | |
| Defendant. | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT IN DISCHARGEABILITY ACTION [DE # 10]

I.    **INTRODUCTION**

This Adversary Proceeding involves a sad family feud centered around a 1,476-acre ranch in East Texas known as the "Happy Hollow Ranch" (hereinafter so called).  The ranch was founded by a former, respected Dallas Cowboy football linebacker (from the 1970's) who was inducted into the Pro Football Hall of Fame and was MVP of Super Bowl V (Charles "Chuck" Howley). The ranch was intended to be a peaceful country retreat that would also provide monetary support for the former player and his wife, Nancy, in their later years.  Chuck and Nancy are now elderly and physically and cognitively impaired and, in 2018, retained one of their six grandchildren (Brandon, now the Chapter 7 Debtor) to manage the ranch.  Things did not go well.  Litigation ensued.

The Court is called in this Adversary Proceeding to decide whether debt owed by Brandon to the plaintiffs (i.e., his grandparents, through family trusts) is nondischargeable pursuant to § 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.[1]  The Court is presented with a common situation: there was prepetition litigation in a state court between the plaintiffs and the debtor that resulted in a judgment.  Large damages were imposed upon the debtor for various wrongful conduct, with specific findings that the debtor engaged in fraudulent behavior, including while acting as a fiduciary.  The overarching question before the Court is whether the plaintiffs must re-litigate:  in other words, are they entitled to summary judgment due to collateral estoppel's application *vis-à-vis* the state court's findings of fact?  The Supreme Court noted, long ago, that if a creditor obtains a prepetition fraud judgment, its claim will be exempt from discharge under collateral estoppel

---

[1] All mentions and citations to the Bankruptcy Code and sections therein are references to title 11 of the United States Code.

principles if the elements of the fraud claim that resulted in the judgment are the same as those of the fraud discharge exception[2] (i.e., § 523(a)(2)(A) or (a)(4), here).

The state court entered both a final judgment (on February 27, 2023) as well as a very detailed, separate set of findings of fact and conclusions of law. Then on May 25, 2023, Brandon filed for relief under Chapter 7 of the Bankruptcy Code. There are two main issues. Were these findings of fact specific enough to support the same type of fraud necessary to make a debt nondischargeable under § 523(a)(2)(A) or (a)(4)? If so, the second issue is whether the state court's attorney's fees award is also nondischargeable. The Court concludes collateral estoppel applies as to the elements necessary to establish both § 523(a)(2)(A) and (a)(4) nondischargeability, and the plaintiffs are entitled to summary judgment. Moreover, the Court concludes that the full amount of the attorney's fees, as well as the damages award, are nondischargeable debts under both § 523(a)(2)(A) and § 523(a)(4).

## II.    **JURISDICTION**

Bankruptcy subject-matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), so this Court has statutory authority to enter a final judgment. Moreover, the Court has constitutional authority to enter a final judgment because § 523 and § 727 are unequivocally bankruptcy causes of action. Courts in this district have stated that "there can be little doubt that this Court, as an Article I tribunal, has the constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case."[3] While issues in such actions may turn on state law, such as

---

[2] *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991).
[3] *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011).

collateral estoppel and fiduciary duties, "determining the scope of a debtor's discharge is a fundamental part of the bankruptcy process."[4] Lastly, venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### III.   UNDISPUTED FACTS AND PROCEDURAL HISTORY

The plaintiffs are Happy Hollow Ranch, LP ("Ranch LP") and Robin Howley Fabik (the daughter of Chuck and Nancy) in her capacity as both the trustee of the Howley Family Trust and as next friend for Chuck and Nancy (collectively, "Plaintiffs"). The defendant is the Chapter 7 Debtor, Brandon (referred to interchangeably as "Defendant" or "Brandon"). Brandon is one of six grandchildren and the son of Chuck's and Nancy's son, Scott Howley. As earlier noted, Chuck and Nancy are now elderly and infirm.

The undisputed facts encompass those adjudicated in Plaintiffs' prepetition suit against Defendant in the 294th District Court of Van Zandt County, Texas, in Cause No. 22-00060 (the "State Court Litigation") and the separate Findings of Fact and Conclusions of Law ("FoFCoL") issued in connection therewith.[5] Brandon fully participated in the State Court Litigation, with counsel. That litigation involved not only real property transactions pertaining to the Happy Hollow Ranch (into which Brandon was found to have fraudulently entered, without consent and in some cases with fraudulently obtained signatures on documents) but also mismanagement and

---

[4] *Id.*; *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006) ("Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge . . . .").
[5] Pls.' App. pt. 2, at 26, ECF No. 10-3 (State Ct.'s Findings of Fact & Conclusions of Law [hereinafter FoFCoL]). Page numbers provided herein refer to the ECF page number(s)—not the page number(s) on the original document.

diversion of revenue and property rights—including intellectual property such as trademarks, in which Chuck had interests.[6]

### A. Happy Hollow Ranch, the Defendant's Mismanagement, and the Resulting Prepetition State Court Litigation

Chuck originally owned the acreage compromising the Happy Hollow Ranch, having acquired it starting in the 1970's.  He eventually, in 2011, transferred the acreage into the entity know as Happy Hollow Ranch, L.P. (i.e., Ranch LP) as part of his and Nancy's estate planning, with which they were assisted by their estate-planning lawyer, Jim Mincey.[7]  The partnership was structured such that a trust established for Chuck (the CLH Trust, of which Chuck was beneficiary) owned a 49.99% limited partnership interest, a trust established for Nancy (the NTH Trust, of which Nancy was the beneficiary) owned a 49.99% limited partnership interest, and an entity known as Happy Hollow Management, LLC ("Ranch LLC") held a .02% general partnership interest.[8]  Ranch LLC, in turn, was owned 50% by Chuck and 50% by Nancy (i.e., Chuck and Nancy were the sole members).[9]  Ranch LLC was member-managed and Chuck handled all the business and financial transactions for it.  Eventually, Chuck's and Nancy's respective 50% membership interests in Ranch LLC were placed into the separate Howley Family Trust.[10]  In fact, all of Chuck's and Nancy's personal property assets were put into the Howley Family Trust, including the cattle and livestock of the Happy Hollow Ranch and various trademarks.[11]

---

[6] App. pt. 2, at 26, 27, ¶¶ 1, 11 (FoFCoL).
[7] App. pt. 2, at 27–28, ¶¶ 15, 16 (FoFCoL).
[8] App. pt. 2, at 27–28, ¶¶ 14–18 (FoFCoL).
[9] App. pt. 2, at 28, ¶ 17 (FoFCoL).
[10] App. pt. 2, at 28, ¶ 20 (FoFCoL).
[11] App. pt. 2, at 28–29, ¶¶ 22–23 (FoFCoL).

In 2016, Chuck was diagnosed with a form of dementia and soon required 24-hour care. In 2018, Nancy's own cognitive abilities became impaired. As a result of all this, in 2018, Brandon was hired as a manager of the Howley's ranching operation.[12]

Brandon soon committed several wrongful acts (some apparently in collusion with his father Scott Howley) in what appeared to the State Court to not only be mismanagement, but also a complex fraudulent scheme to first gain control of the ranch, and then misappropriate significant value and assets.[13] As for Defendant's mismanagement of Happy Hollow Ranch, it included the starvation and neglect of the Howleys' cattle, "causing a high death rate in the herd, a low reproduction rate, and a low growth rate among the calves and yearlings that were born."[14] Brandon apparently also falsified cattle certifications harming Happy Hollow Ranch's good name and reputation, and alienated personnel who had worked for the ranch for decades.[15] As for misappropriation, Brandon sold large numbers of cattle and kept the sales proceeds for himself.[16] And, through a series of unauthorized documents in years 2019–2020, he, among other things, fraudulently obtained control over Ranch LLC and Ranch LP and also registered certain trademarks that rightfully belonged to the Howley Family Trust.[17]

In June 2022, Ranch LP and Chuck and Nancy filed an original petition and an emergency application for a temporary restraining order in the State Court against Defendant and his

---

[12] App. pt. 2, at 30, ¶ 29 (FoFCoL).
[13] *See* "The Need for Permanent Injunctive Relief" at App. pt. 2, at 47–50 (FoFCoL).
[14] App. pt. 2, at 47, ¶ 117 (FoFCoL).
[15] App. pt. 2, at 33, ¶ 42 (FoFCoL).
[16] App. pt. 2, at 47, ¶ 118 (FoFCoL).
[17] App. pt. 2, at 48, ¶ 120 (FoFCoL).

business—an entity known as Lowenjager, LLC.[18]  The original petition alleged that Defendant exploited his mentally incapacitated grandparents who lacked the ability to understand the various transactions Brandon entered into involving the ranch and their other property.[19]  Relying on void and wrongfully secured documents, Defendant allegedly caused over 75% of Happy Hollow Ranch's revenue to flow to himself and his business.[20]  Plaintiffs also alleged that Defendant drained a significant portion of the assets meant to provide for Chuck and Nancy Howley in their advanced age.[21]

The State Court granted a TRO and issued a temporary injunction against Defendant.[22] Given the circumstances, the State Court also found it appropriate to appoint a guardian *ad litem* to serve on behalf of Chuck and Nancy Howley.[23]  After a bench trial beginning on November 30, 2022, the State Court granted Plaintiffs leave to file a fourth amended petition to conform to the evidence adduced at trial.[24]  The fourth amended petition included claims seeking a permanent injunction, a declaratory judgment rendering certain transactions involving the ranch as void and/or unenforceable, to quiet title, recovery of revenues and benefits improperly obtained by using Chuck's name and intellectual property, damages for money had and received, rescission of

---

[18] App. pt. 2, at 70 (Pls.' Original Pet. & Emergency Appl. TRO).  Defendant's wholly owned and controlled business, Lowenjager, LLC, is a Texas limited liability company.

[19] *See* "Chuck's and Nancy's Mental Incapacity" at  App. pt. 2, at 56, ¶¶ 3–4 (FoFCoL).

[20] *See* App. pt. 2, at 53, ¶ 136(M) (FoFCoL); "Summary of the Claims" at App. pt. 2, at 70 (Pls.' Original Pet. & Emergency Appl. TRO).

[21] *See* "Chuck's and Nancy's Estate Plan" at App. pt. 2, at 28, ¶ 18 (FoFCoL).

[22] Pls.' App. pt. 1, at 29–30, ECF No. 10-2 (State Ct's Final J. & Permanent Inj. [hereinafter Final J.]).

[23] App. pt. 1, at 30 (Final J.).

[24] App. pt. 1, at 31 (Final J.).

certain documents and transactions based on fraud, negligent misrepresentation, and undue influence, damages for breach of contract, and damages for breach of fiduciary duty.[25]

### 1. The State Court's Final Judgment

On February 27, 2023, the State Court entered final judgment ("Final Judgment") for Plaintiffs.[26]  Among other things, the State Court entered a declaratory judgment, which included rendering several transactions and agreements entered in mostly 2019 and 2020 as void and/or unenforceable.[27]  There were all sorts of documents including bills of sale and lease agreements that were not properly authorized or contained unauthorized signatures.  The State Court also issued a permanent injunction prohibiting Defendant from engaging in certain activity related to Chuck and Nancy Howley and the operation of Happy Hollow Ranch.[28]  Additionally, Ranch LLC, over which Defendant improperly obtained control (through the filing of a fictitious, unauthorized documents with the Texas Secretary of State—changing Ranch LLC from member-managed to manager-managed, with him as a manager), was expelled as a partner from Ranch LP, due to breach of the partnership agreement and "breach of duty owed to the partnership or the other partners [of Happy Hollow Ranch, LP]."[29]  The State Court further imposed a constructive trust in Plaintiffs' favor along with an award of trademark rights.[30]  As for monetary relief, the State Court awarded Plaintiffs damages in the amount of **$444,324**, for which defendants (Brandon and his

---

[25] See "Claims & Relief Requested" at App. pt. 1, at 14–25 (Pls.' Fourth Am. Pet.).

[26] The entirety of the State Court's final judgment and permanent injunction can be found at App. pt. 1, at 29–42 (Final J.).

[27] See "Declaratory Judgment" at App. pt. 1, at 32–33 (Final J.).

[28] See "Permanent Injunction" at App. pt. 1, at 34–36 (Final J.).

[29] See "Decree of Judicial Expulsion" at App. pt. 1, at 36–37, ¶¶ 6–7 (Final J.).  Defendant appeared on behalf of Happy Hollow Management, LLC in the State Court Litigation by stipulation.  Happy Hollow Management, LLC is a Texas limited liability company.

[30] See "Imposition of Constructive Trust and Award of Trademark Rights" at App. pt. 1, at 37–38 (Final J.).

company Lowenjager, LLC) were jointly and severally liable.[31]   Plaintiffs were also awarded attorney's fees in the amount of **$536,463.46**.[32]   In addition, the State Court awarded post-judgment interest until the judgment is paid in full.[33]

### 2.  The State Court's Findings of Fact

At Defendant's request, the State Court entered findings of facts ("Findings of Fact") and conclusions of law ("Conclusions of Law")—44 pages in length—supporting its Final Judgment on March 30, 2023.[34]   Significant for this Adversary Proceeding, the FoFCoL are awash with explicit findings of fraud.  Among other things, the State Court found that Ranch LLC (which, recall, was the general partner of Ranch LP—originally member-managed by Chuck and Nancy, but changed to manager-managed by Brandon with himself as a manager) "put its own, and [Defendant's] interests ahead of the limited partners' interest.  [Ranch LLC] willfully and persistently acted in contravention of the Agreement of Limited Partnership of HH and breached its fiduciary duties to both HH and its limited partners."[35]   In justifying its decision to expel Ranch LLC as the general partner of Ranch LP, the State Court found that Defendant "fraudulently amended its Certificate of Formation in a way to eliminate the members' right to vote," and diverted revenue to Defendant and his business.[36]   To reiterate, Ranch LLC was originally formed

---

[31] App. pt. 1, at 40, ¶ 18 (Final J.).
[32] App. pt. 1, at 40, ¶ 20 (Final J.).
[33] App. pt. 1, at 41, ¶ 25 (Final J.).
[34] The entirety of the State Court's Findings of Fact and Conclusions of Law can be found at App. pt. 2, at 25–68 (FoFCoL).  The State Court issued its Findings of Fact and Conclusions of Law together in a single entry, but they are discussed separately in this review.
[35] App. pt. 2, at 51, ¶ 133 (FoFCoL).  As noted earlier, Chuck and Nancy Howley were the limited partners and beneficial owners of Happy Hollow Ranch, LP.  The State Court referred to Happy Hollow Ranch, LP as "HH," the Howley Family Trust as "HFT," and Happy Hollow Management, LLC as "Management LLC."
[36] *See* App. pt. 2, at 51, ¶ 134 (FoFCoL).

as a member-managed LLC, with Chuck and Nancy Howley as the sole members.[37]  Defendant

was found to have executed and filed a fraudulent amendment to the Ranch LLC agreement that

converted the entity to a manager-managed LLC, with Defendant appointing himself as one of the

managers.[38]

The State Court then discussed Defendant's "undue influence and fraud" in significant

detail.[39]  The State Court found that Defendant and his company Lowenjager, LLC "engaged in a

fraudulent scheme to exert influence" over Ranch LLC, Chuck, and Nancy.[40]  Without limitation,

the following specific findings of Defendant's undue influence and fraud were made:

A.    Firing [in 2019, after Nancy had become impaired in 2018] two of HH's
      and Chuck's and Nancy's trusted advisors (an accountant [named Alan
      Ross] and a financial advisor [named Rob Bertino]) each of whom had
      decades of experience with and knowledge about HH, the Trusts, the HFT,
      and Chuck and Nancy;

B.    Hiring a [new] financial advisor who controlled Chuck's and Nancy's and
      the Trusts' money and who was loyal to Brandon and [his father] Scott, not
      to Chuck and Nancy;

C.    Attempting to fire a third trusted advisor, a lawyer, Jim Mincey, because he
      was trying to protect HH, the Trusts, HFT, and Chuck and Nancy from
      Brandon;

D.    When Brandon did not succeed in firing Jim Mincey, he and [Brandon's
      father] Scott actively deprived Mincey of access to his clients and pursued
      transactions with the intent of depriving HH, the Trusts, HFT, and Chuck
      and Nancy of legal counsel;

E.    Although Brandon had been told there was no agreement to the [various]
      transactions he sought [these transactions apparently involved such things

---

[37] App. pt. 2, at 28, ¶ 17 (FoFCoL).
[38] App. pt. 2, at 31, ¶ 34 (FoFCoL).  Apparently, Brandon's father, Scott, and Robin, were also designated to be
managers but Brandon and Scott could override Robin's vote.
[39] *See* App. pt. 2, at 51–54, ¶¶ 136–42 (FoFCoL).
[40] App. pt. 2, at 51–52, ¶ 136 (FoFCoL).

as ambiguous sales, ambiguous lease agreements, an option to purchase, a commission agreement, a management agreement, all somehow relating to the ranch—some of which were reflected in documents attached to the State Court's Judgment], to block both Robin and Jim Mincey from any further input, Brandon made ***false representations*** to his own lawyer that the entire family (including the trustees of the Trusts) agreed with his proposed transactions;[41]

F.      Brandon made the foregoing ***false representation[s]*** to his own lawyer to encourage him to draft documents for a transaction when Brandon knew there was no agreement to the transaction;

G.      Brandon then removed the signature block for Robin (a trustee of [Chuck's and Nancy's] Trusts and HFT) and had the 2020 Documents[42] executed without her, and without her knowledge;

H.      Robin's signature block was on the draft 2020 Documents and Brandon had to remove it because the only way Brandon was able to get the documents drafted was through dishonesty directed to his own lawyer about the agreement of the entire family;

I.      The absence of Robin's signature block was an implied false representation that Robin's signature was not required on the document when it was;

J.      Brandon did not inform Robin or Jim Mincey of his intent to have Nancy sign documents without their approval;

K.      For almost a year after the fact, Brandon did not inform Robin or Jim Mincey that the documents had been signed;

L.      In many cases, Brandon had his father Scott sign documents (purportedly on behalf of Nancy) even though Brandon was well informed that Scott did not have the authority to act alone on behalf of Nancy;

M.      Brandon ***falsely represented*** that the transactions reflected in the 2020 Documents would add to HH's income, and improve the annual income available for Chuck and Nancy when the truth was that the transactions were designed to, and most certainly would, divert almost all of HH's revenue

---

[41] The State Court included a relevant footnote on this finding: "Based on the testimony of Brandon's lawyer, including the circumstances, Brandon's testimony and demeanor and the totality of the evidence, it is more likely than not that Brandon repeated the same falsehood to others, including Chuck and Nancy."

[42] "2020 Documents" is a defined term in the FoFCoL.  *See* App. pt. 2, at 58–65 (FoFCoL).

(which was from cattle sales) to Brandon and Lowenjager while increasing HH's expenses and depriving Chuck and Nancy of funds they need for their care; and

N.  The transactions that Brandon sought from HH, Chuck, and Nancy were overreaching, one-sided, and unconscionable up to and including having Chuck sign away the trademark rights to his own name in exchange for nothing of value.[43]

Regarding Chuck's and Happy Hollow Ranch's trademarks, Brandon and his company Lowenjager had registered various trademarks that had belonged to Chuck and had been transferred into the Howley Family Trust, making Lowenjager the sole registered owner of the trademarks.  Again, he did that with no lawful authority.

The State Court, in characterizing Brandon's overall set of acts, stated that "[t]he foregoing scheme was designed to and did exert influence over [Plaintiffs]," and the scheme "was designed to and did operate in such a way as to subvert or overpower [Plaintiffs]."[44]  The State Court, in characterizing Brandon's various statements or omissions in connection with numerous documents, found that "[t]he foregoing representations were material and were false," and Defendant "knew the foregoing representations were false, or [Defendant] made the representations recklessly or with disregard for the truth."[45]  On reliance, the State Court found that "[t]he foregoing false representations were made with the intent to induce reliance.  To the extent that Chuck and Nancy had any remaining mental capacity, they actually and justifiably relied upon [Defendant's] false representations."[46]

---

[43] App. pt. 2, at 52–54, ¶ 136 (FoFCoL) (emphasis added).
[44] App. pt. 2, at 54, ¶¶ 137–38 (FoFCoL).
[45] App. pt. 2, at 54, ¶ 139 (FoFCoL).
[46] App. pt. 2, at 54, ¶ 140 (FoFCoL).

Referring more specifically to the set of transactional documents at issue, the State Court stated that "[t]he 2020 Documents would not have been drafted, much less signed without [Defendant's] false representations and scheme of undue influence."[47]  On causation, the State Court found that "[Defendant's] false representations proximately caused damages to Plaintiffs in the amount of $444,324."[48]  The State Court then separately discussed money had and received. It found that "the amount of the money and benefits that rightfully and in good conscience belong to Plaintiffs but was received by [Defendant] is $444,324."[49]  The Findings of Fact then stated a $536,463.46 award to Plaintiffs for "customary attorney's fees in pursuing their declaratory judgment claims."[50]

### 3.  The State Court's Conclusions of Law

As for the Conclusions of Law, the State Court held that Chuck and Nancy Howley were mentally incapacitated and imposed a constructive trust to facilitate the return of certain intangible assets.[51]  The State Court stated that Defendant "secured Chuck's signature to the consent to use Chuck's name only because he took advantage of the fact that at the time, neither Chuck nor Nancy had the mind or memory needed to understand the nature or effect of what they were being asked to do."[52]  The State Court also invalidated the numerous ambiguous transactions in 2020 involving the ranch (i.e., purportedly memorialized in such things as bills of sale, lease agreements,

---

[47] App. pt. 2, at 54, ¶ 141 (FoFCoL).
[48] App. pt. 2, at 54, ¶ 142 (FoFCoL).
[49] App. pt. 2, at 55, ¶ 146 (FoFCoL).
[50] App. pt. 2, at 55, ¶ 148 (FoFCoL).
[51] App. pt. 2, at 56–57, ¶ 136 (FoFCoL).
[52] App. pt. 2, at 57, ¶ 6 (FoFCoL).

management agreements, commission agreements), due to lack of acceptance or meeting of the minds, a want for mutual consideration, and lack of mental capacity.[53]

Critical to this case, the State Court expressly held that "[t]he 2020 Documents are ***voidable and unenforceable due to*** [Defendant's] ***fraud***," and "undue influence."[54]   On the intellectual property, the State Court held that Defendant's "registration of the Trademarks was wrongful, ***fraudulent, and in breach of a special trust and duty*** imposed on [Defendant].  [Defendant's] conduct in registering the Trademarks was unfair and results in unjust enrichment to [Defendant] and damage to Plaintiffs."[55]   As for Ranch LLC's culpability, the State Court held that Ranch LLC "***breached its fiduciary duties*** to HH and breached its duties under the Agreement of Limited Partnership."[56]   Finishing the Conclusions of Law with the permanent injunction, the State Court held that:

> Brandon and Lowenjager engaged in multiple wrongful acts including but not limited to using and registering trademarks that do not belong to them, misappropriating Chuck's identity, exercising undue influence over HH and Chuck and Nancy, ***fraudulently filing false documents*** with the Texas Secretary of State and with the USPTO harming HH and Chuck and Nancy, and making ***numerous false representations*** and failures to disclose to HH and Chuck and Nancy.[57]

### B.  Procedural History of This Adversary Proceeding

On May 25, 2023, Defendant filed Chapter 7.  On July 31, 2023, Plaintiffs filed a timely complaint seeking a declaratory judgment rendering the State Court's judgment debt nondischargeable under 11 U.S.C. § 523(a)(4).[58]   On September 20, 2023, Plaintiffs filed an

---

[53] *See* "The 2020 Documents" at App. pt. 2, at 58–65 (FoFCoL).
[54] App. pt. 2, at 67, ¶¶ 70–71 (FoFCoL) (emphasis added).
[55] App. pt. 2, at 57, ¶ 7 (FoFCoL) (emphasis added).
[56] App. pt. 2, at 66, ¶ 62 (FoFCoL) (emphasis added).
[57] App. pt. 2, at 67, ¶ 67 (FoFCoL) (emphasis added).
[58] Pls.' Compl., ECF No. 1.

amended complaint to assert an additional nondischargeability theory under 11 U.S.C. § 523(a)(2)(A).[59]  The instant motion for summary judgment was filed by Plaintiffs on September 26, 2023.[60]

The Court heard oral argument on the issues and made a partial ruling on December 7, 2023.  For the reasons discussed in Part V.A. *infra*, the Court entered summary judgment for Plaintiffs in an oral ruling declaring the $444,324 damages award a nondischargeable debt under both § 523(a)(2)(A) and § 523(a)(4).  This Opinion reaffirms the Court's ruling on the damages issue.  On the attorney's fees question discussed in Part V.B. *infra*, the Court took that dischargeability issue under advisement and invited supplemental briefing.  The Court now concludes the attorney's fees are also nondischargeable.

## IV.    SUMMARY JUDGMENT AND COLLATERAL ESTOPPEL STANDARDS

Summary judgment is appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the Court show that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law.  *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).[61]  A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the non-movant.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  And material issues are those that could affect the outcome of the action.  *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).  The Court must view all evidence in the light most favorable to the non-moving party, and

---

[59] Pls.' Am. Compl., ECF No. 6.
[60] Pls.' Mot. Summ. J., ECF No. 10.
[61] A bankruptcy court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.

summary judgment is only appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Piazza's Seafood World*, 448 F.3d at 752 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

On issue preclusion, the Supreme Court has made clear that collateral estoppel may apply in § 523(a) adversary proceedings to determine the dischargeability of a debt. *Grogan*, 498 U.S. at 284 n.11. As for choice of preclusion law in the bankruptcy context, "[w]hen an issue was previously litigated under state law, 'a bankruptcy court will apply the law of collateral estoppel of the relevant state.'" *Fire Safe Prot. Servs. v. Ayesh (In re Ayesh)*, 465 B.R. 443, 447–48 (Bankr. S.D. Tex. 2011) (citations omitted). Thus, Texas law applies when determining the preclusive effect of a Texas judgment. *See Miller v. Lewis (In re Miller)*, 307 F. App'x 785, 790 (5th Cir. 2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508–09 (2001)). Collateral estoppel applies under Texas jurisprudence when (1) "an issue decided in the first action is actually litigated;" (2) the issue is "essential to the prior judgment;" and (3) the issue is "identical to an issue in a pending action." *Ayesh*, 465 B.R. at 448 (quoting *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 579 (Tex. 2001)).

To make this determination, bankruptcy courts look to the state court's record in the previous action. *See Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 115 (5th Cir. 1993). If each element of the § 523(a) actions was satisfied in the first case consistent with collateral estoppel's demands, then Defendant is barred from re-litigating the issues in this second action and Plaintiffs are entitled to summary judgment. On the other hand, if the State Court's judgment does not satisfy all § 523(a) elements, or if collateral estoppel does not apply (to any element), then Defendant is entitled to re-litigate that issue here.

## V.   DISCUSSION

Plaintiffs assert that both the $444,324 in damages and the $536,463.46 in attorney's fees awarded in the prepetition State Court Litigation are nondischargeable judgment debts.  The analysis is threefold.  The Court will first decide whether the State Court's damages award is nondischargeable.  To this end, the Court will evaluate whether the State Court's FoFCoL reflect that all elements for a § 523(a)(2)(A) claim were met.  The Court will then alternatively review the same for the § 523(a)(4) claim.  Second, if the elements of either claim were established in the previous action, then the Court will determine whether collateral estoppel's requirements are met.  Third, if the damages award is nondischargeable, the Court will determine whether the attorney's fees award is also nondischargeable.

Plaintiffs contend that all three questions can be answered in the affirmative.  Their motion for summary judgment asserts that there is no genuine dispute as to any material fact because multiple acts of fraud were fully and finally determined in the State Court action.  In consequence, Plaintiffs argue that collateral estoppel applies and summary judgment is proper.  This Court agrees.  For the reasons below, Plaintiffs are entitled to judgment as a matter of law under both § 523(a)(2)(A) and § 523(a)(4), and the entire $980,787.46 award for damages and attorney's fees is a nondischargeable debt.

### A.  The Dischargeability of the Damages Award

Plaintiffs maintain that the damages award is nondischargeable under both § 523(a)(2)(A) and § 523(a)(4) because the State Court's record shows that each element for both claims was met in the previous action.  The Court agrees.  Each and every element of the § 523(a)(2)(A) and the § 523(a)(4) claims appear to have been met in the course of the State Court Litigation.  Collateral estoppel's demands are met.  Consequently, the State Court's judgment is entitled to full faith and

credit with preclusive effect and the $444,324 in damages is easily a nondischargeable judgment debt.

### 1. *The dischargeability of a debt obtained by false pretenses, a false representation, or actual fraud under 11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) of the Bankruptcy Code prevents an individual debtor from discharging "*any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . .*"[62]   To satisfy summary judgment and collateral estoppel requirements, the State Court's judgment must satisfy each element of one of the three methods of proving a § 523(a)(2)(A) claim: a debt obtained by false pretenses, a false representation, or actual fraud.   Defendant argues that summary judgment for Plaintiffs is improper—or rather, that he is not barred from re-litigation by collateral estoppel, because each element of the § 523(a)(2)(A) claim is not met.   Defendant is incorrect—the State Court's judgment meets § 523(a)(2)(A)'s requirements.

Defendant lays out a five-element test for evaluating a § 523(a)(2)(A) claim.   Per Defendant, in order to except a debt from discharge, a creditor must show that (1) "the debtor made a representation;" (2) "the debtor knew the representation was false;" (3) "the representation was made with the intent to deceive the creditor;" (4) "the creditor actually and justifiably relied on the representation;" and (5) "the creditor sustained a loss as a proximate result of its reliance."   *Gen. Elec. Cap. Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).   Defendant then argues that no false representation and subsequent reliance was specifically attributed to a particular plaintiff.

---

[62] § 523(a)(2)(A) (emphasis added).

Plaintiffs cite the same five-element test for a § 523(a)(2)(A) claim in their brief supporting the motion for summary judgment.  But then in Plaintiffs' reply brief, they seem to adjust or pivot their position a bit and argue that the line of cases using the five-element test have been overruled. Plaintiffs are correct on this point.  The line of Fifth Circuit cases requiring a false representation to prove § 523(a)(2)(A) "actual fraud" has, indeed, been overruled by the Supreme Court—at least in the fraudulent conveyance context when alleging actual fraud.  *See Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 564–65 (5th Cir. 2016) ("The [Supreme] Court reversed the judgment of this court, holding that the term actual fraud in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." (internal quotations omitted)), *on remand from*, 578 U.S. 355 (2016).[63]  This line of overruled cases includes *Acosta*, which applied the same five-element test for actual fraud that was vacated in *Husky International Electronics, Inc. v. Ritz*.  578 U.S. 355, 366 (2016); *see also In re Davis*, 746 F. App'x 392, 395 (5th Cir. 2018) (per curiam) (recognizing *Acosta* as overruled).

At any rate, this discussion of *Husky* is not terribly relevant here.  To be clear, the five-element test for a § 523(a)(2)(A) claim is still good law, so long as the court applying the test is not doing so when assessing the requirements for *actual fraud*.  The test clearly still applies to assessing the requirements for *false representations*.  The first two elements regarding the latter are a false representation and knowledge of its falsity.  *Husky* only stands for the proposition that § 523(a)(2)(A) actual fraud does not *require* a false representation.  For clarity, Plaintiffs' §

---

[63] *Accord Kwong v. Aykiran (In re Aykiran)*, Ch. 7 Case No. 19-42425, Adv. No. 19-4068, 2022 WL 214816, at *4 (B.A.P. 9th Cir. Jan. 25, 2022).

523(a)(2)(A) claim here centers around false representations—not allegations of broader, actual fraud.

Turning to the facts here, all elements for a § 523(a)(2)(A) claim based on a debt obtained through a false representation were met in the State Court Litigation.  First, false representations made with Defendant's knowledge of their falsity were found in multiple instances.  Contrary to Defendant's assertion, the fact that the State Court Litigation happened to discuss an "implied" false representation,[64] in some instances, is of no consequence.  Multiple express instances of false representations were found.  Second, the State Court found that the false representations were made with the intention that they be relied upon, they induced reliance, and Plaintiffs actually and justifiably relied on the false representations.[65]  Lastly, the State Court Litigation found that Defendant's fraudulent conduct was the proximate cause of Plaintiffs' harm.

Defendant's contention that the State Court Litigation did not attribute a false representation to any particular plaintiff is baseless.  The State Court expressly held in its Conclusions of Law that Defendant "fraudulently fil[ed] false documents with the Texas Secretary of State," and made "numerous false representations . . . *to HH and Chuck and Nancy*."[66]  Plaintiffs have not merely shown that a false representation was made to a *single* plaintiff—they have shown that false representations were made to *every* plaintiff.[67]

Defendant emphasizes the fundamental principle that discharge exceptions "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor

---

[64] *See* App. pt. 2, at 53, ¶ 136(I).
[65] App. pt. 2, at 54, ¶ 139 (FoFCoL).
[66] *See supra* note 57 and accompanying text.
[67] *See, e.g.*, *supra* notes 41, 57 and accompanying text.

may be afforded a fresh start." *Hudson v. Raggio (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997). Following this, Defendant asserts that he should be permitted to conduct additional discovery to develop facts and theories to protect the value of the "fresh start" envisioned by Congress. But Defendant's emphasis on the "fresh start" principle is misplaced. Section 523(a)'s discharge exceptions reflect Congress' view that "the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start." *See Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (quoting *Grogan*, 498 U.S. at 287). Moreover, Defendant's argument misses the mark because it lacks any applicability to whether the pending fraud by false representation issue was fully and finally litigated in the prior action. Ultimately, the Court holds that all elements of § 523(a)(2)(A) were, indeed, fully and finally determined in the State Court Litigation.

### 2. *The dischargeability of a debt for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4)*

Plaintiffs also advance a second nondischargeability theory. Section 523(a)(4) of the Bankruptcy Code excepts from discharge "any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[68] The question for the Court is the same as it was on the § 523(a)(2)(A) claim: whether the elements of a § 523(a)(4) claim were met in the State Court Litigation. Or more specifically, whether the State Court's judgment was supported by findings that a qualifying fiduciary duty existed and was breached through fraud or defalcation within the meaning of § 523(a)(4). Defendant advances two arguments for why Plaintiffs are not entitled to summary judgment on their § 523(a)(4) claim—or rather, why Defendant is not bound

---

[68] § 523(a)(4).

by collateral estoppel.  First, Defendant argues that, because he was granted leave to file a fifth amended counterclaim during or after trial in the State Court Litigation, he should be permitted to conduct further discovery and receive a trial on the merits for the § 523(a)(4) claim.  Second, Defendant argues that the State Court Litigation did not result in a finding that there was a fiduciary relationship between himself and Plaintiffs that is adequate for § 523(a)(4).  This contention requires extensive analysis, but the Court can ultimately conclude that the State Court's judgment and the FoFCoL meet the requirements for a § 523(a)(4) claim.

To begin, it has been argued that Defendant may have had some sort of *informal* fiduciary duty owed to his grandparents under Texas common law—indeed, the Texas State Court stated that Brandon's and Lowenjager's registration of the Trademarks was wrongful, fraudulent, and in breach of a "special trust and duty imposed on Brandon and Lowenjager."[69]  In addition, it has been argued that there was a formal fiduciary duty owed by Brandon to the Plaintiffs and breached. In this regard, the Texas State Court stated that Ranch LLC (of which Brandon took control, by filing a fictitious amendment to its LLC agreement, making him a manager, and thus causing him to act as general partner for Ranch LP) "breached its fiduciary duties to both [Happy Hollow Ranch] and its limited partners."[70]  The internal affairs doctrine instructs courts to look to the law of the state of formation when evaluating the existence and potential breach of a fiduciary duty

---

[69] App. pt. 2, at 57, ¶ 7 (FoFCoL).
[70] App. pt. 2, at 51, ¶ 133 (FoFCoL).

involving corporate governance.[71]  Thus, since Ranch LP is a Texas limited partnership, Texas law applies to the question of whether a formal fiduciary duty existed and was breached.[72]

That said, federal courts are the arbiters of federal law.  And although "state law is important in determining whether or not a trust obligation exists," the scope of § 523(a)(4)'s fiduciary concept is a question of federal law.  *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 186 (5th Cir. 1997).  Fraud or defalcation while acting in a fiduciary capacity is required for a § 523(a)(4) claim—as defined by federal law.

Fraud as a fiduciary is different from other fraud theories.  It does not require the same common law elements that actual fraud does.  "Actual fraud" is the term used when referring to fraud committed outside of a fiduciary relationship.[73]

> Actual fraud is an intentional fraud, and the intent to deceive is an essential element of the action.  Fiduciary (or constructive) fraud, however, is a breach of a legal or equitable duty that, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty of purpose nor intent to deceive is necessary.[74]

Meanwhile, defalcation as a fiduciary is an offense with a lower bar than fiduciary fraud. The Fifth Circuit defines defalcation as a "willful neglect of duty, even if not accompanied by fraud or embezzlement," and is adjudicated "essentially [using] a recklessness standard."  *LSP Inv.*

---

[71] *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (describing internal affairs doctrine as a conflict of law rule that requires courts to adjudicate corporate governance issues under the law of the state where the entity is formed); *In re Highland Cap. Mgmt. L.P.*, No. 19-34054-sgj-11, 2023 WL 5523949, at *34 (Bankr. N.D. Tex. Aug. 25, 2023) (applying Delaware law in a contested matter involving alleged breach of fiduciary duty because the reorganized debtor was formed in Delaware.)

[72] *See Faulkner v. Kornman (In re Heritage Org., LLC)*, Ch. 11 Case No. 04-35574-BJH-11, Adv. No. 06-3377-BJH, 2008 WL 5215688, at *15 (Bankr. N.D. Tex. Dec. 12, 2008) ("Texas follows the internal affairs doctrine . . . ." (citing *Hollis v. Hill*, 232 F.3d 460, 464–65 (5th Cir. 2000))).

[73] *See* 121 Am. Jur. Trials 129 *Fiduciary Fraud* § 7 (2023).

[74] *Id.*

*P'ship v. Bennett (In re Bennett),* 989 F.2d 779, 790 (5th Cir. 1993) (citing *Moreno v. Ashworth*, 892 F.2d 417, 421 (5th Cir. 1990)).[75]   How does this recklessness standard unfold in real time? Absent fraud, judgment debts arising from duty of *care* violations, which are generally judged on a gross negligence standard in Texas, would not be considered defalcation for § 523(a)(4) purposes so long as they do not involve willful or reckless conduct.[76]   While debts arising from duty of *loyalty* violations, which tend to involve willful conduct in dealing with a business and its counterparties, would be considered defalcation, assuming reckless, knowing, or willful conduct was involved.[77]

The Fifth Circuit has also observed the Supreme Court's long held narrow view of the scope of a fiduciary duty in the § 523(a)(4) context.   The duty must stem from a "technical" or "express" trust.   *Upshur v. Briscoe*, 138 U.S. 365, 375 (1891); *Schwager*, 121 F.3d at 186.   This technical trust requirement has produced a litany of confusing jurisprudence.   There are two aspects which can be framed as (1) when the duty arose; and (2) the level of the duty.   As for when the duty arose, the requirement is simple.   To constitute a technical trust, the fiduciary relationship must have existed before any wrongdoing occurred.   *See Upshur*, 138 U.S. at 378 ("[T]he language

---

[75] *See also Schwager*, 121 F.3d at 186 (stating that in order for a prior judgment to have preclusive effect regarding defalcation under § 523(a)(4), the previous action's finder of fact "must have found a breach of fiduciary duty and awarded damages on that basis" (citation omitted)).

[76] *See* Tex. Bus. Orgs. Code § 152.206 (stating that a partner's duty of care requires conduct that "an ordinarily prudent person would exercise in similar circumstances"); *FDIC v. Harrington*, 844 F. Supp. 300, 303, 306 (N.D. Tex. 1994) (interpreting *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707 (5th Cir. 1984), stating "if Texas law imposes any liability on officers and directors for breaching the duty of care, Texas law applies a gross negligence standard of liability").

[77] *See* Tex. Bus. Orgs. Code § 152.205 (including in a partner's duty of loyalty the duty to refrain from certain affirmative actions such as using partnership property for non-partnership reasons and executing transactions involving conflicts of interest); *Loy v. Harter*, 128 S.W.3d 397, 407–08 (Tex. App.—Texarkana 2004, pet. denied) (discussing usurpation of corporate opportunity in breach of the duty of loyalty); *Landon v. S&H Mktg. Grp., Inc.*, 82 S.W.3d 666, 672–73 (Tex. App.—Eastland 2002, no pet.) (discussing conflicting interest transactions in breach of the duty of loyalty).

would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created.").[78]  Thus, "[c]onstructive or *ex maleficio* trusts—those created to combat unjust enrichment—are excluded from the scope of § 523(a)(4)" because that fiduciary duty arises in response to prior wrongdoing.  *Mid-South Maint., Inc. v. Burk (In re Burk)*, 583 B.R. 655, 669–70 (Bankr. N.D. Miss. 2018) (citing *Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998)); *accord Angelle*, 610 F.2d at 1339.

The "level" of fiduciary duty required is a much more complicated standard.  On the one hand, a technical trust does not exist simply because fiduciary duties are imposed by contract.  *See Upshur*, 138 U.S. at 376.[79]  On the other hand, the Fifth Circuit has mentioned that state law "may impose trust-like obligations on those entering into certain kinds of contracts, and these obligations may make a contracting party a trustee."  *Angelle*, 610 F.2d at 1341.[80]  In any event, Fifth Circuit case law beginning with *In re Angelle* stated that "a relationship involving confidence, trust, and good faith" was "far too broad" to satisfy the federal technical trust standard.[81]  The Fifth Circuit reaffirmed this position in *In re Gupta*, holding that a fiduciary duty "predicated solely on 'a relationship of trust and confidence'" was not a duty sufficient to constitute a technical trust.[82]  Yet after *Angelle* was decided, but before *Gupta*, the Fifth Circuit stated in *In re Bennett* that "the

---

[78] *See also Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004) (emphasizing that "a trust must exist 'prior to the wrong and without reference to it' in order to constitute a 'technical trust'" (quoting *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1340 (5th Cir. 1980))); *Angelle*, 610 F.2d at 1341 (holding a Louisiana statute that made misappropriation of funds by a contractor a criminal offense insufficient to create a technical trust because the defendant "would have been a trustee only at the time of and because of the misappropriation").
[79] *See also Tran*, 151 F.3d at 342 ("The purported trustee's duties must, therefore, arise independent of any contractual obligation.").
[80] *Angelle* interpreted § 17(a)(4) of the Bankruptcy Act, a predecessor of § 523(a)(4) of the 1978 Bankruptcy Code, but the provisions are materially indistinguishable.
[81] 610 F.2d at 1341.
[82] 394 F.3d at 352.

'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed *pursuant to statute or common law*." 989 F.2d at 784–85 (emphasis added); *see also Gupta*, 394 F.3d at 350 ("This court has . . . not hesitated to conclude that debts arising from misappropriation by persons serving in a *traditional*, pre-existing fiduciary capacity, *as understood by state law principles*, are non-dischargeable." (emphasis added)).

This considered, certain relationships are "readily accepted as traditional fiduciary relationships. These relationships include trustee-beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and principals and agents."[83] These "traditional" fiduciary relationships often satisfy the technical trust requirement.

As alluded to earlier, Texas courts have acknowledged the existence of informal fiduciary relationships, which may arise where one person trusts in and relies on another—even if no formal fiduciary relationship exists. An informal fiduciary relationship may arise out of a "moral, social, domestic, or purely personal relationship of trust and confidence." *Ritchie v. Rupe*, 443 S.W.3d 856, 874 n.27 (Tex. 2014) (and cases cited therein). That said, it is unclear if these types of informal fiduciary relationships meet the technical trust requirements for § 523(a)(4) under the federal standards articulated in *Angelle* and its progeny. On balance, this Court believes it is necessary for there to be an express (or formal) fiduciary duty imposed by statute or pursuant to a traditional common law fiduciary duty theory already recognized by federal courts, to satisfy the

---

[83] *Fiduciary Fraud*, *supra* note 73, § 5. Note: It is beyond the scope of this Opinion to consider whether these fiduciary duties may be eliminated by contract in certain states.

technical trust requirement for § 523(a)(4) purposes.[84]  For clarity, the State Court found that a fiduciary duty existed and was breached (by Ranch LLC, through Brandon, to the Plaintiffs/limited partners).  This Court is not scrutinizing that determination.  Rather, the Court is tasked with determining whether the fiduciary duty identified by the State Court was adequate for § 523(a)(4).  The Court concludes that it was, indeed, adequate.

First, the FoFCoL included a finding that Brandon was hired for the Happy Hollow Ranch in the position of manager.[85]  If Defendant had been a corporate officer or director, he would have owed traditional fiduciary duties imposed by the Texas Business Organizations Code that would pass muster under § 523(a)(4).  *See Moreno*, 892 F.2d at 421.[86]  The State Court's findings do not expressly state anything this formal—they merely state that Defendant "was hired to work for HH in the position of manager."  This alone may be adequate here, since, if Defendant was a manager of Happy Hollow Ranch, this created an agency relationship.[87]  And Texas courts have stated that "[a]gency is a type of special relationship that gives rise to a formal fiduciary duty."  *Dipprey v. Double Diamond, Inc.*, 637 S.W.3d 784, 804 (Tex. App.—Eastland 2021, no pet.).  The State Court findings reflect that:  (a) Defendant had the managerial authority as agent to control ranch

---

[84] *See, e.g.*, *Moreno*, 892 F.2d at 421 (corporate officers owed common law fiduciary duties to shareholders sufficient for § 523(a)(4)); *Carey Lumber Co. v. Bell*, 615 F.2d 370, 374 (5th Cir. 1980) (Oklahoma Lien Trust statutes created an express trust); *Lewis v. Short (In re Short)*, 818 F.2d 693, 695–96 (9th Cir. 1987) (Washington common law imposes trustee-like duties on partners of a partnership); *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986) (same under California common law).

[85] App. pt. 2, at 30, ¶ 29 (FoFCoL).

[86] Texas defines a "director" as an individual who serves on the board of directors of a foreign or domestic corporation."  Tex. Bus. Orgs. Code § 1.002(16).  An "officer" is defined as "an individual elected, appointed, or designated as an officer of an entity by the entity's governing authority or under the entity's governing documents.  Tex. Bus. Orgs. Code § 1.002(61).

[87] A company manager is an agent of the company.  *See Welch v. Coca-Cola Enters., Inc.*, 36 S.W.3d 532, 539 (Tex. App.—Tyler 2000, pet. withdrawn) ("An 'agent' is one who is authorized by another to transact business or manage some affair for him." (citations omitted)).

property and exercised that authority to fraudulently divert and procure ranch assets; (b) Defendant

knew said property was for the benefit of Chuck and Nancy Howley (i.e., they, through their family

trusts, were the 99.98% limited partners of Ranch LP which owned the ranch assets);[88] and (c)

Defendant knew that his mentally incapacitated grandparents placed him in a special position of

trust and confidence—at a minimum, as the agent/manager of Ranch LP.  Again, at a minimum,

Defendant was in an agency relationship with Plaintiffs when he was hired as a manager of the

ranch.  *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) ("Directors and

managers, if not technically trustees, occupy positions of a fiduciary nature . . . .").  This traditional

fiduciary relationship meets the federal standard.

Most importantly, the State Court expressly held that Ranch LLC (which Defendant

fraudulently controlled) breached its fiduciary duties (as a general partner) under the Texas

Business Organizations Code §§ 152.204–152.206.[89]  This is a statutorily imposed fiduciary duty

adequate for § 523(a)(4).  On this point, Defendant placed himself in a qualifying fiduciary position

by his own hand—he cannot wash himself clean now.  Defendant fraudulently amended the Ranch

LLC's certificate of formation, appointing himself as a manager of Ranch LLC.  Again, Ranch

LLC was the general partner of Ranch LP.[90]  And managers of Texas LLCs owe fiduciary duties

---

[88] "One is acting in a fiduciary capacity when the business which he transacts, or the money or property which he handles, is not his own or for his benefit, but for the benefit of another person, as to whom he stands in a relationship implying or necessitating great confidence and trust on the one part and a high degree of good faith on the other part." *Avila v. Perez (In re Perez)*, Ch. 13 Case No. 11-31919-13, Adv. No. 11-03384, 2012 WL 2576393, at * 22 (Bankr. N.D. Tex. July 3, 2012) (internal quotations and citation omitted).

[89] These provisions govern general standards of partner conduct, the duty of loyalty, and the duty of care.

[90] App. pt. 2, at 27, ¶ 14 (FoFCoL).

to the LLC's members, which were Chuck and Nancy by way of beneficial ownership.[91]

Furthermore, a limited partnership is managed by its general partners.[92]  And general partners of

Texas limited partnerships owe formal fiduciary duties to the limited partners—the latter of which,

again, were ultimately Chuck and Nancy.[93]

Finally, the doctrine of "unclean hands" judicially estops Defendant from now claiming

that he owed no fiduciary duty—or that any duty was null and void, because the duty arose from

a fraudulent amendment to Ranch LLC's certificate of formation.  *See Precision Instrument Mfg.*

*Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 807, 814–15 (1945) (describing the "unclean hands"

doctrine, which precludes a litigant from asserting defenses when that party acted fraudulently or

deceitful as to the controversy, such that his "willful act[s] concerning the cause of action . . . can

be said to transgress equitable standards of conduct").[94]

Defendant has contended that the State Court's constructive trust remedy cannot trigger a

fiduciary duty for purposes of § 523(a)(4).  Taken in isolation, this statement is correct.  But the

constructive trust that the State Court happened to impose, due to Defendant's unjust enrichment

here, was not the sole source of Defendant's fiduciary duties.  The facts here present a mix of

---

[91] Managers of manager-managed LLCs and members of member-managed LLCs that are vested with actual or apparent authority by the managers or members, as applicable, are agents of the LLC.  *See* Tex. Bus. Orgs. Code §§ 101.251, 101.254(a).

[92] Tex. Bus. Orgs. Code § 153.152(a)(1).

[93] Although the Texas Business Organizations Code does not expressly impose fiduciary duties on general partners of limited partnerships, general partners of limited partnerships are subject to the same restrictions and liabilities as apply to partners in general partnerships.  Thus, general partners of Texas limited partnerships are presumed to owe fiduciary duties of care and loyalty.  *See* Tex. Bus. Orgs. Code § 152.204(a); *see also Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 426 (Tex. App.—Austin 1997, writ denied) (holding that general partners of a limited partnership owe the limited partners the duty of disclosure regarding partnership matters).

[94] *See also* App. pt. 1, at 11, ¶ 25 (Pls.' Fourth Am. Pet.) ("The subversive purpose of this improper [Certificate of Amendment] filing was to give BH control of the general manager of HH.").

statutorily imposed duties and a common law agency and special relationship driven duty.  This

forms a robust foundation for § 523(a)(4)'s technical trust demands.  Accordingly, this Court holds

that Defendant's fiduciary duty meets § 523(a)(4)'s requirements.  And Defendant's fraudulent

registration of trademarks in breach of fiduciary duty serves as a singularly acceptable ground to

constitute fraud in a fiduciary capacity within the meaning of § 523(a)(4).

But Plaintiffs' § 523(a)(4) claim does not end there:  defalcation as a fiduciary also

occurred.  With respect to defalcation, the Fifth Circuit observed in the *Bennett* case, cited earlier,

that Texas courts have held that a general partner in control of a limited partnership "stands in the

same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust."

989 F.2d at 787 (quoting *Watson v. Ltd. Partners of WCKT, Ltd.*, 570 S.W.2d 179, 182 (Tex. Civ.

App.—Austin 1978, writ ref'd n.r.e.)).[95]  The *Bennett* defendant caused improper charges to accrue

to the limited partners instead of to the defendant, and those charges amounted to defalcation.[96]

This Court sees Defendant's diversion of revenue properly meant for Ranch LP's limited

partners the same way as *Bennett* did.  As acknowledged previously, Ranch LP's general partner

was Ranch LLC.[97]  The State Court held that Defendant's diversion of revenue and improper

accession to the ranch's income through Ranch LLC was a breach of fiduciary duty to the

partnership.[98]  Critically, even absent any findings of fraud in the State Court Litigation, because

_____

[95] *See also Schwager*, 121 F.3d at 186 ("After an examination of Texas partnership law, the *Bennett* court concluded that "Texas law clearly and expressly imposes trust obligations on managing partners of limited partnerships and these obligations are sufficient to meet the narrow requirements of section 523(a)(4)." (quoting *Angelle*, 610 F.2d at 787)).
[96] 989 F.2d at 791.
[97] *See supra* note 8 and accompanying text.
[98] *Gupta* observed that "[S]ince *Bennett* was decided, the Eighth and Ninth Circuits have held that debts of a partner toward fellow partners or the partnership are non-dischargeable on this ground." 394 F.3d at 350 (first citing *Laughter v. Speight (In re Speight)*, 16 F.3d 287, 287 (8th Cir. 1994); and then citing *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1187 (9th Cir. 1996)).  However, *Bennett* also observed a split among lower courts as to whether co-equal partners

Defendant committed *willful* acts in breach of fiduciary duty, the recklessness standard from *Bennett* is met as to whether a breach of duty rises to the level of defalcation. A willful breach of fiduciary duty sits within the common nucleus of a willful neglect of fiduciary duty under *Bennett*. The Court accordingly holds that this breach of fiduciary duty constitutes defalcation in a fiduciary capacity sufficient for a § 523(a)(4) claim. This is a major buttress for Plaintiffs' position because no fraud finding is required.

### 3.   *Collateral estoppel's application*

With the elements of Plaintiffs' § 523(a) claims having been found to be present in the State Court's FoFCoL, the Court now turns to whether collateral estoppel's requirements are met. Apart from the § 523(a) elements discussed previously, Defendant fails to identify any flaws in collateral estoppel's deployment here. Plaintiffs assert that each element was met such that the doctrine applies. The Court agrees. The State Court's record is detailed enough to trigger collateral estoppel, and no policy reasons exist to preclude its application.

Texas' first and third issue preclusion requirements are easily met on both claims—that the issues were "actually litigated"[99] previously and "identical"[100] to the issues here. The issue of

---

have fiduciary duties to each other that rise to the level required by § 523(a)(4) but declined to rule on that issue. 989 F.2d at 783–84 (listing cases at n.6–7).

[99] *See Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 272 (5th Cir. 2005) (stating that an issue was "actually litigated" for collateral estoppel purposes if the issue was "raised, contested by the parties, submitted for determination by the court, and determined"); *Pancake v. Reliance Ins. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997) (reviewing prior holdings, and saying when a Texas court enters judgment "after conducting a hearing or trial at which the plaintiff meets his evidentiary burden, the issues raised therein are considered fully and fairly litigated"); *James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451, 459–60 (5th Cir. 1971) (stating that "where a question of fact is put in issue by the pleadings, and is submitted to the jury or other trier of facts for its determination, and is determined, that question of fact has been actually litigated" (internal quotations and citation omitted)).

[100] The Fifth Circuit has applied collateral estoppel directly in the § 523(a)(2)(A) and the § 523(a)(4) context. *See Park v. Chang (In re Park)*, F. App'x 398, 400 (5th Cir. 2008). In holding that collateral estoppel barred re-litigation of Texas fraud claims in a bankruptcy proceeding, the Fifth Circuit stated that "the State Court's charge to the jury explaining the elements of fraud contained elements that were identical to those required under § 523." *Id.*

whether Defendant committed fraud by false representation was extensively reviewed by the State Court in the Final Judgment and FoFCoL.  The same was done for fraud or defalcation as a fiduciary.  And the issues are identical to the § 523(a)(2)(A) and § 523(a)(4) issues here.

Texas' second collateral estoppel requirement is that the issue was essential to the prior judgment.  This presents a much more complicated inquiry on the record before the Court.  Even still, this requirement is also met.  As a baseline, *In re Schwager* recognized that Texas courts have adopted the Restatement (Second) of Judgments § 27 for issue preclusion.[101]  Schwager, the debtor-defendant, argued that the prepetition state court judgment was insufficient for collateral estoppel because the jury found that he breached the partnership agreement *and* his fiduciary duty.[102]  Schwager maintained that "the conjunctive nature of the jury's damages finding means it was impossible to determine what was the basis for the issuance of the debt against Schwager."[103]  The Fifth Circuit agreed with Schwager and held that collateral estoppel did not apply.[104]

The court relied on the ruling from *Eagle Properties, Inc. v. Scharbauer*, 807 S.W.2d 714, 722 (Tex. 1991), where the Supreme Court of Texas applied the Restatement's Comment *i*.  The comment provides:  "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone."[105]  The Supreme Court of Texas' justification for the rule was that "a determination in the alternative may not have been as

---

[101] 121 F.3d at 183; *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1203 n.6 (5th Cir. 1996) (citing cases and noting that Texas follows the Restatement (Second) of Judgments § 27 in determining when issue preclusion is proper).  All further mentions of "Restatement" refer to the Restatement (Second) of Judgments § 27.
[102] *Schwager*, 121 F.3d at 183.
[103] *Id.* (internal quotations omitted).
[104] *Id.*
[105] Restatement (Second) of Judgments § 27 cmt. *i.*

rigorously considered as it would have been if necessary to the result, and the losing party may be dissuaded from appealing one determination because of the likelihood that the other will be upheld."[106]  In other words, if the finder of fact in the prior action was asked a single question to award damages for *either* one legal theory *or* another, then *neither* issue was "essential" to the prior judgment "because the award can be upheld on either basis."[107]

The Southern District of Texas' decision in *In re Dang* provides helpful color to this "conjunctive" damages problem from *Schwager*—which may be more simply referred to as a judgment entered on alternative grounds.[108]  Interpreting *Schwager*, the court stated:  "When a jury awards damages on alternative grounds, issue preclusion does not apply to either ground.  In that circumstance, a bankruptcy court must hold an evidentiary hearing to decide dischargeability and apportion damages if some result from a nondischargeable debt."[109]

At the same time, Texas recognizes a "rigorously considered" exception to this prohibition against collateral estoppel due to an alternative damages award.[110]  "When it is apparent that the trial court 'rigorously considered' one of the alternative grounds for decision, by 'carefully reviewing each contention,' that ground may be considered "'essential' to its judgment for the purposes of preclusion by collateral estoppel."  *Dang*, 560 B.R. at 293 (quoting *Eagle Props.*, 807 S.W.2d at 722).[111]  The focal point here is whether the State Court's judgment provided enough

---

[106] *Eagle Props.*, 807 S.W.2d at 722.
[107] *Schwager*, 121 F.3d at 183.
[108] *Gilbert v. Dang (In re Dang)*, 560 B.R. 287 (S.D. Tex. 2016).
[109] *Id.* at 291.
[110] *See Williams v. Home Depot USA, Inc. (In re W. Hills Park Joint Venture)*, 587 F. App'x. 89, 92 n.2 (5th Cir. 2014) (acknowledging Texas' "rigorously considered" exception and indicating that the exception may apply even if a trial court erred in determining that an issue was essential to the prior judgment (citing *Eagle Props.*, 807 S.W.2d at 722)).
[111] *Schwager* also identified a similar exception to the Restatement's Comment *i* found in Comment *o*.  121  F.3d at 183 ("If the judgment of the court of first instance was based on a determination of two issues, either of which standing

detail and analysis on the issues calling for a debt to be rendered nondischargeable.[112]  If so, then

the Restatement Comment *i* does not apply and the determination of that issue has preclusive

effect.

This Court faces a similar problem here, but *Schwager* and the Restatement are not fatal

for Plaintiffs.  Calibrating the appropriate lens, the question is whether the issue of fraud was

essential to the State Court's Final Judgment.  The Court believes it was.  First, nothing in the State

Court's record suggests that the Final Judgment was entered on an alternative basis.  The situation

here is distinguishable from the one in *Schwager*, where the finder of fact "was asked in a single

question to award damages for *either* breach of fiduciary duty *or* breach of the partnership

agreement."[113]  The record does not indicate that any alternative determination was made such that

collateral estoppel is inapplicable here.[114]

And even if the judgment were considered made on an alternative basis, it cannot be said

that the issue of fraud was not essential.  Excluding equitable relief, the State Court awarded

---

independently would be sufficient to support the result, and the appellate court upholds both of these determinations as sufficient and accordingly affirms the judgment, the judgment is conclusive as to both determinations.  In contrast to the case discussed in Comment *i*, the losing party has here obtained an appellate decision on the issue, and thus the balance weighs in favor of preclusion." (quoting Restatement (Second) of Judgments § 27 cmt. *o*)).  This Comment *o* exception is similar to the "rigorously considered" exception.  Both exceptions seek to ensure that due process demands are met by only permitting issue preclusion when the risk is negligible that an identical, essential issue was not fully litigated and determined previously.

[112] "When a state-court judgment does not contain sufficiently detailed findings to meet the federal nondischargeability test, the court should look beyond the judgment and examine the jury instructions and evidence produced in the state-court proceedings that support the judgment." *Dang*, 560 B.R. at 293 (first citing *Harold V. Simpson & Co. v. Shuler (In re Shuler)*, 722 F.2d 1253, 1257–58 (5th Cir. 1984); and then citing *Sierra Invest. Assoc., ex rel. Willow Bend Bancshares, Inc. v. Tomlin (In re Tomlin)*, Ch. 7 Case No. 99-35175-BJH-7, Adv. No. 99-3485-BJH, 2005 WL 6440629 (Bankr. N.D. Tex. Dec. 20, 2005)).

[113] 121 F.3d at 183.

[114] The only potential alternative ruling was on Chuck's and Nancy's mental capacity for purposes of reliance.  The State Court found "[t]o the extent that Chuck and Nancy had any remaining mental capacity, they actually and justifiably relied upon [Defendant's] false representations."  App. pt. 2, at 54, ¶ 140 (FoFCoL).

$444,324 in damages under two legal theories: (1) undue influence and fraud; and (2) money had and received. Defendant contends that the State Court awarded damages for one legal theory that could result in a nondischargeable judgment debt, while the other may be dischargeable. Following this, Defendant's argument is parallel to the theory that the $444,324 in damages was awarded after determining two issues, "either of which standing independently would be sufficient to support the result." This could make the determination of either issue non-preclusive under the rule from Comment *i*.

However, the record here shows that *both* theories for awarding damages stemmed from detailed findings of fraud. The situation here is not like the one in *Dang*, where that court declined to apply collateral estoppel because "neither the jury verdict nor the state-court judgment included specific findings on whether [defendants'] intentional fraud on its own supported the entire damage award."[115] Awarding damages for undue influence and fraud of course required a fraud finding. The State Court awarded $444,324 in damages on that basis, and met every element required by § 523(a)(2)(A) and § 523(a)(4). The core question involves the claim for money had and received, for which the State Court also awarded the same $444,324 in damages.

Although money had and received does not require a finding of fraud, fraud was so found. Why was Defendant in possession of money "which in equity and good conscience belongs to [Plaintiffs]?"[116] Because of the fraudulent scheme perpetrated by Defendant. The point is that both the undue influence and fraud theory and the money had and received theory are both

---

[115] 560 B.R. at 294.
[116] *See Graman v. Graman*, No. 05-14-01254-CV, 2016 WL 235055, at *5 (Tex. App.—Dallas Jan. 20, 2016, no pet.) (mem. op.) (stating Texas' requirements for a money had a received claim, which is an equitable doctrine aimed at preventing unjust enrichment).

supported by extensive findings of fraud.  Put contrarily, neither the undue influence and fraud theory nor the money had and received theory support the damages award *independently without a finding of fraud*.  For this reason, to the extent that Comment *i* occupies the field, the "rigorously considered" exception applies.[117]

Furthermore, the policy basis for the rule from Comment *i* weighs against its application here.  One purpose for declining to extend preclusive effect to a previously litigated issue is rooted in fairness.  A party may not have had incentive to fully litigate an issue at trial or pursue an appeal if a court could dispose of the case by only deciding an issue on an alternative basis.  But no such fairness concerns exist if the trial court "rigorously considered" both issues—even without appeal.[118]

Although no Texas appellate court reviewed the State Court's Final Judgment, this Court can still ask the relevant question:  did Defendant have incentive to fully litigate the fraud issue, such that the concerns from Comment *i* are absent?  Absolutely.  Defendant had every incentive to challenge whether his actions rose to the level of fraud.  Fraud was the essential issue—and the essential finding.  If Defendant could show at trial or on appeal that there was no fraud, then Plaintiffs' fraud and undue influence claim would collapse, as would their claim for money had

---

[117] Along related lines regarding the breach of fiduciary duty, the disjunctive nature of the elements in Texas Business Organizations Code § 152.501(b)(5) is not fatal for Plaintiffs' invocation of collateral estoppel.  *See Simmons Cap. Advisors, Ltd. (In re Bachinski)*, 393 B.R. 522, 539 (Bankr. S.D. Ohio 2008) ("A judgment does not have issue-preclusive effect if it makes several findings of fact or conclusions of law in the disjunctive and at least one of the alternative findings is insufficient to support a nondischargeability judgment.").  The issue of whether a fiduciary duty was breached was found conjunctively by the State Court.  The State Court held that all three disjunctive statutory reasons for expelling a partner occurred, one of which is a willful breach of duty.  *See* App. pt. 1, at 36–37, ¶ 6 (Final J.); Tex. Bus. Orgs. Code §§ 152.501(b)(5)(A)–(C).

[118] *See supra* note 111.  Comment *o*'s exception becomes relevant when the trial court did not rigorously consider the relevant issue.  If the case goes to appeal and the appellate court rules on both issues, it cannot be said that the issue was not fully litigated and determined previously, thereby pulling the issue out of the rule from Comment *i*.

and received.  On the latter, if there were no fraud, then Defendant's possession of property in dispute would not have been wrongful.  This is also why the State Court carefully detailed the fraud in the FoFCoL but did not state separate acts constituting (non-fraudulent) money had and received.  There were no separate, less sinister acts that warranted lesser and different damages— so the ruling was not an alternative one.  Nor was the State Court's ruling based on separate and distinctly different facts for multiple claims.  Therefore, Defendant had every incentive to litigate (including in a Texas appellate forum) the fraud issue.

Lastly, general judicial policy considerations against the inappropriate use of collateral estoppel do not prevent its application here.  For example, it is true that the federal courts are instructed to avoid the offensive use of collateral estoppel.  This is especially so in non-mutual offensive situations or when the doctrine would otherwise be unfair to the party against whom issue preclusion is used.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–30 (1979) (reviewing the arguments against the offensive use of collateral estoppel, but ultimately giving trial courts discretion to permit offensive use when fairness principles are not violated).

But there are no mutuality concerns here:  the parties in this case were parties in the previous State Court Litigation.  More importantly, Texas courts have indicated that the policy against offensive issue preclusion is only directly relevant when applying federal preclusion rules—not state preclusion rules.  *See Eagle Props.*, 807 S.W.2d at 722.  Because a Texas state court issued the previous judgment, Texas preclusion rules apply in this action.[119]   And under Texas law, an action seeking a declaratory judgment, like the § 523(a) adversary proceeding here,

---

[119] *See Miller*, 307 F. App'x at 790.

is not considered offensive use of collateral estoppel. *See Mann v. Old Republic Nat'l Title Ins.*, 975 S.W.2d 347, 351 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (holding that collateral estoppel was being used defensively when seeking declaratory judgment).[120]

In sum, this Court holds that collateral estoppel is appropriate here. The Court echoes the sentiments from *In re Shuler*: to allow Defendant to re-litigate the issues here would "do violence to judicial finality, a fundamental tenet of our judicial system."[121] And facts that were "actually litigated and necessary to the decision in the [state court action], and that are discernible from the [state court] record of the case, should not be reopened absent a compelling reason to avoid injustice . . . ."[122] No injustice will occur by applying collateral estoppel here. Accordingly, the State Court's judgment is entitled to full faith and credit and Plaintiffs are entitled to judgment as a matter of law.

### B. The Dischargeability of the Attorney's Fees Award

With the question as to the nondischargeability of damages decided in the affirmative, the second question for the Court is whether the full amount of attorney's fees is also nondischargeable. Plaintiffs argue that under applicable law, all debts arising from fraud are nondischargeable—including attorney's fees. The Court agrees. The $536,463.46 in attorney's

---

[120] *See also Republic Ins. v. Davis*, 856 S.W.2d 158, 164 (Tex. 1993) (seeking equitable relief under the Texas Declaratory Judgments Act is "remedial only" (citing Tex. Civ. Prac. & Rem § 37.002(b) (2023))).
[121] 722 F.2d at 1256.
[122] *Id.* Defendant's position that he is "entitled to investigate whether or not this Fifth Amended Complaint impacts either the State Court judgment or his attempt to preserve his discharge in bankruptcy, despite the Plaintiffs' rush to strip him of same," fails accordingly. *See* Def.'s Br. Supp. Resp. Pls.' Mot. Summ. J. 7–8, ¶ 22, ECF No. 12. Moreover, Plaintiffs are not "rushing" to strip Defendant of his asserted right to a discharge. They are merely complying with Bankruptcy Rule 4007(c), which requires a complaint to determine the dischargeability of a debt under § 523(a) to commence early in the bankruptcy—"no later than 60 days after the first date set for the meeting of creditors under § 341(a)." Fed. R. Bankr. P. 4007(c).

fees incurred in the State Court Litigation are nondischargeable under controlling Supreme Court and Fifth Circuit jurisprudence.

With attorney's fees in mind, the Supreme Court addressed a similar dischargeability issue and the broad reach of § 523(a)(2)(A)'s text in *Cohen v. de la Cruz*.[123]  *Cohen* held that treble damages available under a New Jersey antifraud provision were nondischargeable under § 523(a)(2)(A).[124]  The Supreme Court observed that § 523(a)(2)(A) "prevents discharge of 'any debt' respecting 'money, property, services, or . . . credit' that the debtor has fraudulently obtained."[125]  As follows, "[o]nce it is established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge."[126]

Dischargeability analysis begins with whether there was a "debt."  *Cohen* stated that "an obligation to pay treble damages satisfies the threshold condition that it constitute a 'debt.'"[127]  The Supreme Court then looked at the definitions of the relevant terms.  "A 'debt' is defined in the Code as 'liability on a claim,' § 101(12), a 'claim' is defined in turn as a 'right to payment,' § 101(5)(A), and a 'right to payment,' we have said, 'is nothing more nor less than an enforceable obligation.'"[128]

The Supreme Court's dischargeability analysis of treble damages can be applied to attorney's fees as well.  A court order to pay another party's attorney's fees meets the definition of a debt.  And like treble damages, attorney's fees call for a nondischargeability determination of

---

[123] 523 U.S. at 218.
[124] *Id.* at 215.
[125] *Id.* at 218 (citing *Field v. Mans*, 516 U.S. 59, 61, 64 (1995), which barred discharge for debts "resulting from" or "traceable to" fraud under § 523(a)(2)(A)).
[126] *Id.*
[127] *Id.*
[128] *Id.* (citation omitted).

a debt that is not tethered to a purely compensatory function.[129]  *Cohen* pointed to an Eleventh Circuit decision reaching a parallel conclusion—a debt's fraudulent procurement can pull other related debts into nondischargeable territory.  523 U.S. at 222 (citing *Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 679 (11th Cir. 1993), which held that punitive damages are nondischargeable if the compensatory damages are nondischargeable).

The petitioner in *Cohen* argued that § 523(a)(2)(A) should be read narrowly—that only the value of money or other property obtained through fraud should be nondischargeable.[130]  But the Supreme Court disagreed and read the statute broadly:

> [T]he text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt . . . for money, property, services, or . . . credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, *including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.*[131]

Thus, the Supreme Court has already ruled that attorney's fees awarded in connection with a valid § 523(a)(2)(A) claim are nondischargeable.

Following *Cohen*, the Fifth Circuit in *In re Snook* expressly held that attorney's fees accrued in connection with a nondischargeable debt are also nondischargeable.[132]  *Snook* discussed § 523's reach in the fraud context.  "[T]he status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt.  When the primary debt is nondischargeable . . .

---

[129] A "compensatory function" in this context refers to direct recompense—i.e., damages.
[130] 523 U.S. at 219.
[131] *Id.* at 223 (emphasis added).
[132] *Snook v. Popiel (In re Snook)*, 168 F. App'x 577, 579 (5th Cir. 2006) (dealing with a situation where the bankruptcy court held that damages for breach of contract and quantum meruit were dischargeable, while separate and lesser damages for fraud under § 523(a)(2)(A) were nondischargeable).

the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable."[133]  The court reasoned that if attorney's fees arise from fraud litigation, then those debts for attorney's fees are nondischargeable just like the underlying damages assessed for fraud.[134]

*Snook* is particularly relevant because the Fifth Circuit faced a situation where the state court's judgment did not allocate attorney's fees to each particular cause of action, as is the case here.  Defendant makes such an objection now.  But *Snook* noted that the state court's jury charge did not impose any limitation on attorney's fees.[135]  The court took no issue with the fact that the damages awards were segregated by claim, while the attorney's fees award was not.  The critical fact:  nothing suggested that the attorney's fees were limited to certain causes of action—they were assessed "for the case as a whole."[136]

Armed with this precedent, this Court holds that the entire $536,463.46 in attorney's fees is a nondischargeable debt.  *Cohen* alone provides the basis for such a finding.  And like the Fifth Circuit observed in *Snook*, nowhere in the State Court's Final Judgment or FoFCoL did the State Court apply any limiting principle to the attorney's fees award.  To the contrary, it awarded Plaintiffs attorney's fees for "pursuing their declaratory judgment claims."[137]  The declaratory relief that Plaintiffs pursued necessarily was predicted on there being fraud in the underlying transactions that Plaintiffs sought to have declared null and void.  Thus, this Court will read the

---

[133] *Id.* (quoting *Gober*, 100 F.3d at 1208).
[134] *Id.*
[135] *Id.*
[136] *See id.*
[137] *See supra* note 50 and accompanying text.

State Court's judgment regarding attorney's fees as applicable to the lawsuit as a whole.  Because

Plaintiffs prevail under either of the § 523(a)(2)(A) or § 523(a)(4) theories, the attorney's fees

incurred in connection with those damages are also nondischargeable.[138]

## VI.   <u>CONCLUSION</u>

For the reasons discussed above, summary judgment for Plaintiffs is hereby **GRANTED**.

The $444,324.00 in damages, $536,463.46 in attorney's fees, and post-judgment interest are

hereby declared nondischargeable debts.[139]

Finally, Plaintiffs have requested "recovery of the "Plaintiffs' reasonable costs and

attorney's fees incurred in connection with prosecuting this Adversary Proceeding."[140]  Under the

"American Rule," each party to litigation pays its own fees arising out of litigation, unless a fee-

shifting provision exists pursuant to statute or a contract.[141]  Since the Bankruptcy Code does not

address (in § 523 or elsewhere) whether creditors can recover attorney's fees in prosecuting

nondischargeability actions, creditors can only recover them if allowed by another statute or by

contract.   The issue is not always simple.[142]   As addressed herein, the State Court awarded

Plaintiffs' attorney's fees as part of the State Court's award (which fees this Court has found to be

nondischargeable, in addition to the underlying damages), but this is not the same as the request

now to have the fees associated with the § 523 action imposed on Defendant (and added to the

---

[138] Plaintiffs' successful § 523(a)(4) claim also suffices a nondischargeability declaration for attorney's fees because that claim was supported by fraud as consistent with *Cohen* and *Snook*.

[139] *Snook* provides the requisite authority for declaring post-judgment interest a nondischargeable debt.  168 F. App'x at 579.

[140] Pls.' Br. Supp. Mot. Summ. J. 26, ECF No. 10-1.

[141] *See, e.g.*, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 263 (1975); *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006).

[142] *See, e.g.*, *Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk)*, 525 B.R. 325, 330–36 (Bankr. W.D. Tex. 2015) (and numerous cases cited therein).

nondischargeability tab).  If there is some applicable contractual provision or Texas statute that might allow for this fee shifting (perhaps the one(s) that the State Court might have relied on in making its award), the Court will grant Plaintiffs 21 days after entry of this Memorandum Opinion and Order to file a fee application setting forth their reasonable attorney's fees sought, along with post-trial briefing setting forth the contract or statutory provisions upon which they rely (along with supporting case law) to establish fee shifting here.  Debtor shall have 14 days from the date that the fee application and briefing is filed to file any objections and oppositional briefing.  The Court will thereafter issue supplemental findings and conclusions on this discrete issue.  After a ruling by this Court on the amount of additional attorney's fees (if any) owed to Plaintiffs for prosecution of this § 523 action, Plaintiffs shall upload a final judgment consistent herewith.  All other relief that may have been requested but that is not set forth herein is **DENIED**.

### ### END OF MEMORANDUM OPINION AND ORDER ###